**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STILTON INTERNATIONAL HOLDINGS LIMITED, | ) ) ) | |
| Petitioner, | ) ) | C.A. No. 08-361 (JJF) |
| v. | ) ) | |
| CIS FINANCIAL SERVICES, INC. and CARGILL, INCORPORATED, | ) ) ) | **PUBLIC VERSION** |
| Respondents. | ) ) | |

**RESPONDENTS CARGILL, INCORPORATED AND CIS FINANCIAL
SERVICES, INC.'S MEMORANDUM IN OPPOSITION TO MOTION FOR
CONFIRMATION OF ARBITRATION AWARD AND ENTRY OF
JUDGMENT AND IN SUPPORT OF CROSS-MOTION TO VACATE OR
ALTERNATIVELY TO MODIFY ARBITRATION AWARD**

LANDIS RATH & COBB LLP
Daniel B. Rath, Esquire (No. 3022)
Rebecca L. Butcher, Esquire (No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  rath@lrclaw.com
          butcher@lrclaw.com

*Attorneys for Respondents CIS Financial
Services, Inc. and Cargill, Incorporated*

DATE: July 15, 2008

OF COUNSEL:
FAEGRE & BENSON LLP
Michael B. Fisco, Esquire
Will Stute, Esquire
Michael M. Krauss, Esquire
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612)766-7000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTS ............................................................................................................................... 3

ARGUMENT ..................................................................................................................... 3

I.   The Award Should Be Vacated Because The Panel Exceeded Its Powers By Re-Writing the Account Agreement. ..................................................................... 4

    A.   The Panel exceeded its authority by inferring a nonexistent contractual duty to insure against the broker's collapse, or to return funds on demand. ......................................................................................... 6

    B.   The Panel based its Award exclusively on nonexistent contract terms ........................................................................................................ 8

II.  Alternatively, The Award Should Be Modified or Vacated Because It Is Not Final and Definite And Allows For Double Recovery ............................................ 9

    A.   The Amount of The Award Is An Impermissible Moving Target ............. 11

        1.   Increasing distribution percentages reduce the Award amount .......................................................................................... 11

        2.   The Award allows Stilton to manipulate resolution of the preference action and improperly reduce the credit owed to Cargill ............................................................................... 13

    B.   The Award improperly allows for double recovery .................................. 14

    C.   The Award provides no mechanism for Cargill to receive any credit due ........................................................................................................... 15

III. Cargill's Alternative Proposed Judgment ............................................................ 16

CONCLUSION ................................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**                                                                                             **Page**

*Brentwood Med. Assocs. v. United Mine Workers of Am.*,
396 F.3d 237 (3d Cir. 2005)..........................................................................................5, 8

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001).........................................................................................................3

*Collins & Aikman Floor Coverings Corp. v. Froehlich*,
736 F. Supp. 480 (S.D.N.Y. 1990) ..........................................................................7, 8, 10

*Dighello v. Busconi*,
673 F. Supp. 85 (D. Conn. 1987), *aff'd*, 849 F.2d 1467 (2d Cir. 1988) ........................ 10

*Duhos v. Strasberg*,
321 F.3d 365 (3d Cir. 2001).............................................................................................4

*Eljer Mfg., Inc. v. Kowin Development Corp.*,
14 F.3d 1250 (7th Cir. 1994) .........................................................................................15

*Exxon Shipping Co. v. Exxon Seamen's Union*,
73 F.3d 1287 (3d Cir. 1996).............................................................................................5

*Hall Street Assocs., L.L.C. v. Mattel, Inc.*,
__ U.S. __, 128 S. Ct. 1396 (2008)...............................................................................3, 4

*Matteson v. Ryder Sys. Inc.*,
99 F.3d 108 (3d Cir. 1996)................................................................................................4

*Roadway Package Sys., Inc., v. Kayser*,
257 F.3d 287 (3d Cir. 2001).........................................................................................4, 9

*Southco, Inc. v. Reell Precision Mfg. Corp.*,
__ F. Supp. 2d __, 2008 WL 2221891 (E.D. Pa. May 27, 2008).....................................5

*Tollinger v. Ithaca Gun Co., Inc.*,
555 N.Y.S.2d 908 (3d Dep't 1990)...................................................................................8

*Torrington Co. v. Metal Prod. Workers Union Local 1645*,
362 F.2d 677 (2d Cir. 1966)..............................................................................................7

**Statutes**

9 U.S.C. §§ 1, 2.................................................................................................................3

9 U.S.C. §§ 1-16 ........................................................................................................................... 3

9 U.S.C. §§ 9-11 ........................................................................................................................... 3

9 U.S.C. § 10(a)(4)................................................................................................................. 4, 6, 9

9 U.S.C. § 11(c) ...................................................................................................................... 4, 9

## PRELIMINARY STATEMENT

Though it is fairly rare for a federal court to vacate an arbitration award, this is the rare case demanding vacation. The Panel issued an award based on a contract provision that does not exist, thereby exceeding the Panel's powers under the Federal Arbitration Act. As a result, this Court can, and indeed should, vacate the arbitration award. Beyond that, the Panel's award is not final or definite, and does not provide sufficient mechanisms for execution of its terms.

This dispute arose out of the now infamous Refco bankruptcy filing caused by the $2.4 billion dollar fraud perpetrated by Philip Bennett, Refco's CEO, who today was sentenced to a federal prison term of 16 years for his misconduct. Stilton International Holdings, Inc. ("Stilton") had a foreign exchange trading account with CIS Financial Services, Inc. ("CISFS"), an unregulated foreign currency exchange broker and wholly-owned subsidiary of Cargill, Incorporated. Cargill sold its global brokerage operations to Refco, including the assets of CISFS, and Stilton agreed, in writing, to transfer its account to Refco as part of the sale. (See Transfer of Trading Account attached hereto as Ex. 1). A few weeks later, Mr. Bennett's fraud came to light, and Refco and multiple subsidiaries, including Refco Capital Markets, Ltd. ("RCM"), quickly filed the largest Chapter 11 bankruptcy in history. The value of Stilton's account with Refco was $54 million at the time of the bankruptcy filing, and Stilton became an unsecured creditor in the bankruptcy holding a $54 million claim.

Stilton filed an arbitration claim against Cargill and CISFS with the American Arbitration Association ("AAA"). Stilton asserted a number of tort claims against Cargill[1] in the AAA

---

[1] The Panel found that "Cargill 'caused' the transfer of the Agreement and, while both Respondents are responsible here, Cargill 'caused' the dissolution of CISFS in 2006." (Award at 3.) Accordingly, solely for the sake of simplicity, Defendants are jointly referred to herein as "Cargill," unless context demands specifying CISFS. Regardless, both Defendants are jointly liable under the Award.

arbitration, including that Cargill knew or should have known of Bennett's fraud, fraudulently or negligently misled Stilton to agree to transfer its account to Refco prior to the sale, and breached other purported fiduciary duties owed to Stilton. The arbitration panel here (the "Panel") correctly rejected and dismissed all of Stilton's tort claims.

Still, the Panel entered an award against Cargill and in favor of Stilton for $30.6 million, subject to Cargill's right to a credit based on distributions paid to Stilton in the Refco bankruptcy. (Final Arbitration Award dated May 20 and May 21, 2008 (hereinafter "Award") attached hereto as Ex. 2). The Panel held that in connection with the sale of CISFS assets to Refco, Cargill assigned the Account Agreement to Refco without relieving itself of the contractual obligations, and therefore under New York law Cargill remained jointly liable for performance under the Account Agreement. But the Award rests entirely and exclusively on a nonexistent contract term that simply does not appear in the underlying brokerage Account Agreement between Cargill and Stilton – a purported guarantee against the liquidation, bankruptcy, or default of the broker holding Stilton's deposit. Thus, even if Cargill remained jointly liable to Stilton under the Account Agreement as an assignor after the transfer to Refco, *there is no provision in the Account Agreement, either express or implied, guaranteeing Stilton's funds against the risk of bankruptcy or insolvency by the broker.* The Panel inexplicably and erroneously created a contract term out of whole cloth and rested the Award on it.

Under the Federal Arbitration Act ("FAA"), courts have the power to vacate arbitration awards where an arbitration panel exceeds its powers. Arbitrators do so when they create a new agreement for the parties and issue an award based on the agreement created by the Panel. That is exactly with the Panel did here. Accordingly, this Court can and should vacate the Award.

Alternatively, if the Court denies Cargill's motion to vacate, the Court should modify the Award or remand the matter back to arbitration because the Award is not final and definite, as required by the FAA. Indeed, the approved distribution from RCM has already been increased since the Award, evidencing the undetermined, shifting, and improper nature of the damage Award. The Award also provides Stilton with an opportunity for double recovery. That fact alone is enough for the Court to vacate the Award, or remedy it.

## FACTS

Cargill Incorporated and CIS Financial Services, Inc. (collectively referred to herein as "Cargill") incorporate by reference and adopt the fact section contained in Stilton's Motion for Confirmation of Arbitration Award and Entry of Judgment, without adopting or agreeing to any of the legal conclusions contained therein.

## ARGUMENT

The Federal Arbitration Act, 9 U.S.C. §§ 1-16, "supplies mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, __ U.S. __, 128 S. Ct. 1396, 1402 (2008) (citing 9 U.S.C. §§ 9-11).[2] Where, as here, one party seeks to confirm the award, and the other party seeks either to vacate or modify it on specified statutory grounds, the FAA provides for expedited judicial review. "An application for any of these orders will get

---

[2] The FAA governs arbitration agreements in written contracts that evidence a transaction involving foreign or interstate commerce. 9 U.S.C. §§ 1, 2. In this case, the Account Agreement is between a Delaware corporation and a company existing and organized under the laws of the British Virgin Islands, and addresses over-the-counter trading in foreign exchange accounts. As such, the Account Agreement is subject to the FAA. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 112 (2001) ("involving commerce" in the FAA interpreted as "implementing Congress's intent 'to exercise its commerce power to the full'").

streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court." *Id.*

Sections 10 and 11 of the FAA provide the exclusive grounds for vacating or modifying an arbitration award. *See id.* at 1404-05. Under Section 10, an award may be vacated where, among other things, "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter was not made." 9 U.S.C. § 10(a)(4). Under Section 11, an award may be modified or corrected where, among other things, "the award is imperfect in matter of form not affecting the merits of the controversy." *Id.* § 11(c). Because the Panel exceeded its powers by basing its award on a purported contractual duty found nowhere in the Foreign Exchange Account Agreement (attached hereto as Ex. 3), or the Foreign Exchange Account Agreement Addendum (attached hereto as Ex. 4) (collectively "Account Agreement"), this Court should vacate the arbitration award. Alternatively, because the Panel's award is not definite, because it lacks any mechanism to enforce Cargill's rights thereunder, and because it allows Stilton to have a double recovery, it should be either modified by this Court or vacated for further proceedings.

## I.    The Award Should Be Vacated Because The Panel Exceeded Its Powers By Re-Writing the Account Agreement.

Although review of arbitration awards is "extremely deferential" and vacation warranted only in "exceedingly narrow" circumstances, *Duhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2001), courts are "neither entitled nor encouraged to simply 'rubber stamp' the interpretations and decisions of arbitrators," *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996). As the Third Circuit has explained, "a court may conclude that an arbitrator exceeded his or her authority when it is obvious from the written opinion." *Roadway Package Sys., Inc., v. Kayser*, 257 F.3d 287, 301 (3d Cir. 2001).

Where neither the form nor terms of an arbitration award are rationally derived from the parties' contract, the award should be vacated on grounds that the arbitrators exceeded their authority. *See Southco, Inc. v. Reell Precision Mfg. Corp.*, __ F. Supp. 2d __, 2008 WL 2221891, at *5 (E.D. Pa. May 27, 2008) (citations omitted). The award should not be affirmed where its terms are "completely irrational," such that the award does not draw its essence from the agreement to arbitrate. *Id.* (citation omitted). "In considering the arbitrator's interpretation of the contract, the question becomes whether 'the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention.'" *Id.* (quoting *Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1295 (3d Cir. 1996)).

Where the arbitration award is based solely on purported text found nowhere in the parties' contract, vacation is appropriate. *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241-42 (3d Cir. 2005). In *Brentwood*, the Third Circuit found that the arbitrator had effectively "added language" to the parties' contract in supporting the award, and confirmed the award only because it found other, legitimate contractual bases for the award. The Third Circuit explained: "Had this [modification of contract language] been the only basis for his conclusion, we would agree that vacatur is appropriate. However, even if we were to kick out the 'bum leg' of the arbitrator's award, there are still many others upon which this award can stand." *Id.* at 242.

But the Panel's award here rests exclusively on the Panel's implied assertion that the Account Agreement imposed on RCM (and thus CISFS) the duty to return Stilton's funds on request – in other words, to guarantee against the risk of bankruptcy of the broker. The Panel thus exceeded its authority by first inferring a material term in the Account Agreement that does

not exist, and then basing its award on that nonexistent term. This Court should therefore vacate the Award under section 10(a)(4) of the FAA.

### A. The Panel exceeded its authority by inferring a nonexistent contractual duty to insure against the broker's collapse, or to return funds on demand.

The Panel improperly read into the Account Agreement a contractual duty by CISFS (and later Refco) to insulate Stilton against any broker default, liquidation or bankruptcy, by returning on demand funds in Stilton's account. The Account Agreement says no such thing. To the contrary, as the Account Agreement made clear, the foreign exchange brokerage market is completely unregulated and uninsured. In it, Stilton expressly acknowledged "that transactions in Foreign Exchange are unregulated by any governmental entity or self-regulatory organization and that the activities of CISFS are unregulated by any governmental entity or self-regulatory organization and that the activities of CISFS are therefore not supervised or subject to oversight." (Account Agreement ¶1.) The Account Agreement continued: "Bearing this mind, [Stilton] represents it is aware of the risks inherent in the trading of Foreign Exchange and is financially able to bear such risks and withstand any losses incurred." (*Id.*)

The Panel held that CISFS was jointly liable in contract for Refco's breaches of the Agreement, which it described as "Refco's October 13, 2005 moratorium on trading and withdrawals; liquidation of the account; and failure and refusal to return the monies in that account." (Award at 3.) For these purported breaches the Panel imposed contract damages of $30.6 million. But the Account Agreement contains no provision guaranteeing, insuring, or otherwise protecting Stilton from the risk of default, liquidation, or bankruptcy of CISFS (or Refco by assignment). To the contrary, all rights and remedies for breach of the Account Agreement flow in only one direction: from Stilton to CISFS. Specifically, paragraph 8 of the Account Agreement identifies nine occurrences that would trigger an Event of Default.

(Account Agreement ¶8(a)-(i).) Each addresses an action or failure to act *by Stilton* that entitles CISFS (and later Refco) to declare an Event of Default *by Stilton*. In fact, one occurrence giving rise to an Event of Default is the bankruptcy or insolvency *of Stilton* – but not of the broker. (*Id.* ¶8(b).) The Account Agreement does not even contemplate any breach or an Event of Default by the broker, much less allow recovery for one in an amount exceeding $30 million. Under the structure of the Account Agreement, Stilton had to pursue remedies in tort if it claimed that its broker misappropriated or wrongly withheld funds.

It is well-settled that "[a]n arbitrator cannot re-write a new agreement for the parties." *Collins & Aikman Floor Coverings Corp. v. Froehlich*, 736 F. Supp. 480, 484 (S.D.N.Y. 1990) (citing *Torrington Co. v. Metal Prod. Workers Union Local 1645*, 362 F.2d 677, 682 (2d Cir. 1966)). The court in *Collins* held that the arbitrator exceeded her authority by awarding a former employee commissions on sales made for a "reasonable period of time" after discharge, even though the agreement entitled the employee only to commissions on sales made through termination. *Id.* To the extent that "no provision" of the parties' agreement supported such an award, the arbitrator had exceeded her powers. *Id.*

The same is true here. No provision of the Account Agreement entitles Stilton to contract damages for the broker's failure to freeze trading and withdrawals, or to fail to return funds on demand. Indeed, neither CISFS nor Refco is even a signatory to the Account Agreement – only Stilton is. The Account Agreement's preamble makes clear that each paragraph therein addresses an obligation flowing from Stilton to CISFS (and later Refco), as it provides that "the *Customer* agrees . . . as follows." (Account Agreement at p. 1.)

The only purported obligation by CISFS that Stilton ever claimed is the preamble's opaque reference to "the Agreement of [CISFS] to act as broker." (*Id.*) From this sentence

fragment Stilton sought to infer a provision insulating Stilton from the risk of default, liquidation, or bankruptcy of CISFS (or Refco by assignment), and binding CISFS (and later Refco) to return the funds in Stilton's account on demand, no matter the circumstances. But it is well-settled that "the specific controls over the general when speaking of but one contract." *Tollinger v. Ithaca Gun Co., Inc.*, 555 N.Y.S.2d 908, 910 (3d Dep't 1990). And here the Account Agreement specifies the obligations thereunder and the Events of Default giving rise to contractual remedies. Conspicuously absent is any discussion of any contractual rights arising for Stilton if CISFS (and later Refco) liquidates or enters bankruptcy, or of any contractual duty arising for CISFS (and later Refco) if Stilton demands return of its funds.

### B.     The Panel based its Award exclusively on nonexistent contract terms.

The Panel based its award solely on the nonexistent agreement language purportedly giving rise to contract damages for Refco's failure to return funds. The Panel denied all of Stilton's tort claims, having concluded that Cargill neither breached any cognizable duty to Stilton nor made any misrepresentation in connection with the sale of CISFS's business to Refco. Accordingly, the Panel specifically rejected any recovery against Cargill in tort for Stilton's damages flowing from Refco's sudden collapse – leaving only recovery in contract.

And unlike the awards in both *Brentwood* and *Collins*, the Award here should be vacated because the only contract leg on which it stands is a phantom one. In each of those cases, the court ultimately denied vacatur because existing contract language separately supported the award, such that it had other legs on which to stand. *See Brentwood*, 396 F.3d at 242-43 (ultimately confirming award where arbitrators also cited several agreement provisions in additional support for his conclusions); *Collins*, 736 F. Supp. at 485-87 (denying motion to vacate where arbitrator apparently granted relief on theory of implied duty of good faith). Here,

in contrast, review of the Panel's written statement demonstrates that the Panel based its Award entirely on a purported duty to insure against the broker's bankruptcy or to return funds on demand. (Award at 3.) *See Roadway Package Sys.*, 257 F.3d at 289 (vacating award where "the arbitrator's written opinion makes crystal clear" that decision was based on factors beyond his scope of authority).

Accordingly, neither the Award's form nor its terms can be rationally derived from the Account Agreement itself. The Panel radically expanded the Account Agreement in two ways. First, by writing into the agreement a contractual duty for CISFS (and later Refco) to insulate Stilton against any of the broker's potential financial problems by guaranteeing return of funds on demand. Second, by imposing contract damages of more than $30 million – the full value of Stilton's bankruptcy proof of claim less bankruptcy distribution to the date of the Award – for breach of that non-existent contractual duty. Because the Panel's interpretation and resulting Award cannot in any rational way be derived from the Account Agreement, the Award should be vacated on the ground that the Panel exceeded its powers.

## II. Alternatively, The Award Should Be Modified or Vacated Because It Is Not Final and Definite And Allows For Double Recovery.

If the Court denies Cargill's motion to vacate the Award because Panel exceeded its authority, the Court should modify the award before entering judgment because the Award is not final and definite, as the FAA requires, or vacate the award on that ground. *See* 9 U.S.C. § 10(a)(4) (award may be vacated where "a mutual, final and definite award upon the subject matter was not made"); *id.* § 11(c) (award may be modified or corrected where it "is imperfect in matter of form not affecting the merits of the controversy"). "[F]or an arbitration award to be final and definite, it must resolve all issues submitted to arbitration, and determine each issue fully so that no further litigation is necessary to finalize the obligations of the parties under the

award." *Dighello v. Busconi*, 673 F. Supp. 85, 90 (D. Conn. 1987), *aff'd*, 849 F.2d 1467 (2d Cir.

1988) (table).  In other words, the award "must be clear enough to indicate what each party is

required to do." *Id. See also Collins* 736 F. Supp. at 487-88 (S.D.N.Y. 1990) (remanding award

to arbitration panel where award was not final or definite).

The Award here falls far short of these standards both because the Award amount

remains ever-shifting, and because it leaves Cargill with no mechanism to collect any credit from

Stilton.


**REDACTED.**



The pertinent section  of the Award provides:

> Also, resolution/distributions with respect to the "preference claim" of $20
> million is irrelevant to damages here since Refco's payment prior to bankruptcy
> was not a breach of the Agreement.
>
> ....
>
> Respondents shall pay to Claimant the sum of THIRTY MILLION, SIX
> HUNDRED THOUSAND DOLLARS and NO CENTS ($30,600,000.00), plus
> interest at the legal rate from the date of this Award until said sum is paid in full;
> provided, however, that Respondents ***shall be given credit for any monies paid to
> Claimant on account of its $54 million claim in bankruptcy court in excess of
> $23.4 million***.

(Award at 3 (emphasis added).)

Additional background is necessary to understand how the Award is impermissibly

flawed and why it requires modification.  On the date the Award was issued, Stilton was a

creditor in the Refco bankruptcy proceedings with a claim of $54,000,000.  (Stilton's Proof of

Claim dated 7/7/2006 attached hereto as Ex. 5).    At that point the bankruptcy trustee (the "Trustee") over time had approved six distributions, then totaling 43.33% of the claim amounts, to all creditors in Stilton's position, specifically holders of foreign exchange accounts with RCM (the "RCM FX/Unsecured Claims").    For Stilton, this meant it was entitled to receive approximately $23,400,000.    But although the Trustee had approved these distributions generally, *Stilton's* distributions are being withheld because the Trustee has filed a preference action against Stilton.    In that action, the Trustee seeks return of $20,000,000 that Stilton allegedly withdrew from its RCM account just before the bankruptcy filing.    Stilton thus cannot receive distributions until it resolves the outstanding preference action.    And with distributions withheld by the Trustee, Stilton also cannot sell its $54,000,000 bankruptcy claim in the distressed debt market, where such claims are currently selling for approximately 62.5% of the total amount of claims.

### A.    The Amount of The Award Is An Impermissible Moving Target.

The net effect of the Award is to place Cargill in the position of guaranteeing Stilton's recovery of 100% of its $54,000,000 bankruptcy claim.    As explained earlier, there is no language in the Account Agreement to support this finding and the Award should therefore be vacated.    But if the Court denies Cargill's motion to vacate, it nonetheless should modify the award because Stilton's ultimate damages remain a moving target and the ultimate amount of the award is uncertain.

### 1.    Increasing distribution percentages reduce the Award amount.

Indeed, Cargill is already entitled to a "credit" against the amount of the Award due to the recent increase in the amount of approved claims by the bankruptcy Trustee.    As of the date

the Award was issued, approved distributions were 43.33%, and that amount has since increased to 44.57% as of June 20, 2008. (See RCM Plan Administrator's Amended Notice of (1) Seventh Interim Distribution of RCM Assets in Place and (2) Fifth Interim Distribution of Additional Property attached hereto as Ex. 6). **REDACTED**.[3]  Under the terms of the Award, Cargill is entitled to a credit "for any monies paid to Claimant on account of its $54 million claim in bankruptcy court in excess of $23.4 million." (Award at 3.)


**REDACTED**[4]


Additional distributions are very likely. Another category of Refco bankruptcy creditors, Refco Securities Customers, has received 91.8% of the amount of its claims, and recoveries are capped at 100%. The Trustee is actively pursuing litigation against a number of entities, seeking to recover hundreds of millions in additional funds for distribution to account holders, including a claim against Thomas H. Lee Partners. (See Floyd Norris, Bankruptcy Trustee Sues Big Investor in Refco, N.Y. TIMES, August 9, 2007, reprinted at www.nytimes.com/2007/08/09/business/09refco.html attached hereto as Ex. 7).  While perhaps unlikely, it is certainly possible that the RCM FX/Unsecured Claims, including Stilton, will receive distributions totaling 100% of their claims. Under the Award, this would leave Cargill with the right to a credit for the entire $30.6 million Cargill is ordered to pay to Stilton under the Award. It is virtually certain, however, that the amount of allowed distribution from the bankruptcy to Stilton will increase as the bankruptcy proceedings progress, thereby further reducing the amount

---

[3] **REDACTED**.

[4] **REDACTED**.

it may recover from Cargill.

### 2.    The Award allows Stilton to manipulate resolution of the preference action and improperly reduce the Credit owed to Cargill.

The Trustee's preference action against Stilton creates even more uncertainty as to the final Award amount.    There are a number of ways the bankruptcy estate's preference action against Stilton could be resolved.    Stilton could simply win the preference action, thus allowing it to keep the $20,000,000 outright.    Alternatively, Stilton could lose the preference action and be ordered to pay the entire $20,000,000 to the Refco bankruptcy estate.    Neither of these alternatives would have any effect on the amount Cargill ultimately pays Stilton.

But a third, and more likely, option is that that Stilton and the Trustee agree on terms to resolve the preference action.    One scenario for doing so would be dismissal of the preference action, allowing Stilton to keep the entire $20,000,000 or some percentage of it, in exchange for Stilton's agreement to accept a distribution from the RCM bankruptcy of an *amount less than the approved distribution*.    This would decrease Cargill's potential credit under the Award, because it would reduce the "monies paid to Claimant on account of its $54 million claim in bankruptcy court."    (Award at 3.)    This is unfair, and directly contrary to the FAA's requirement that arbitration awards constitute a final determination of the issues between the parties.

**REDACTED.**

All of these problems flow from the Panel's core and fundamental error in issuing an indefinite

award that does not finalize the parties' obligations, in violation of the FAA.

**B.       The Award improperly allows for double recovery.**

The Award also impermissibly provides the theoretical opportunity for a double recovery, and negates Stilton's obligation to mitigate, because it ties the calculation of Cargill's credit to "any monies paid to Claimant." (Award at 3.) Instead, the calculation of Cargill's credit should be tied to the ultimate amount Stilton is entitled to at the end of the bankruptcy process, as measured by the final report of the Trustee setting for the total amount of allowed claims. The Award states:

> Respondents shall pay to Claimant the sum of THIRTY MILLION, SIX
> HUNDRED THOUSAND DOLLARS and NO CENTS ($30,600,000.00), plus
> interest at the legal rate from the date of this Award until said sum is paid in full;
> provided, however, that Respondents shall be given credit for ***any monies paid to***
> ***Claimant*** on account of its $54 million claim in bankruptcy court in excess of
> $23.4 million.

(*Id.* (emphasis added).) The Award thus ties the calculation of Cargill's credit to the amount Stilton actually receives on account of its claim in the RCM bankruptcy, without regard to Stilton's ability to recover even more through the bankruptcy process.

The problem with this is that Stilton has one principal, Harold McPike. Mr. McPike owns and controls a number of other investment entities. If Mr. McPike were to sell Stilton's bankruptcy claim to a third party that he owns or controls for $23,400,000, he could pocket the proceeds and deny Cargill any credit under the Award. **REDACTED.**

**REDACTED.**

This potential for a double recovery requires that the Award be vacated, or at a minimum, allows the Court to cure this problem by entering a judgment that fixes this fatal flaw. *Eljer Mfg., Inc. v. Kowin Development Corp.*, 14 F.3d 1250, 1254 (7th Cir. 1994) (modifying award because double recovery constitutes materially unjust miscalculation that may be modified under FAA).

The simplest way for the Court to fix this error in the Award is to tie the calculation of Cargill's credit to the total and final approved distribution at the conclusion of the RCM bankruptcy proceeding, rather than tying it to *"any monies paid to Claimant."* (Award at 3.)

### C.    The Award provides no mechanism for Cargill to receive any credit due.

Complicating matters further, there is no mechanism by which Cargill can obtain any credit due to it under the Award. Stilton International Holdings is a Bahamian Corporation with no known presence in the United States. (See Memorandum of Association and Articles of Association of Stilton International Holdings Limited attached hereto as Ex. 8). The citizenship of Harold McPike, Stilton's sole principal, is unknown, but he is not believed to be a United States citizen, and he claimed to be a resident of the Bahamas during the arbitration hearing. Accordingly, Cargill has no realistic or practical ability to enforce its right to a credit, and potentially no way to effectively do so through any federal or state court in the United States. This is untenable and illogical. The FAA requires arbitration awards to be final and definite to avoid this very situation. The FAA also empowers the Court to fix such problems without remanding the matter to arbitration.

### III.    Cargill's Alternative Proposed Judgment.

Cargill believes that the Award should be vacated outright. But if the Court denies the motion to vacate and enters judgment in Stilton's favor, it should nonetheless modify or correct the Award. Cargill proposes and requests that any judgment be crafted along the following lines to remove ambiguity from the Award and to correct its flaws.

1.    That Cargill immediately pay $29,932,200, plus annual interest of 9% from the date of the Award until paid, into an escrow account for the benefit of Stilton.

2.    That upon the conclusion of the Refco bankruptcy proceedings, Stilton shall deliver to the escrow agent a copy of the final report of the Trustee, indicating the final and full amount of distribution to RCM FX/Unsecured Creditors, with a copy to Cargill. The escrow agent shall then pay to Stilton: (i) $29,932,200; *minus* (ii) the total amount of the distribution Stilton is entitled to receive from the bankruptcy proceedings in connection with its $54,000,000 claim as set forth in the Trustee's final report.

3.    That Stilton is entitled to any and all interest generated in the escrow account, payable from the escrow account to Stilton upon receipt of the Trustee's final report.

4.    That any amount remaining in the escrow account after payments described in paragraphs 1-3 above shall then be distributed to Cargill.

So, for example, if the approved distribution for FX/Unsecured Creditors at the conclusion of the bankruptcy per the Trustee's final report is 70%, Stilton would be entitled to a distribution from the escrow account in the amount of $16,200,000 ($54,000,000 *minus* 37,800,000, which equals $16,200,000), *plus* any and all interest deposited, and interest earned.

Cargill would be entitled to receive $13,732,200 ($29,932,200 *minus* $16,200,000, which equals $13,732,200).

In modifying the Award in this fashion, the Court would fulfill the FAA's mandate that any arbitration award be final, definite, and subject to execution. By placing the Award amount in escrow pending resolution of the bankruptcy, the Court assures that Stilton can recover any losses without relieving Stilton of its duty to mitigate its damages in resolving the preference action. Moreover, the proposed modification provides a mechanism by which Cargill is fairly and reasonably assured that it will be able to obtain the credit the Award correctly provides for in theory, but not in practice, and avoids the impermissible potential for Stilton's double recovery. Finally, the proposed judgment also accommodates the fluid nature of the amount of Stilton's recovery in a clear way, without disturbing the rationale of the underlying Award.

## CONCLUSION

If ever there were an arbitration award that requires vacation, this is it. The Panel rested an award of $30.6 million on a contract provision that it created out of whole cloth. By doing so the Panel exceeded its powers under the Federal Arbitration Act, requiring vacation of the Award.

Alternatively, the structure of the Award is flawed because it allows Stilton to manipulate the final calculation of Cargill's damages in its own favor, there is no mechanism for Cargill to obtain the credit to which it is entitled, and the Award permits a potential double recovery. Accordingly, if the Court determines not to vacate the award outright, Cargill respectfully requests that any judgment be structured in the manner proposed by Cargill, which would not harm or change Stilton's right to recovery in any way, but would remedy the significant defects caused by the Award.

LANDIS RATH & COBB LLP

OF COUNSEL

Michael B. Fisco, Esquire
Will Stute, Esquire
Michael M. Krauss, Esquire
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612)766-7000

Daniel B. Rath, Esquire (No. 3022)
Rebecca L. Butcher, Esquire (No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: rath@lrclaw.com
       butcher@lrclaw.com

*Attorneys for Respondents CIS Financial*
*Services, Inc. and Cargill, Incorporated*

DATE: July 15, 2008

# EXHIBIT 1



CIS FINANCIAL SERVICES, INC.

August 15, 2005

# REDACTED

CIS Financial Services, Inc.　Sears Tower, Suite 2300　233 South Wacker Drive　Chicago, Illinois 60606　312.460.4000

** TOTAL PAGE.02 **

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0139

**EXHIBIT 1**

# EXHIBIT 2

 International Centre
for Dispute Resolution

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

May 22, 2008

**By UPS**

Bruce G. Paulsen, Esq.
Seward & Kissel LLP
1 Battery Park Plaza
New York, NY  10002

Michael Fisco, Esq
Faegre & Benson LLP
2200 Wells Fargo Center
90 South 7th Street
Suite 2200
Minneapolis, MN  55402

Re: 50 148 T 00217 07
    Stilton International Holdings Limited
    vs
    CIS Financial Services, Inc.
    Cargill, Incorporated

Dear Counsel:

By direction of the Tribunal, please find enclosed herewith your executed copy of the Final Award in the above-referenced matter.

We will close our file accordingly.  Please note that any unused deposits will be refunded by our finance department shortly.

In addition, please find enclosed herewith a copy of your final financial statement.

If you have any questions, please do not hesitate to contact me.

Thank you for using our services.

Sincerely yours,

Guillaume M. Lemenez, Esq.
Attorney-at-Law, New York, France*
International Case Manager
Tel: +1 212-484-3262
Fax: +1 212-246-7274
lemenezp@adr.org
* Admission pending

*A Division of the American Arbitration Association*

**EXHIBIT 2**

**50-148-T-00217-07**
**CIS Financial Services, Inc.**

**Administrative Fees and Expenses:**

| | | |
|---|---|---|
| Filing Fees | $0.00 | |
| Case Services Fee | $0.00 | |
| Hearing Fees | $0.00 | |
| AAA Room Rental Fee | $375.00 | |
| Abeyance/Misc. AAA Fees | $0.00 | |
| Non-AAA Conference Room Expenses | $0.00 | |
| Misc Expenses | $0.00 | |
| Your Share of Administrative Fees and Expenses: | | $375.00 |
| Amount Paid for Administrative Fees and Expenses: | | $0.00 |
| Balance Administrative Fees and Expenses: | | $375.00 |

**Neutral Compensation and Expenses:**

| | |
|---|---|
| Your Share of Neutral Compensation and Expenses: | $19,420.00 |
| Amount Paid for Neutral Compensation and Expenses: | $39,600.00 |
| Balance Neutral Compensation and Expenses: | ($20,180.00) |

| | |
|---|---|
| **Party Balance:** | **($19,805.00)** |

---

**50-148-T-00217-07**
**Cargill, Incorporated**

---

**Administrative Fees and Expenses:**

| | | |
|---|---|---|
| Filing Fees | $0.00 | |
| Case Services Fee | $0.00 | |
| Hearing Fees | $0.00 | |
| AAA Room Rental Fee | $0.00 | |
| Abeyance/Misc. AAA Fees | $0.00 | |
| Non-AAA Conference Room Expenses | $0.00 | |
| Misc Expenses | $0.00 | |
| Your Share of Administrative Fees and Expenses: | | $0.00 |
| Amount Paid for Administrative Fees and Expenses: | | $0.00 |
| Balance Administrative Fees and Expenses: | | $0.00 |

**Neutral Compensation and Expenses:**

| | |
|---|---|
| Your Share of Neutral Compensation and Expenses: | $0.00 |
| Amount Paid for Neutral Compensation and Expenses: | $0.00 |
| Balance Neutral Compensation and Expenses: | $0.00 |

|  |  |
|---|---|
| **Party Balance:** | **$0.00** |

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
Commercial Arbitral Tribunal

---

In the Matter of the Arbitration Between:

**Case No. 50 148 T 00217 07**

**Stilton International Holdings Limited**

**Vs.**

**CIS Financial Services, Inc. and**

**Cargill, Incorporated**

---

### FINAL AWARD

WE, the UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration provisions of the parties' Foreign Exchange Account Agreement dated October 17, 1997, as amended, and the Commercial Rules of the American Arbitration Association; and having been duly sworn; and having heard and duly considered the proofs and allegations of Stilton International Holdings Limited (hereinafter "Claimant") and of CIS Financial Services, Inc. ("CISFS") and Cargill, Incorporated (hereinafter "Respondents"); do hereby DECIDE and AWARD as follows:

**Operative Facts**

In October 1997, Claimant executed the Foreign Exchange Account Agreement; funded its account with CISFS (an indirect subsidiary of Cargill); and, for the next 7 or so years, CISFS acted as Claimant's broker in unregulated, over-the-counter foreign exchange transactions. In June 2005, Cargill agreed to sell its brokerage operations, including the "assets" of CISFS (*i.e.,* the accounts of its customers, among other things), to Refco Group Ltd. ("Refco"); and, when the transaction closed on August 31, 2005, Claimant's account with CISFS was transferred to Refco Capital Markets Ltd. ("RCM"). During September and early October 2005, Refco was Claimant's "broker" and serviced Claimant's foreign exchange account (in large measure using a number of the same CISFS employees and systems who moved to Refco as a part of the transaction).

On or about October 10, 2005, Refco publicly announced that it had discovered serious accounting irregularities and other misconduct involving its then CEO, Phillip Bennett (who had

negotiated and approved the June transaction with Cargill). On October 13, 2005, Refco declared a moratorium on trading with respect to all of its accounts, including Claimant's; and on October 17, 2005, Refco and its affiliates, including RCM, filed for bankruptcy protection. As a consequence, Claimant's account was liquidated and made subject to distribution to all of Refco's customers and creditors pursuant to bankruptcy law.

**Claims and Defenses**

By these proceedings, Claimant seeks to recover from Respondents the sum of approximately $36.3 million, calculated as the difference between its accepted proof of claim in the Refco bankruptcy ($54 million) and the monies Claimant has received or expects to receive in distributions from the bankruptcy proceedings (plus interest, costs and attorneys' fees). In this regard, Claimant posits two basic theories of liability: First, Claimant essentially argues that, since the Agreement was merely transferred or assigned by Respondents to Refco and not novated, Respondents remain jointly liable with Refco for Refco's breaches of that Agreement. Second, Claimant seeks to hold Respondents liable for Stilton's losses by virtue of their alleged bad faith and/or tortious misrepresentations in connection with Respondents' transactions with Refco.

With respect to Stilton's contract claim, Respondents deny any liability since Claimant "consented" to the assignment of the Agreement and transfer of its account to Refco. With respect to the tort claims, Respondents, among other things, deny that there was any bad faith on their part; that they made any material misrepresentations; or, for that matter, that they owed any duty to Claimant in connection with the transactions between Refco and Respondents. More importantly, Respondents argue, any losses suffered by Claimant were caused by Bennett's misconduct and Refco's bankruptcy; consequently, recovery of those losses must be determined in bankruptcy court, not here. In addition to dismissal of all claims, Respondents also seek their costs and attorneys fees incurred in these arbitration proceedings.

**Liability**

The credible evidence failed to establish that Respondents breached a cognizable duty owed to Claimant, or made material misrepresentations to Claimant, in connection with the sale of the brokerage business to Refco. While it may be true that the more customer accounts transferred to Refco, the more Cargill stood to gain in the sale, there was insufficient credible evidence that Cargill improperly misled its clients and customers into continuing their account

Case No. 50 148 T 00217 07                                                                3
Stilton and CISFS/Cargill
Final Award of Arbitrators

activities with Refco. In this regard, the somewhat unsavory reputation of Refco in the brokerage business appears to have been well known; and no amount of due diligence on the part of Cargill could have uncovered the massive fraud and misconduct that lead to Refco's bankruptcy.

On the other hand, New York law governing the Agreement is clear that, absent a novation or specific release, the transferor/assignor of such a contract remains jointly and severally liable for the breaches of that contract by the transferee/assignee. Under the circumstances presented here, no novation or release of Respondents' obligations to Claimant was ever offered or even considered; and neither Claimant's failure to object to the transfer/assignment, nor the handwritten notation on Respondents' August 15, 2005, letter to Claimant, can relieve Respondents of their joint liability with Refco for Refco's breaches of the Agreement under New York law.

**Proximate Cause and Damages**

Claimant's damages of $54 million were a direct consequence of Refco's breaches of the Agreement; that is, among other things, Refco's October 13, 2005 moratorium on trading and withdrawals; liquidation of the account; and failure and refusal to return the monies in that account to Claimant. Refco's bankruptcy limited Claimant's ability to recover its damages from Refco occasioned by the breaches of the Agreement; the bankruptcy and bankruptcy law neither excused those breaches nor Respondents' joint liability therefor.

As conceded by Claimant in its final submissions, it is reasonable to expect that Stilton will receive 43.33 % of its $54 million in damages "from" Refco in the bankruptcy proceedings, leaving approximately $30.6 million due and owing from Respondents. (In this regard, we note that Cargill "caused" the transfer of the Agreement and, while both Respondents are responsible here, Cargill "caused" the dissolution of CISFS in 2006. Also, resolution/distributions with respect to the "preference claim" of $20 million is irrelevant to damages here since Refco's payment prior to bankruptcy was not a breach of the Agreement.)

Claimant's request for interest dating back to the breach (October 2005) is denied; the damages due from Respondents could not be "fixed" until the Panel heard and considered the proofs and allegations of the parties as set forth in this Award. Finally, each party shall bear its own costs of this proceeding, including attorneys' fees.

Accordingly, as and for an **AWARD** herein:

Case No. 50 148 T 00217 07                                                                4
Stilton and CISFS/Cargill
Final Award of Arbitrators

    1. Respondents shall pay to Claimant the sum of THIRTY MILLION, SIX HUNDRED
THOUSAND DOLLARS and NO CENTS ($30,600,000.00), plus interest at the legal rate from
the date of this Award until said sum is paid in full; provided, however, that Respondents shall be
given credit for any monies paid to Claimant on account of its $54 million claim in bankruptcy
court in excess of $23.4 million.

    2. The administrative fees and expenses of the International Centre for Dispute
Resolution ("ICDR") totaling TWENTY TWO THOUSAND SIX HUNDRED FIFTY
DOLLARS AND NO CENTS ($22,650.00) shall be borne by the parties as incurred; the
compensation and expenses of the Arbitrators totaling THIRTY EIGHT THOUSAND EIGHT
HUNDRED FORTY DOLLARS AND NO CENTS ($38,840.00) shall be borne 50% by
Claimant and 50% by Respondents.

    3. This Award is in full and complete settlement of any and all claims, counterclaims,
defenses and off-sets properly submitted to the jurisdiction of the Arbitrators in this proceeding;
and any claim or counterclaim not specifically granted herein is nonetheless deemed DENIED.

    4. This Award may be executed in any number of counterparts, each of which shall be an
original, and all of which together shall be deemed to be the Final Award in this matter.


    We hereby certify that, for the purposes of Article 1 of the New York Convention of
1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was
made in New York, New York, U.S.A.


_____                    _____
       Date                                     John F. Byrne, Esq.


_____                    _____
       Date                                     Joanne Barak, Esq.


_____                    _____
       Date                                     Peter Collins, Esq.

Case No. 50 148 T 00217 07                                                 5
Stilton and CISFS/Cargill
Final Award of Arbitrators


I, John F. Byrne, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.


_____                    _____
         Date                                    John F. Byrne, Esq.


I, Joanne Barak, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.


_____                    _____
         Date                                    Joanne Barak, Esq.


I, Peter Collins, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.


_____                    _____
         Date                                    Peter Collins, Esq.

Case No. 50 148 T 00217 07                                                    4
Stilton and CISFS/Cargill
Final Award of Arbitrators

    1. Respondents shall pay to Claimant the sum of THIRTY MILLION, SIX HUNDRED THOUSAND DOLLARS and NO CENTS ($30,600,000.00), plus interest at the legal rate from the date of this Award until said sum is paid in full; provided, however, that Respondents shall be given credit for any monies paid to Claimant on account of its $54 million claim in bankruptcy court in excess of $23.4 million.

    2. The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling TWENTY TWO THOUSAND SIX HUNDRED FIFTY DOLLARS AND NO CENTS ($22,650.00) shall be borne by the parties as incurred; the compensation and expenses of the Arbitrators totaling THIRTY EIGHT THOUSAND EIGHT HUNDRED FORTY DOLLARS AND NO CENTS ($38,840.00) shall be borne 50% by Claimant and 50% by Respondents.

    3. This Award is in full and complete settlement of any and all claims, counterclaims, defenses and off-sets properly submitted to the jurisdiction of the Arbitrators in this proceeding; and any claim or counterclaim not specifically granted herein is nonetheless deemed DENIED.

    4. This Award may be executed in any number of counterparts, each of which shall be an original, and all of which together shall be deemed to be the Final Award in this matter.

    We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.


_____                          _____
Date                                            John F. Byrne, Esq.


_____                          _____
Date                                            Joanne Barak, Esq.


_____                          _____
Date                                            Peter Collins, Esq.

Case No. 50 148 T 00217 07                                                    5
Stilton and CISFS/Cargill
Final Award of Arbitrators

    I, John F. Byrne, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.


_____5/21/08_____                              _____
Date                                           John F. Byrne, Esq.



    I, Joanne Barak, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.



_____                              _____
Date                                           Joanne Barak, Esq.



    I, Peter Collins, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.



_____                              _____
Date                                           Peter Collins, Esq.

Case No. 50 148 T 00217 07
Stilton and CISFS/Cargill
Final Award of Arbitrators

4

1. Respondents shall pay to Claimant the sum of THIRTY MILLION, SIX HUNDRED THOUSAND DOLLARS and NO CENTS ($30,600,000.00), plus interest at the legal rate from the date of this Award until said sum is paid in full; provided, however, that Respondents shall be given credit for any monies paid to Claimant on account of its $54 million claim in bankruptcy court in excess of $23.4 million.

2. The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling TWENTY TWO THOUSAND SIX HUNDRED FIFTY DOLLARS AND NO CENTS ($22,650.00) shall be borne by the parties as incurred; the compensation and expenses of the Arbitrators totaling THIRTY EIGHT THOUSAND EIGHT HUNDRED FORTY DOLLARS AND NO CENTS ($38,840.00) shall be borne 50% by Claimant and 50% by Respondents.

3. This Award is in full and complete settlement of any and all claims, counterclaims, defenses and off-sets properly submitted to the jurisdiction of the Arbitrators in this proceeding; and any claim or counterclaim not specifically granted herein is nonetheless deemed DENIED.

4. This Award may be executed in any number of counterparts, each of which shall be an original, and all of which together shall be deemed to be the Final Award in this matter.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.


_____
Date


_____
John F. Byrne, Esq.


*May 21, 2008*
_____
Date


_____
Joanne Barak, Esq.


_____
Date


_____
Peter Collins, Esq.

Case No. 50 148 T 00217 07
Stilton and CISFS/Cargill
Final Award of Arbitrators

5

I, John F. Byrne, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.

_____
Date

_____
John F. Byrne, Esq.

I, Joanne Barak, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.

_May 21, 2008_
Date

_Joanne Barak_
Joanne Barak, Esq.

I, Peter Collins, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.

_____
Date

_____
Peter Collins, Esq.

Case No. 50 148 T 00217 07
Stilton and CISFS/Cargill
Final Award of Arbitrators

4

    1. Respondents shall pay to Claimant the sum of THIRTY MILLION, SIX HUNDRED THOUSAND DOLLARS and NO CENTS ($30,600,000.00), plus interest at the legal rate from the date of this Award until said sum is paid in full; provided, however, that Respondents shall be given credit for any monies paid to Claimant on account of its $54 million claim in bankruptcy court in excess of $23.4 million.

    2. The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling TWENTY TWO THOUSAND SIX HUNDRED FIFTY DOLLARS AND NO CENTS ($22,650.00) shall be borne by the parties as incurred; the compensation and expenses of the Arbitrators totaling THIRTY EIGHT THOUSAND EIGHT HUNDRED FORTY DOLLARS AND NO CENTS ($38,840.00) shall be borne 50% by Claimant and 50% by Respondents.

    3. This Award is in full and complete settlement of any and all claims, counterclaims, defenses and off-sets properly submitted to the jurisdiction of the Arbitrators in this proceeding; and any claim or counterclaim not specifically granted herein is nonetheless deemed DENIED.

    4. This Award may be executed in any number of counterparts, each of which shall be an original, and all of which together shall be deemed to be the Final Award in this matter.

    We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.


_____                    _____
Date                                        John F. Byrne, Esq.


_____                    _____
Date                                        Joanne Barak, Esq.


May 20, 2008
_____                    _____
Date                                        Peter Collins, Esq.

Case No. 50 148 T 00217 07
Stilton and CISFS/Cargill
Final Award of Arbitrators

5

I, John F. Byrne, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.

_____
Date

_____
John F. Byrne, Esq.

I, Joanne Barak, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.

_____
Date

_____
Joanne Barak, Esq.

I, Peter Collins, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Final Award.

May 20, 2008
Date

_____
Peter Collins, Esq.

# EXHIBIT 3

FROM : TRADING

PHONE NO. : 809+363+2638

Stilton International
_____
Customer Name

_____
Account Number

# Foreign Exchange
# Account Agreement

# cis FINANCIAL SERVICES, INC.

Suite 2300
233 S. Wacker Drive
Chicago, Illinois 60606

10/04/94

OCT 17 '97 14:17                    809+363+2638        PAGE.02

SIHAAA0019

**EXHIBIT 3**

FROM : TRADING                                                        PHONE NO.  : 809+363+2638

# FOREIGN EXCHANGE ACCOUNT AGREEMENT

_Stilton International Holdings LTD._
_____
Customer Name                                                        Account Number

TO:    CIS Financial Services, Inc.
       233 S. Wacker Drive, Suite 2300
       Chicago, Illinois 60606

In consideration of the Agreement of CIS Financial Services, Inc. ("CISFS") to act as broker for the undersigned (hereinafter referred to as the "Customer") in any over-the-counter ("O.T.C.") Foreign Exchange transactions, the Customer agrees, in respect to all such O.T.C. Foreign Exchange accounts which the Customer now has or may at any time have with CISFS or its successors, including accounts from time to time closed and then reopened (each an "Account"), as follows:

**1. Scope of this Agreement; Risks.**

All transactions, and all Contracts entered into between CISFS and the Customer, shall be governed by the terms of this Agreement except to the extent (if any) that CISFS shall agree in writing or notify the Customer in writing or by telex or telecopy that other or additional terms apply. Any proposals for, additions to, or modifications of this Agreement, absent written agreement by CISFS to the contrary, are hereby void. The terms of each Contract (as defined below) shall be as set forth in the confirmation relating thereto sent by CISFS to the Customer. The Customer understands and recognizes that transactions in Foreign Exchange are unregulated by any governmental entity or self-regulatory organization and that the activities of CISFS with respect to such transactions are therefore not supervised or subject to oversight. Bearing this in mind, the Customer represents that it is aware of the risks inherent in the trading of Foreign Exchange and is financially able to bear such risks and withstand any losses incurred.

**2. Definitions.**

For the purposes of this Agreement the following definitions apply:

(a) *Business Day* means, with respect to the United States, any day on which banks are open for business (other than a Saturday or Sunday) in New York City, and with respect to any country other than the United States, any day on which banks are open for business (other than a Saturday or Sunday) in the principal financial center of the relevant country.

(b) *Contract* means an agreement between CISFS and the Customer for the delivery of a specified amount of a specified currency in return for a specified amount of a different specified currency for settlement on a specified Value Date. The amounts of the two currencies are related by a specified price or rate. Furthermore, "Contract" means a Spot Contract or a Forward Contract (as defined below), or both, as the context of this Agreement requires.

(c) *Daily Cutoff* means the point in time selected each Business Day by CISFS after which any Contract entered into will be considered to have as its Trade Date the next Business Day. The Daily Cutoff will occur at a time selected solely by CISFS and may vary from day to day.

(d) *Federal Bankruptcy Code* means The Bankruptcy Code of 1978, 11 U.S.C. §101, et seq.

(e) *Foreign Currency* means the lawful currencies of the applicable countries as specified in Schedule 1 attached to this Agreement,

which schedule may be amended from time to time by mutual agreement of CISFS and the Customer.

(f) A *Forward Contract* means a Contract where the Value Date is at least one Business Day later than the Business Day that would be the Value Date if the Contract were a Spot Contract. No Forward Contract shall have a Value Date later than the Business Day which is six months after the spot Value Date.

(g) *Market Value* means the U.S. Dollar Value, determined by CISFS in its sole discretion, that CISFS determines it would receive if it sold the relevant collateral for immediate delivery in the relevant market.

(h) *Open Position* means any Contract that has not settled.

(i) A *Spot Contract* means a Contract where the Value Date is the second Business Day following the Trade Date; provided, however, that with respect to any Spot Contract involving the European Currency Unit (BCU), the Value Date is the third Business Day following the Trade Date; provided further, however, that with respect to any Spot Contract involving only U.S. Dollars and Canadian Dollars, the Value Date is the next Business Day following the Trade Date.

(j) *Trade Date* with respect to any Contract means the date on which the Contract is entered into between CISFS and the Customer, except in the case of any Contract entered into after the Daily Cutoff, but before the next U.S. Business Day, which shall have as its Trade Date the next U.S. Business Day.

(k) *U.S. Dollar Value* means the amount of U.S. Dollars at any moment in time which would result from the conversion of the relevant Foreign Currency into U.S. Dollars at CISFS' then prevailing exchange rates for buying or selling, as applicable, such Foreign Currency.

(l) *Value Date* means, with respect to any Contract, the applicable settlement date specified in the confirmation relating to the particular Contract. A Value Date must be a Business Day in the United States and, for each Foreign Currency specified in the Contract, the country in which the Foreign Currency is the lawful currency.

Other capitalized terms in this Agreement shall have those meanings provided for herein.

2

OCT 12 '07 14:42                                                        809+363+2638        PAGE 03

**SIHAAA0020**

3. Hypothecation; Collateral; Additional Collateral.

   (a) The Customer agrees that securities, including Collateral securities, and other property in the Customer's Account(s) may be carried in CISFS' general loans and may be pledged, repledged, hypothecated or rehypothecated separately or in common with other securities and property for the sum due to CISFS thereon or for a greater sum and without regard to whether or not such securities or property remain in the possession and control of CISFS.

   (b) As security for the Customer's obligations to CISFS hereunder, the Customer agrees to deposit and maintain collateral with CISFS at its head office in Chicago, Illinois, or other location or account as CISFS may direct ("the Collateral Account") as follows:

     (i) Only instruments in such form as specified in Schedule 2 of this Agreement shall be acceptable to CISFS as Collateral for the purposes of this Agreement. CISFS may change said schedule by notifying the Customer in writing. Any change shall be effective immediately upon receipt of such notice by the Customer. The value of any Collateral provided by the Customer shall be subject to the haircuts listed in Schedule 2 of this Agreement. CISFS' acceptance of any Collateral may be subject to other limitations and/or qualifications specified in Schedule 2 of this Agreement. The Customer shall execute and deliver such separate pledge or deposit agreements including without limitation, security agreements or financing statements, as may be requested by CISFS. Such Collateral, together with the Contracts and all other monies, securities, treasury bills and other property of the Customer now or any time hereafter delivered, conveyed, transferred, assigned or paid to CISFS or coming into CISFS' possession in any manner whatsoever are hereby pledged to CISFS and shall be subject to a security interest in CISFS' favor for the discharge of the Customer's obligations to CISFS under this Agreement and the Contracts. The Customer hereby represents and warrants to CISFS that the Customer holds good and marketable title to all Collateral and that the Collateral delivered to CISFS is free and clear of any and all liens, claims, pledges or encumbrances of any kind.

     (ii) The Customer agrees to maintain at all times with CISFS Collateral in such form and in such amount as CISFS may from time to time request orally or in writing. The Customer acknowledges that any changes regarding the amount and form of Collateral may also result in a request for additional Collateral. The Customer shall respond to such requests by immediately supplying sufficient additional Collateral.

     (iii) In all cases, Collateral shall be deemed received by CISFS when such Collateral shall be actually received in the Collateral Account and CISFS shall be notified of such receipt as determined by CISFS in its sole discretion.

   (c) CISFS will monitor on a daily basis, or more frequently as CISFS solely determines, the Customer's Collateral Account in the following manner:

     (i) CISFS will compute the Customer's "Total U.S. Dollar Market Value of Collateral" by aggregating (a) the U.S. Dollars in the Collateral Account, (b) the U.S. Dollar Value of any Foreign Currencies in the Collateral Account, and (c) the U.S. Dollar Value of the Market Value, as determined solely by CISFS, of other Collateral in the Collateral Account, subject to any and all haircuts, limitations, and qualifications listed in Schedule 2 of this Agreement.

     (ii) CISFS will compute the Customer's "Net U.S. Dollar Value of Gains and Losses on Open Positions" as follows:

For each Open Position, the gain or loss, if any, is computed by assuming that the relevant Contract is offset in the market at the relevant foreign exchange rate then prevailing for the Value Date of the Contract, as determined solely by CISFS. The U.S. Dollar Value of these computed gains and/or losses, if any, is computed by assuming that the gain or loss is converted into U.S. Dollars in the market at the relevant foreign exchange rate then prevailing for the Value Date of the Contract, as determined solely by CISFS. The U.S. Dollar Value of the gain or loss of each Open Position will be aggregated together to determine the "Net U.S. Dollar Value of Gains and Losses on Open Positions."

     (iii) CISFS will compute the Customer's "Net Collateral" by netting together the "Net U.S. Dollar Value of Gains and Losses on Open Positions" and the "Total U.S. Dollar Market Value of Collateral."

     (iv) CISFS will compute the Customer's "Total Required Initial Collateral" and "Total Required Maintenance Collateral" amounts in the following manner:

       (1) For each Open Position that involves a particular set of two currencies, (e.g. all Contracts involving only British Pounds and German Marks) the quantity of that currency specified as the "Defined Currency" in Schedule 3 of this Agreement shall be divided by the quantity specified as the "Defined Quantity" in Schedule 3 of this Agreement. The result, which will be negative in instances when the Customer is short the first currency of the currency pair, and positive otherwise, will be called the "Unit-Equivalent."

       (2) The "Unit-Equivalent" of each Open Position will be multiplied by the amount specified in Schedule 3 of this Agreement as the "Required Initial Collateral per Unit-Equivalent" to determine the "Required Initial Collateral" for the particular Open Position.

       (3) The "Total Required Initial Collateral" is determined by aggregating the "Required Initial Collateral" for all Open Positions.

       (4) The "Unit-Equivalent" of each Open Position will be multiplied by the amount specified in Schedule 3 of this Agreement as the "Required Maintenance Collateral per Unit-Equivalent" to determine the "Required Maintenance Collateral" for the particular Open Position.

       (5) The "Total Required Maintenance Collateral" is determined by aggregating the "Required Maintenance Collateral" for all Open Positions.

       (6) CISFS may change Schedule 3 of this Agreement at any time by notifying the Customer verbally or in writing. Any change shall be effective immediately upon such notification. The Customer acknowledges that any changes regarding Schedule 3 of this Agreement may result in a request for additional Collateral. The Customer shall respond to such requests by immediately supplying sufficient additional Collateral.

   (d) The Customer agrees to maintain the Collateral Account at all times so that the following three conditions are met:

     (i) the "Total U.S. Dollar Market Value of Collateral" is greater than or equal to (USD) 250,000.00 (Two hundred fifty thousand), AND

     (ii) the "Total U.S. Dollar Market Value of Collateral" is greater than or equal to the "Total Required Initial Collateral," AND

3

SIHAAA0021

(iii) The "Net Collateral" is greater than or equal to the "Total Required Maintenance Collateral."

(e) If at any time one or more of the conditions listed in part (d) of section 3 of this Agreement are not met, the Customer shall be deemed to have a "Collateral Deficiency" and shall be obligated to immediately deliver sufficient additional Collateral to CISFS, and/or offset open positions so as to meet all of the said conditions.

   (i) When the Customer has a "Collateral Deficiency," it shall not create any new positions, and may trade only to offset existing positions.

   (ii) If CISFS determines, in its sole discretion, that the Customer has a Collateral Deficiency, CISFS shall have the right to offset, close out, and/or liquidate any open positions in the Customer's Account, and any such offsetting, closing out, and/or liquidating transactions may be made in a manner solely determined by CISFS.

   (iii) The Customer agrees that additions to Collateral are due and must be paid immediately upon determination by CISFS, in its sole discretion, that there is a need for additional Collateral in any of the Customer's Accounts. The Customer hereby represents that it is able to effect same-day payment of U.S. Dollar funds to CISFS.

(f) The Customer shall not make a request for the withdrawal of Collateral if the requested withdrawal will cause any of the conditions listed in part (d) of section 3 of this Agreement to not be met.

## 4. Trading.

(a) The Customer acknowledges CISFS' right to limit, without notice to the Customer, the number and/or size of Open Positions which the Customer may maintain or acquire through CISFS.

(b) CISFS reserves the right to refuse to accept any order.

(c) With respect to any Open Position which has as its Value Date the same date as the Value Date which would apply for Spot Contracts involving the same two currencies and entered into on the current day, CISFS reserves the right to require the Customer to offset the Open Position in the market or roll it in the market to a later Value Date.

(d) If for any reason CISFS is unable to execute a Contract with its counterparty at the price quoted to the Customer, CISFS will have no obligation to the Customer to enter into the Contract with the Customer at the quoted price.

(e) The Customer recognizes that exchange rates it may view on electronic market information screens (e.g. Reuters, Telerate, etc.) are only indications of exchange rates, and may or may not reflect actual exchange rates available to CISFS or the Customer.

## 5. Commissions.

The Customer agrees to pay when due CISFS's charges for commissions at rates specified in Schedule 4 of this Agreement.

## 6. Offsetting Contracts.

Whenever there may exist in any of or between any of the Customer's foreign exchange accounts two or more open and opposite Contracts providing for the purchase and sale of the same foreign currency on the same Value Date, CISFS may, in its sole discretion, elect to treat the Contracts as a single transaction, and upon the Value Date of the Contracts, the net difference between the amounts payable under the contracts, and/or the net difference between the quantities of currency

deliverable thereunder, shall be paid and/or delivered, as the case may be.

## 7. Delivery of Foreign Currency.

Delivery of foreign currency shall be made to the bank specified by the purchaser in a major city in the country in which the foreign currency is the legal tender. Unless otherwise agreed to by CISFS and the Customer in writing, the foreign currency shall be deliverable by cable or wire transfer. All payments to be made in U.S. Dollars shall be made by wire transfer of immediately available funds to a bank in a major U.S. city specified by the purchaser. CISFS may require payment of amounts due to it on any day simultaneously with or prior to payment of amounts due from it on that day. CISFS and the Customer shall both exchange, make use of, and periodically update and confirm standing payment instructions.

## 8. Events of Default.

The occurrence of one or more of the following events shall constitute a "Default" under this Agreement:

(a) The Customer shall fail to pay any amount hereunder or under any Contract when due;

(b) The Customer shall (i) have an order for relief entered with respect to it under the Federal Bankruptcy Code, (ii) not pay, or admit in writing its inability to pay its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its property, (v) institute any proceedings seeking an order for relief under the Federal Bankruptcy Code or seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate action to authorize or affect any of the foregoing actions set forth in this subparagraph, or (vii) fail to contest in good faith any appointment or proceeding described in (c) below;

(c) Without the application, approval or consent of the Customer, a receiver, trustee, examiner, liquidator, or similar official shall be appointed for the Customer or any substantial part of its property, or a proceeding described in (b) above shall be instituted against the Customer and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 30 consecutive days;

(d) Any court, government or governmental agency shall condemn, seize or otherwise appropriate or take custody or control of all or any substantial portion of the property of the Customer;

(e) Any representation or warranty made by the Customer in this Agreement or the Contracts shall be materially false as of the date on which it was made, or Customer shall fail or omit to state any fact which is necessary to make the representations and warranties herein not misleading;

(f) The Customer shall fail to comply with any of the terms or provisions of this Agreement or of any Contract;

(g) The Customer fails to deliver sufficient additional Collateral upon request from CISFS;

(h) The Customer shall fail to perform any term or provision of any Agreement to which it is a party, including but not limited to any foreign exchange contract, the effect of which is to cause an event of default or termination or similar event howsoever defined pursuant to any such agreement or

4

SIHAAA0022

FROM : TRADING

(i) CISFS, in its sole discretion, considers it necessary for its protection to terminate this Agreement and exercises its remedies as provided below.

**9. Remedies.**

In the event any Default occurs, CISFS is authorized to offset and to sell or purchase for the Customer's account any Contract in any manner which CISFS shall deem necessary in its sole discretion and to dispose of, as CISFS deems appropriate, any or all of the Collateral held by CISFS and any of the Customer's other property or assets at any time held by CISFS or Cargill Investor Services, Inc. It is understood and agreed that any prior tender, demand or call of any kind from CISFS, or prior notice from CISFS, of the time and place of such sale or purchase shall not be considered a waiver of CISFS' right to sell or purchase any Collateral or to offset at any time as herein provided, nor shall CISFS' failure to make such a demand or call waive CISFS' right to take such action without such tender, demand, call or notice in the future. After deducting costs and expenses incurred in connection with any such actions, CISFS may apply any remaining proceeds to the payment of any other obligations the Customer may owe to CISFS pursuant to this Agreement or any Contract, and in the event such proceeds are insufficient for payment of all such obligations, the Customer shall, within 24 hours of CISFS giving notice orally or in writing, pay to CISFS the amount of such deficit, together with interest thereon for each day such deficit is outstanding and remains unpaid until paid at a rate per annum, on a 365 day year/actual number of days elapsed basis, equal to an overdraft rate determined by CISFS in its sole discretion for the relevant Foreign Currency, or the Prime Rate (as quoted by Chase Manhattan Bank, New York) plus two percent for U.S. Dollars, plus all costs of collection, including reasonable attorneys' fees.

Without limiting anything in the foregoing, if any Default as described in Section 8(b) or 8(c) occurs, then all amounts due or to become due by the Customer under this Agreement and under all Contracts shall immediately become due and payable, the Collateral Account shall be deemed closed, all Contracts shall be deemed Offset and all Collateral shall be deemed to have been applied to the obligations for the Customer under this Agreement and any Contracts all without any election, notice or action by CISFS and all without any liability on CISFS' part to the Customer or any third party. If any other Default shall occur, CISFS may, by notice either orally or in writing to the Customer, declare any or all amounts due or to become due by the Customer under this Agreement or under any Contracts to be due and payable, whereupon all of such amounts as CISFS shall designate and such notice shall become immediately due and payable and CISFS may take any and all of the following actions, all without any liability on CISFS' part to the Customer or any third party; (i) close the Cash and Collateral Account; (ii) offset, sell or assign any or all Contracts; and (iii) apply the Collateral as provided above.

Nothing in the foregoing shall be deemed to waive, limit, terminate, modify, or otherwise change any rights or remedies available to CISFS of law or in equity, or the Customer's liability to CISFS for the payment of any debit balance owing in the accounts of the Customer with CISFS. The Customer is liable for any deficiency remaining in any such account or on any Contracts in the event of the offset or liquidation thereof, in whole or in part.

**10. Authorization to Transfer between Accounts.**

CISFS may, without notice, transfer any money or other property interchangeably between any accounts of the Customer with CISFS or any of its affiliates, including Cargill Investor Services, Inc., except that any transfer from a commodity or securities account which is subject to regulations under the Commodity Exchange Act, Securities Act of 1933 or Securities Exchange Act of 1934, to a non-regulated account and/or a Foreign Exchange Account shall have such other authorization by the Customer as is required by such laws and their regulations. The Customer authorizes CISFS to debit immediately any

margin or collateral payment called for to any of its accounts including Foreign Exchange Accounts showing a balance in its favor.

**11. Matters Precedent; Corporate Resolution.**

CISFS shall not be required to enter into any Contracts with the Customer unless and until all legal matters incident to such Contracts shall be satisfactory to CISFS and its counsel, the provisions of paragraph 3(b) are met to the satisfaction of CISFS and its counsel, a duly executed copy of this Agreement is furnished to CISFS by the Customer, the Customer establishes the Collateral Account, and the Customer's standing payment instructions are furnished to CISFS. In addition, within 10 days of the date of this Agreement, the Customer (if a partnership or corporation) shall deliver to CISFS a certified copy of (i) an authorizing resolution of the Customer Board of Directors substantially in the form attached hereto or otherwise as acceptable to CISFS; and (ii) the names, titles, signatures, and phone numbers, including home phone numbers where applicable, of the persons duly authorized by the Customer to execute and deliver this Agreement and to initiate transactions in O.T.C. foreign exchange for the Customer's account. CISFS shall be entitled to rely on any such evidence until informed in writing by the Customer of any change.

**12. Death; Incompetency.**

If the Customer should die or become incompetent, any pending order shall be validly executed by CISFS, up to the time it receives written notice of the death or incompetence of the Customer, and CISFS is hereby indemnified against any loss arising therefrom.

**13. Separate Contracts.**

Each Contract for the purchase and sale of Foreign Currency hereunder is a separate Contract even though more than one such Contract may be included on a single confirmation.

**14. Joint Accounts; Trust Accounts.**

If this Agreement is extended to more than one natural person as the Customer, all such natural persons agree to be jointly and severally liable for the obligations assumed in this Agreement. If this Facility is extended to a trust, joint ownership, or partnership, the Customer hereby agrees to indemnify, defend, save and hold free and harmless CISFS for any losses, costs and expenses resulting from breach of any fiduciary duty or allegation thereof.

**15. Limitation of Liability.**

CISFS will not be responsible for delays or failures in the delivery of any Foreign Currency within the time specified for the delivery thereof to the extent the failure is caused by a breakdown of communication facilities or by any other cause beyond CISFS' reasonable control.

**16. Collection Expenses.**

The Customer agrees to pay any and all losses, costs, expenses, internal charges and fees, including attorneys' fees, which attorneys may be employees of CISFS or its affiliates, paid or incurred by CISFS in connection with the collection and enforcement of this Agreement, the Collateral and the Contract.

**17. Arbitration.**

Any controversy arising out of or relating to transactions in this Account, this Agreement or the breach hereof or thereof shall be settled by arbitration pursuant to the commercial arbitration rules of the American Arbitration Association. Judgment upon any award entered by the arbitrators may be entered in any court of competent jurisdiction. Any such action must be brought within two years after the date of cause of action accrued.

5

SIHAAA0023

FROM : TRADING                                          PHONE NO. : 809+363+2638

**18. Full Disclosure.**

The Customer additionally represents to CISFS that the information provided by the customer in connection with this agreement is full, complete and accurate and CISFS is entitled to rely on this information until CISFS receives written notice from the customer of any change in such information.

**19. Notification.**

Any notices and other communications may be transmitted to the Customer at the address, telephone or telefax number given herein, or at such other address, telephone or telefax number as the Customer hereafter shall notify CISFS in writing, and all notices or communications shall be deemed transmitted when telephoned, faxed or deposited in the mail by CISFS or CISFS' representative, whether actually received by the Customer or not. Confirmations, and account statements shall be deemed accurate unless objected to in writing within one business day from the date of such notice and such objection(s) delivered to CISFS at 233 South Wacker Drive, Suite 2300, Chicago, Illinois, 60604, Attention: Treasurer, telefax number (312) 460-4739, telephone number (312) 460-4000. In the event the Customer fails to receive a faxed confirmation within one Business Day of the date of the transaction, the Customer agrees to notify CISFS at the above address via fax immediately.

**20. Governing Law.**

This Agreement is made under and shall be governed by laws of the State of New York in all respects, including construction and performance. This Agreement shall be binding upon you and/or your estate, executors, administrators, successors and/or assigns.

**21. Disclaimer.**

The Customer acknowledges that CISFS is ultimately owned by Cargill, Incorporated and is under the common control of Cargill, Incorporated with Cargill Investor Services, Inc. The Customer further acknowledges that the market recommendations of CISFS, if any, may or may not be consistent with the market position or intentions of Cargill, Incorporated, Cargill Investors Services, Inc. or their subsidiaries and/or affiliates. The market recommendations of CISFS, if any, are based upon information believed to be reliable, but CISFS cannot and does not guarantee the accuracy or completeness thereof or represent that following such recommendations will eliminate or reduce the risks inherent in transactions in foreign currency.

**22. Telephone Recordings.**

CISFS is hereby granted permission to record telephone conversations between its employees and the Customer. The Customer agrees that such recordings may be used as evidence by either party in any disputes between CISFS and the Customer.

---

**Corporate Account:**          (Also sign Corporate Resolution)

The Customer represents and warrants that the Corporation is duly organized and in good standing under the laws of its country or state of incorporation and that trading in over-the-counter Foreign Exchange transactions for hedging or speculation is within the powers granted to it. The undersigned represents that he/she has full authority to enter into this Agreement on behalf of the Corporation and is concurrently furnishing to CISFS a Certified Resolution as required by CISFS.

Attest:                                        Stilton International Holdings ETO
_____                _____
                                                      Customer (Corporation)
Date: 10/17/97                                  By: Simon Berkett
                                                    _____
                                                Title: _____

---

**Individual Account:**

The undersigned represents that this is an individual or sole proprietorship account and no one else has an interest in this account.

Date: _____          _____
                                                    Individual

---

6

**SIHAAA0024**

FROM : TRADING                                          PHONE NO. : 809+363+2638

## Corporate Resolution:

### Certified Resolution of Board of Directors

I, the undersigned, do hereby certify that the following is a complete, true and correct copy of certain resolutions of the Board of Directors of ___ Stilton International Holdings Ltd ___, a corporation duly organized and existing under the laws of the State of (Country) British Virgin Islands ___, having its principal office at P.O. Box 146 Road Town ___, City of Tortola ___, State of (Country) British Virgin Isl. ___, which resolutions were duly adopted at a duly called meeting of said Board, held on 8 March ___, 19 95, a quorum being present, and are set forth in the minutes of the said meeting; that I am the keeper of the corporate seal and of the minutes and records of this Corporation; and that the said resolutions have not been rescinded or modified:

"BE IT RESOLVED, That the Director(s), President or any Vice President of this Corporation or ___ Simon Berkett ___ ___ (list individual(s)) be and hereby is authorized to establish and maintain one or more accounts for the purpose of trading in foreign exchange for present or future delivery for hedging; or speculation for the account and risk of this Corporation through and with CIS Financial Services, Inc. (hereinafter the Broker), maintaining offices at Chicago, Illinois, U.S.A., as said firm is now constituted or may be hereafter constituted, the authority hereby granted including the power to do any and/or all of the following:

To give written or oral instructions to the Broker with respect to said transactions; to bind and obligate the Corporation to and for the carrying out of any contract, arrangement or transaction which shall be entered into by any such director, officer and/or agent for and on behalf of the Corporation with or through the Broker; to pay in cash or by checks and/or drafts drawn upon the funds of the Corporation such sums as may be necessary in connection with any of the said accounts; to deliver foreign currencies to the Broker; to order the transfer or delivery thereof to any other person whatsoever; to affix the corporate seal to any documents or agreements, or otherwise; to sign for the Corporation all releases, powers of attorney and/or other documents in connection with any such account, and to agree to any terms or conditions to control any such account; to accept delivery of any foreign currencies; to appoint any other person or persons to do any and all things which any of the said officers and/or agents is hereby empowered to do, and generally to do and take all action necessary in connection with the account or considered desirable by such director, officer and/or agent with respect thereto.

BE IT FURTHER RESOLVED: That Broker be directed to send written confirmations of all foreign exchange trades effected by Broker for this Corporation and all statements of account(s) of this Corporation through and other pertinent records and documents to ___ Joann McPike ___ (Note: the person designated to receive written notice of transactions must be someone other than the person(s) authorized to trade for the corporation) who is hereby authorized to receive and acquiesce in the correctness of such confirmations, statements and other records and documents;

BE IT FURTHER RESOLVED: That any and all past transactions of any kind herein authorized, which may have been heretofore made on behalf of this Corporation through or with Broker be and hereby are ratified.

BE IT FURTHER RESOLVED: That Broker is authorized to act upon the authority of these resolutions until receipt by it of a certificate showing rescission or modification thereof signed by a Director or Secretary of this Corporation and under its seal, and that said firm is also authorized to recognize and deal with the directors or officers of this Corporation whose names are set forth in this certificate, setting forth the names of another person or persons and such directors or officers."

I FURTHER CERTIFY that the Director(s) or President of this Corporation are Harald McPike ___ and that the Vice Presidents of this Corporation are ___
IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of this Corporation this day of 17 October 19 97.

_____
Director / Secretary

8

**SIHAAA0025**

**Wire Transfer Instructions**

Wire Transfer Instructions

# REDACTED

10

SIHAAA0026

Schedule 1

The Foreign Currencies under this Agreement are:

Australian Dollar
Austrian Schilling
Belgian Franc
British Pound
Canadian Dollar
Danish Kroner
Dutch Guilder
European Currency Unit (ECU)
Finnish Markka
French Franc
German Mark
Greek Drachma
Hong Kong Dollar
Indian Rupee
Indonesian Rupiah
Italian Lira
Japanese Yen
Malaysian Ringgit
New Zealand Dollar
Norwegian Krona
Portuguese Escudo
Saudi Riyal
Singapore Dollar
South African Rand
Spanish Peseta
Swedish Kroner
Swiss Franc
Thai Baht

11

SIHAAA0027

Schedule 2

CISFS considers as acceptable collateral the following:

1.    Immediately-available U.S. Dollar funds.

2.    Immediately available Foreign Currency deposits (only those currencies listed in Schedule 1).

12

SIHAAA0028

FROM : TRADING                                          PHONE NO. : 809+363+2638
         SEP 22 '97 13:47 FR CISFS CASH-FX     312 460 4759 TO 912423632638     P.03/03

**Schedule 3**

# REDACTED

SIHAAA0029

**New Account Fact Sheet**

# REDACTED

15

**SIHAAA0030**

FROM : TRADING                                              PHONE NO. : 809+363+2638

---

**Form W-8**

(January 1994)

Department of the Treasury
Internal Revenue Service

**Certificate of Foreign Status**

Use to notify payers, middlemen, brokers, and barter exchanges not to withhold or report tax payments of interest, broker transactions, or barter exchanges.

Give This Form To the Payer, Middleman, Broker or Barter Exchange

Name as shown on account (if joint account also give joint owner's name):
**Stitot International Holdings Ltd**

U.S. tax payer identification number (if any):

Address:

City, state, and ZIP code (or country):

List account number(s) here (see instructions) ▶

**Part I — Qualifications for Exemption.—Check Applicable Box(es)**

**Part II — Notice of Change in Status**—To notify the payer, broker, or barter exchange that you no longer qualify for exemption, check here . . . ▶ ☐

**Interest Payments.**—If this form was sent to you because you are receiving interest payments and if you are not a U.S. citizen or resident (or if you are a foreign corporation, partnership, estate or trust), check here . . . . . . . . . . . . ▶ ☐

**Broker Transactions or Barter Exchanges.**—If your broker or barter exchange sent you this form and if you are an "exempt foreign person" (see the instructions below for definition), check here ▶ ☑

If you check this box, reporting will begin on the account(s) listed.

**Certification.**—Under the penalties of perjury, I certify that, to the best of my knowledge and belief, I qualify as a foreign person as indicated on the box(es) checked above.

Please Sign Here ▶ Signature _(signature)_    Date 10/17/97

**Instructions**

(Section references are to the Internal Revenue Code, unless otherwise stated.)

**Purpose of Form.**—Use this form to tell the payer, middleman, broker or barter exchange that you are a nonresident alien or foreign entity that is not subject to U.S. information return reporting or backup withholding rules. Beginning January 1, 1984, payers of interest, brokers, and barter exchanges may have to withhold 20% of each payment or transaction if payees do not tell the payer or broker their correct taxpayer identification number or if they fail to report the interest as income on their U.S. Federal income tax return. This is referred to as "backup withholding." (The taxpayer identification number is either a U.S. social security number or Federal employer identification number.) Also, the law requires that:

● payments of interest;

● sales of securities, commodities, regulated futures contracts and forward contracts through a broker; and

● exchanges of property or services through a barter exchange

must generally be reported to the Internal Revenue Service.

Nonresident aliens (individuals who are neither citizens nor residents of the United States) and foreign partnerships, corporations, estates and trusts are not generally required to have a U.S. taxpayer identification number, nor are they subject to any backup withholding because they do not furnish such a number to a payer or broker. Also, payments to these account holders are generally not subject to U.S. reporting requirements.

**Interest Payments.**—Interest paid to you is not subject to the new withholding or reporting requirements if you are not a U.S. citizen or resident, or if you are a foreign corporation, partnership, estate or trust. Use this form to notify the payer of your foreign status.

**Broker Transactions and Barter Exchanges.**—You are exempt from U.S. withholding and reporting requirements and may use Form W-8 to notify the broker or barter exchange if you meet the following definition of an "exempt foreign person" for the calendar year in which the transaction occurs:

**Individuals.—**

● You are not a citizen or resident of the United States;

● You have not been present in the United States for 183 days or more during the calendar year, and don't plan to be (or your country has a tax treaty with the United States that exempts your transactions from U.S. taxes); and

● The gains from your transactions with the broker or barter exchange are not effectively connected (related) to any U.S. trade or business you are engaged in or plan to engage in during the year, or your country has a tax treaty with the United States that exempts your transactions from U.S. taxes.

**Nonresident Alien Married to a U.S. Citizen or Resident.**—If you are married to a U.S. citizen or resident and have made an election under section 6013(g) or (h), you are treated as a U.S. resident and may not file Form W-8.

**Corporations, Partnerships, Estates and Trusts.—**

● You are not a U.S. corporation, partnership, estate or trust; and

● The gains from your transactions with the broker or barter exchange are not effectively connected (related) to any U.S. trade or business you are engaged in or plan to engage in during the year, or your country has a tax treaty with the United States that exempts your transactions from U.S. taxes.

**Note:** Filing Form W-8 with the payer will not exempt you from the 30% (or lower treaty) flat rate tax on nonresident aliens and foreign corporations.

Where to File.—File this certificate (or substitute) with the payer (or broker or barter exchange) in the calendar year in which the payment is made or collected (or for brokerage sales or barter exchanges, the year the transaction took place), unless you have already done this in either of the two preceding calendar years.

Address.—

| If you are— | Then show the address of— |
|---|---|
| An individual . . . | Your permanent residence |
| A Partnership or Corporation . . . | Principal office |
| An estate or trust . . . | Permanent residence or principal office of any fiduciary |

16

**SIHAAA0031**

# EXHIBIT 4

# Foreign Exchange Account Agreement Addendum

| Stilton | | 5001P |
|---|---|---|
| **Customer Name** | | **Account Number** |

**Agreement
To
Pay
Interest**

**CIS Financial Services, Inc.**
233 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606

**EXHIBIT 4**

## DEFINITIONS

**"Cash Balance"**

The outstanding cash balance in each currency as reported in the Ending Account Balance section of the customers Cash Foreign Exchange Statement for each day during the prior month.

**"U.S. Treasury Bill Rate"**

The median point between the bid and ask price of the current __90__ day Treasury Bill discount rate for each day during the prior month as published in the Midwest edition of the <u>Wall Street Journal</u>.

## ADDENDUM TO FOREIGN EXCHANGE ACCOUNT AGREEMENT / NON-U.S.

### Purpose

The purpose of this agreement is to ensure compliance with certain U.S. tax rules relating to the payment of interest by CISFS to Non-U.S. clients. The agreement also specifies the terms of interest paid to the account(s).

### Interest Calculation

CISFS agrees to pay the customer account(s) (the "Account"), identified below, interest on the cash balance in the Account as follows:

For U.S. Dollar credit balances, payments will be made monthly and will be equal to the summation of the Cash Balance, multiplied by ___100%___ of the __90__ day rate for U.S. Treasury Bills publicly issued during the month divided by 360, for each calendar day in the month. The balance used will be the daily ending account balance in the Account; and

### Ownership

For purposes of this agreement, as well as all other purposes, CISFS will treat the undersigned customer as the owner of all cash balances, unrealized gains and/or losses and interest due or credited on the Account. CISFS will document the customer's ownership interest in the Account through an entry on its books.

### Transfer of Account

If at any time the customer wishes to transfer ownership of all or part of the Account, including any due or credited interest, the transfer will be effective only if CISFS receives:

(a)    a written request signed and notarized by the customer and by the party to whom the customer wishes to transfer the Account (the "Transferee"); and

(b)    an accurately completed and signed I.R.S. Form W-8 from the Transferee; and

(c)    all necessary CISFS new Foreign Exchange Account Agreements for the Transferee.

No transfer shall be effective until CISFS records the Transferee's name as the owner of the Account on its books. Further, in no event can the Account be transferred to anyone who would not be eligible to open a new account with CISFS directly.

### Acknowledgment

Acknowledged this _9_ day of _March_, 19 _2000_

Account Name: _____ Stilton

Account Number(s): _____ 5001P

By: _____
        (Signature of Authorized Person)

Title: _Herald McPike, President Stilton International_
        (Title of Authorized Person)

# EXHIBIT 5

| REFCO CAPITAL MARKETS, LTD. CUSTOMER CLAIM FORM | UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK |
|---|---|

Specific debtor against which this claim is asserted:

Refco Capital Markets, Ltd.

Name of Creditor:

Stilton International Holdings Limited

Notices to be sent to:

John R. Ashmead, Esq.
Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004

**INSTRUCTIONS**

1. Carefully read these instructions before completing.

2. This form should not be used to make a claim for post-petition administrative expense arising after the commencement of the case (10/17/2005). A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

3. In order to have your claim considered for payment and/or voting purposes, complete ALL applicable questions.

   a) Type of Claim – check the box next to the appropriate type of claim
   b) Net Liquidation Value of Account – Enter the value of the securities in the boxes provided. Value must be specified in U.S. dollars.
   c) Social Security/Tax Payer Identification – Enter the last 4 digits of your social security OR tax payer identification number
   d) Signature – sign, date and print your name and title

4. Mail completed form to:    or    Hand Deliver completed form to:
   United States Bankruptcy Court        United States Bankruptcy Court
   Southern District of New York          Southern District of New York
   Attn: Refco Inc. Claims                Attn: Refco Inc. Claims
         Docketing Center                       Docketing Center
   Bowling Green Station                  One Bowling Green , Room 534
   P.O. Box 5175                          New York, New York 10004 -4408
   New York, New York 10274 -5175

   Form must be received no later than July 17, 2006, at 5:00 pm prevailing Eastern Time. No facsimiles will be accepted. Upon receipt of this claim, the claims agent will mail you an acknowledgement.

TEL: (☐☐☐)☐☐☐-☐☐☐☐

**1. Type of Claim    (See Addendum)**

☒ Constructive Trust          ☐ Guarantee
☒ Return of Property          ☒ Unsecured Nonpriority Claim

**2. Net Liquidation Value of Account (denomination in US Dollars only):**

U.S. $ ☐☐☐ 5 4 0 0 0 0 0 0 . 0 0  *

**3. Social Security/Tax Payer Identification Number:**

Last 4 Digits of Your Social Security #: ☐☐☐☐
             OR                                    N/A

Tax Payer Identification #: ☐☐☐☐☐☐☐☐☐

**4. Signature:**

SIGN and print the name and title, if any, of the creditor or other person authorized to file this claim (attach power of attorney, if any).

_Harald McPike_
Signature

H A R A L D   M C P I K E
Printed Name

0 7 / 0 7 / 2 0 0 6
Date (mm/dd/yyyy)

D I R E C T O R
Title

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

THIS SPACE IS FOR COURT USE ONLY

POC0006                                                      0001

**SIHAAA0001**

**EXHIBIT 5**

### Addendum to Proof of Claim

1.  Stilton International Holdings ("Stilton") hereby files this Proof of Claim in respect of cash owing to it or held on its behalf by Refco Capital Markets, Ltd. ("RCM"). Copies of documents supporting Stilton's rights and claims against RCM are voluminous and have not been attached, but are available upon request.

2.  On October 17, 1997, Stilton, as customer, and CIS Financial Services Inc. ("CISFS"), predecessor to RCM , entered into that certain Foreign Exchange Account Agreement (the "Account Agreement"). The Account Agreement established a foreign exchange trading account, account number 5001P (the "Account), in respect of foreign exchange transactions (the "Transactions"). The contents of the Account at any given time included margin for existing Transactions and/or proceeds of completed Transactions.

3.  Pursuant to a March 9, 2000 Addendum to the Account Agreement (the "Addendum"), CISFS confirmed Stilton as the owner of all cash balances, unrealized gains and/or losses and any interest due or credited on the Account and that Stilton's ownership interest in the Account would be indicated through an entry on CISFS's books.

4.  On August 31, 2005, upon the sale of CISFS's business to RCM, RCM began to act as broker and custodian to Stilton.

5.  On October 18, 2005, at RCM's instruction, Stilton's open foreign exchange positions were liquidated. Stilton has a cash balance in the Account of approximately $54 million (the "Stilton Funds").

6.  On November 14, 2005, Stilton commenced an adversary proceeding against RCM, AP. No. 05-03157 (the "Adversary Proceeding"), to recover the Stilton Funds.

SIHAAA0002

The Adversary Proceeding, along with other "estate property" adversary proceedings, has been stayed by order of the Bankruptcy Court.

7.     By this Proof of Claim, Stilton makes claim to all amounts due and owing to it or that become due and owing to it in connection with the Adversary Proceeding and the deposits of cash and cash balances in the Account on October 17, 2005 (the "Petition Date").

8.     At the Petition Date, the net value to Stilton of Stilton's positions was approximately $54,000,000.

9.     Stilton reserves, and does not hereby waive, the right to seek recovery as its assets and not assets of the RCM estate the securities and cash deposited in, identified in or credited to its Account.

10.    Stilton also asserts a contingent claim for all amounts which may have or may hereafter become due and payable to it by RCM under or in connection with the Account.

11.    Stilton reserves the right to replace, amend or supplement this Proof of Claim at any time and in any respect, including, without limitation, for the purpose of (a) setting forth or changing the basis of the claims described herein, (b) providing further description or evidence of such claims and/or (c) including additional claims at law or in equity arising under or relating to the Account.

12.    Notices regarding the Proof of Claim should be sent to:

> Seward & Kissel LLP
> One Battery Park Plaza
> New York, New York 10004
> Tel.: 212-574-1200
> Fax.: 212-480-8421
> Attn: John R. Ashmead, Esq.

SIHAAA0003

13.    In filing this Proof of Claim, Stilton does not submit itself to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim, and does not waive its right to seek a jury trial.

SK 25387 0001 684055

3

SIHAAA0004

# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Refco Inc., et al., | : | Case No. 05-60006 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**RCM PLAN ADMINISTRATOR'S AMENDED NOTICE OF (1) SEVENTH
INTERIM DISTRIBUTION OF RCM ASSETS IN PLACE AND
(2) FIFTH INTERIM DISTRIBUTION OF ADDITIONAL PROPERTY**

PLEASE TAKE NOTICE that the Plan Administrator (the "RCM Plan Administrator")

of Refco Capital Markets, Ltd. ("RCM"), a debtor in the above-captioned bankruptcy cases,[1]

filed the motion for entry of an order (1) allowing certain claims and classifying certain claims

by agreement, (2) authorizing and directing a third interim distribution in respect of allowed

claims and disputed claims reserves, in each case, pursuant to the Joint Chapter 11 Plan of Refco

Inc. and Certain of its Direct and Indirect Subsidiaries, and (3) authorizing the RCM Plan

Administrator to make distributions more frequently than quarterly (the "Third Interim

Distribution Motion") [Docket No. 5242].[2]

---

[1] The following entities are Debtors in these chapter 11 cases: Bersec International LLC; Kroeck & Associates, LLC; Lind-Waldock Securities LLC; Marshall Metals, LLC; New Refco Group Ltd., LLC; Refco Administration, LLC; Refco Capital Holdings, LLC; Refco Capital LLC; Refco Capital Management, LLC.; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial, LLC; Refco Fixed Assets Management, LLC; Refco F/X Associates, LLC; Refco Global Capital Management LLC; Refco Global Finance Limited; Refco Global Futures, LLC; Refco Global Holdings, LLC; Refco Group Ltd., LLC; Refco Inc.; Refco Information Services, LLC; Refco Managed Futures, LLC; Refco Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summit Management, LLC; and Westminster-Refco Management LLC. Refco Capital Markets, Ltd. is a debtor in these chapter 11 cases, but not a debtor-in-possession.

[2] Capitalized terms used herein or in the Exhibits or Annexes to this Notice but not defined herein or therein shall have the meanings ascribed to such terms in the Third Interim Distribution Motion, including by reference to the Plan described therein.

A/72574331.1

**EXHIBIT 6**

PLEASE TAKE FURTHER NOTICE that the Court entered an order (the "Third Interim Distribution Order") [Docket No. 5327] on June 6, 2007 granting the Third Interim Distribution Motion.

PLEASE TAKE FURTHER NOTICE that, pursuant to paragraph 1.d. of the Third Interim Distribution Order, the Court ordered that, in respect of each distribution to be made by the RCM Plan Administrator after the third interim distribution, (1) no further order of the Court is required and (2) the RCM Plan Administrator is required to file with the Court and serve on the electronic service list maintained in these cases, no later than three business days in advance of such distribution, a notice (each, a "Required Notice") containing (a) as necessary, a restatement of the claim exhibits attached to the Third Interim Distribution Order showing the results of further claims resolution efforts and (b) a statement of the amounts proposed to be distributed and amounts proposed to be placed into disputed claims reserves, in each case, consistent with the RCM Plan Administrator's practice in connection with the first, second, and third interim distributions.

PLEASE TAKE FURTHER NOTICE that on June 20, 2007, the RCM Plan Administrator filed the Notice of (1) Fourth Interim Distribution of RCM Assets in Place and (2) First Interim Distribution of Additional Property [Docket No. 5452] (the "June 2007 Distribution Notice").

PLEASE TAKE FURTHER NOTICE that, based on the Plan elections made by claimants, the distributions made pursuant to the June 2007 Distribution Notice resulted in certain Holders of Allowed Class 3 RCM FX/Unsecured Claims and Allowed Class 4 RCM Securities Customer Claims receiving a share of Additional Property while others did not.

A/72574331.1

PLEASE TAKE FURTHER NOTICE that to resolve the ambiguities surrounding certain Plan election issues and provide additional time for those claimants who did not receive the first interim distribution of Additional Property to elect to do so, on July 12, 2007 the RCM Plan Administrator filed that Motion for Entry of an Order (1) Deeming Certain RCM Creditors to Have Made Certain Plan Elections and (2) Authorizing Distribution to, or Reserves for, Such Newly Electing Creditors of Shares of the RCM Cash Distribution and Shares of 50% of the RGL FXCM Distribution, In Each Case Pursuant to the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries [Docket No. 5554] (the "Elections Motion").

PLEASE TAKE FURTHER NOTICE that on August 15, 2007, the Court entered an order granting the Elections Motion [Docket No. 5727] (the "Elections Order"). Pursuant to the Elections Order, virtually every creditor of RCM potentially entitled to share in Additional Property proceeds has either made or has been deemed to have made the ballot elections that will enable such creditors to receive Additional Property (the "Electing Creditors").

PLEASE TAKE FURTHER NOTICE that as contemplated by the Elections Motion and Elections Order, on August 15, 2007, the RCM Plan Administrator filed the Notice of Interim Distribution Of Additional Property For Certain Holders Of Allowed Class 3 RCM FX/Unsecured And Class 4 RCM Securities Customer Claims [Docket No. 5736] to provide for a distribution (or appropriate reserve in the RCM Disputed Claims Reserve) of Additional Property to those Electing Creditors who did not previously receive a distribution of Additional Property in connection with the June 2007 Distribution Notice.

PLEASE TAKE FURTHER NOTICE that on September 12, 2007, the RCM Plan Administrator filed the RCM Plan Administrator's Notice of (1) Fifth Interim Distribution of

3

RCM Assets in Place and (2) Second Interim Distribution of Additional Property [Docket No. 5852].

PLEASE TAKE FURTHER NOTICE that on November 13, 2007, the RCM Plan Administrator filed the RCM Plan Administrator's Notice of Sixth Interim Distribution of RCM Assets in Place to Holders of Allowed Class 4 RCM Securities Customer Claims Solely in Respect of the SPhinx Settlement Proceeds [Docket No. 6249].

PLEASE TAKE FURTHER NOTICE that on December 19, 2007, the RCM Plan Administrator filed the RCM Plan Administrator's Notice of Third Interim Distribution of Additional Property [Docket No. 6327].

PLEASE TAKE FURTHER NOTICE that on March 21, 2008, the RCM Plan Administrator filed the RCM Plan Administrator's Notice of Fourth Interim Distribution of Additional Property [Docket No. 6529], which notice the RCM Plan Administrator amended on March 24, 2007 by filing the RCM Plan Administrator's Amended Notice of Fourth Interim Distribution of Additional Property [Docket No. 6533].

PLEASE TAKE FURTHER NOTICE that on June 20, 2008, the RCM Plan Administrator filed the RCM Plan Administrator's Notice of (1) Seventh Interim Distribution of RCM Assets in Place and (2) Fifth Interim Distribution of Additional Property [Docket No. 6663] (the "June 2008 Distribution Notice").

PLEASE TAKE FURTHER NOTICE that subsequent to the filing of the June 2008 Distribution Notice, the RCM Plan Administrator was made aware of a clerical error in connection with the cumulative percentage recoveries for allowed RCM Securities Customer Claims and allowed RCM FX/Unsecured Claims.

A/72574331.1

PLEASE TAKE FURTHER NOTICE that the RCM Plan Administrator is filing this amendment to the June 2008 Distribution Notice (the "Amended June 2008 Distribution Notice") to update the cumulative percentage recoveries for allowed RCM Securities Customer Claims and allowed RCM FX/Unsecured Claims.

PLEASE TAKE FURTHER NOTICE that all changes to the attached Annexes from the June 2008 Distribution Notice to this Amended June 2008 Distribution Notice are highlighted in blackline form.

PLEASE TAKE FURTHER NOTICE that (1) the RCM Plan Administrator intends to make a seventh interim distribution of Assets in Place and a fifth interim distribution of Additional Property, in each case, on or about June 26, 2008; (2) this notice is the Required Notice in respect thereof; and (3) attached hereto and incorporated herein are (a) Annex 1, which is a restatement of all claims against RCM that continue to receive distributions or benefit from reserve deposits (*i.e.*, claims which appear on claims Exhibits A1, B1, E1, and E3), and (b) Annex 2, which is a statement of the amounts of Assets in Place and Additional Property proposed to be distributed and amounts proposed to be placed into reserves.

Dated: New York, New York
    June 20, 2008

**BINGHAM MCCUTCHEN LLP**

By:  /s/ Steven Wilamowsky
    Steven Wilamowsky (SW-9266)
    Mark W. Deveno (MD-8708)
    399 Park Avenue
    New York, NY 10022
    (212) 705-7000

Counsel for the RCM Plan Administrator

5

A/72574331.1

**Annex 2**

1.    Introduction.    To date, the RCM Plan Administrator has made six interim distributions from Assets in Place and four interim distributions from Additional Property. In sum, the six interim distributions from Assets in Place aggregate to recoveries of approximately $2.16 billion or 76.61% to holders of Allowed RCM Securities Customer Claims and $156.17 million or 24.49% to holders of Allowed RCM FX/Unsecured Claims. The four interim distributions from Additional Property resulted in recoveries of $397.50 million or 14.06% to holders of Allowed RCM Securities Customer Claims and $118.78 million or 18.84% to holders of Allowed RCM FX/Unsecured Claims.[1]  In each case, appropriate amounts were placed into reserves on account of disputed claims. The RCM Plan Administrator now intends (a) to distribute approximately $19.89 million from Assets in Place to the claimants listed on Exhibit A1 of Annex 1, (b) to distribute approximately $10.48 million from Additional Property to the claimants listed on Exhibit A1 of Annex 1 and approximately $7.83 million from Additional Property to the claimants listed on Exhibit B1 of Annex 1, and (c) to reserve approximately $22.56 million and $52.45 million in cash in the RCM Disputed Claims Reserve, out of RCM's Assets in Place and Additional Property, respectively.

2.    Deductions from and Additions to Available Cash. From the aggregate available cash, as required by the Plan, the RCM Settlement Agreement, and other Court orders, the RCM Plan Administrator will also maintain, replenish or adjust reserves previously established.

3.    Assumptions for Calculation of Reserves. To calculate disputed claims reserves, the RCM Plan Administrator has assumed that claims ultimately will be allowed in the sum of (a) the agreed claims shown on Exhibits A1 and B1 of Annex 1 and (b) the filed claims shown on Exhibits E1 and E3 of Annex 1 (the "High Case Claims"). In the business judgment of the

---

[1] In certain limited cases, in accordance with applicable Plan elections, a portion of the distributions that otherwise would have been available to certain claimants has been (and will continue to be) redirected to BAWAG or otherwise recycled to other holders of allowed claims in accordance with the Plan.

RCM Plan Administrator, all reserves are adequate to assure that sufficient cash will be available ultimately to pay all allowed claims.

4.      _Allocation of RCM's Assets in Place to RCM Securities Customer Claims._  The aggregate cash available for the seventh interim distribution from Assets in Place will be allocated as between RCM Securities Customer Claims pursuant to the terms of the RCM Settlement Agreement. For purposes of calculating the seventh interim distribution's percentage dividend to holders of allowed RCM Securities Customer Claims, the amount of cash available for the seventh interim distribution to holders of RCM Securities Customer Claims is divided by the sum of the High Case Claims that are RCM Securities Customer Claims.  Based on these calculations, and other than claims in convenience classes (which are described in the Initial Distribution Motion and have already been paid), the RCM Plan Administrator estimates that there are sufficient funds for a distribution from Assets in Place of a seventh interim dividend in respect of all allowed RCM Securities Customer Claims of 0.74%.[2]

5.      _Allocation of Additional Property Proceeds to RCM Securities Customer Claims and RCM FX/Unsecured Claims_. Upon receipt, proceeds of Additional Property are to be distributed to RCM creditors pursuant to a complex waterfall formula which is set forth in the RCM Settlement Agreement.  Reference is hereby made to the RCM Settlement Agreement, the terms of which govern in the event of any conflict between such terms and this Annex 2. In summary, however, the RCM Plan Administrator is required to apply the proceeds of Additional Property: *first* as needed, to certain administrative and priority claims, *second* the next

---

[2]  The percentages set forth throughout this Annex are for illustrative purposes only, and the actual percentages may vary based on the outcome of claims resolution and other matters after the date hereof.

2

$150 million, Pro Rata to holders of allowed RCM Securities Customer Claims on account of their Implied Deficiency Claims and holders of allowed RCM FX/Unsecured Claims (subject to adjustment on account of certain administrative and priority claims advanced out of Assets in Place otherwise allocated to holders of RCM Securities Customer Claims), *third* to holders of allowed RCM Securities Customer Claims until the Risk Return Amount and the Advance Amount have been paid, *fourth* in payment of True-up Distributions and *thereafter* Pro Rata. Three exhibits annexed hereto summarize the details of the calculations under this complex waterfall:  Exhibit A of this Annex 2 sets forth the calculation of total RCM Assets in Place and Customer Property at December 15, 2006 and sets forth the details of the calculation of Implied Deficiency Claims and Pro Rata Shares; Exhibit B of this Annex 2 sets forth the calculation of the Advance Amount and the Risk Return Amount; and Exhibit C of this Annex 2 demonstrates how all five interim distributions of Additional Property totaling approximately $587.07 million will have been allocated as between RCM FX/Unsecured Claims and RCM Securities Customer Claims under the RCM Settlement Agreement, including the repayment of the Advance Amount and the Risk Return Amount.  The initial distribution of Additional Property satisfied the Advance Amount and Risk Return Amount as described in Exhibit C of this Annex 2.  Pursuant to the Plan, by the date of the fifth interim distribution of Additional Property, the RCM Plan Administrator will have received $542.30 million of Additional Property from the Contributing Debtors, $385.92 million of which was received prior to the date of the first interim distribution of Additional Property in or around June 2007, an additional $39.14 million of which was received by the date of the second interim distribution of Additional Property in or around September 2007, an additional $68.61 million of which was received by the date of the third interim distribution of Additional Property in or around December 19, 2007, an additional $29.25 million of which was received by the date of the fourth interim distribution of Additional

3

Property in or around March 2008, and $19.11 million of which was received by the date of the fifth interim distribution of Additional Property in or around June 2008. RCM has also received Additional Property from other sources totaling approximately $45.04 million, $14.08 million of which was received prior to the date of the first interim distribution of Additional Property in or around June 2007, an additional $21.9 million of which was received by the date of the second interim distribution of Additional Property in or around September 2007, an additional $4.4 million of which was received by the date of the third interim distribution of Additional Property in or around December 2007, an additional $750,000 of which was received by the date of the fourth interim distribution of Additional Property in or around March 2008, and an additional $3.89 million of which was received by the date of the fifth interim distribution of Additional Property in or around June 2008. As a result of the Additional Property received by the RCM Plan Administrator since the date of the fourth interim distribution of Additional Property, $23.0 million is now available for the distribution (or appropriate amounts being placed in reserves). This amount is first allocated to RCM Securities Customer Claims and RCM FX/Unsecured Claims by the Pro Rata Shares in Exhibit A of this Annex 2, as Trued-up in December 2007

4

(*i.e.*, 45.33% to RCM Securities Customer Claims and 54.67% to RCM FX/Unsecured Claims).[3] For purposes of calculating this distribution's percentage dividend to, or deposits into the RCM Distribution Reserve for, holders of allowed RCM Securities Customer Claims, the amount of Additional Property available for distribution to holders of allowed RCM Securities Customer Claims is divided by the sum of the High Case Claims that are RCM Securities Customer Claims. For purposes of calculating this distribution's percentage dividend, or deposits into the RCM Distribution Reserve for holders of allowed RCM FX/Unsecured Claims, the amount of Additional Property available for distribution to holders of RCM FX/Unsecured Claims is divided by the High Case Claims that are RCM FX/Unsecured Claims. Based on these calculations, the RCM Plan Administrator estimates that there are sufficient funds for distribution from Additional Property of (a) a dividend in respect of all allowed RCM Securities Customer Claims of 0.39% and (b) a dividend in respect of all allowed RCM FX/Unsecured Claims of 1.24%. Of course, since not all claims are agreed, not all available dollars will be distributed, and instead the RCM Plan Administrator may make a ratable deposit of cash into the RCM Disputed Claims Reserve on account of such unresolved claims.

---

[3] In calculating the initial Pro Rata Shares, the RCM Plan Administrator estimated that the total amount of Allowed RCM Securities Customer Claims would be $2,835,000,000 and that the total amount of Allowed RCM FX/Unsecured Claims would be $900,000,000. Accordingly, under the first and second interim distributions of Additional Property, Allowed Class 4 RCM Securities Customer Claims and Allowed Class 3 RCM FX/Unsecured Claims received 44.93% and 55.07% of Additional Property, respectively. Section 6(d) of the RCM Settlement Agreement requires subsequent distributions of Additional Property to be applied as True-up distributions and thereafter Pro Rata. In accordance with Section 8(a) of the RCM Settlement Agreement, the Pro-Rata Shares were Trued-up in December, 2007 in connection with the third interim distribution of Additional Property to reflect updated estimates of claims. At such time, the RCM Plan Administrator estimated that the total amount of Allowed RCM Securities Customer Claims would be $2,837,000,000 and that the total amount of Allowed RCM FX/Unsecured Claims would be $888,000,000. No additional True-up was made in connection with the fourth interim distribution of Additional Property. Likewise, because these are still disputed FX/Unsecured Claims, for purposes of this fifth interim distribution of Additional Property, no additional True-up will be made, although the final allowed total of Securities Customer Claims is $2,835,617,000. The Pro Rata Shares will be Trued-up at the time of future distributions, after all FX/Unsecured Claims are finally resolved.

6.    <u>Cumulative Effect of Amounts to be Distributed or Placed into Reserves</u>.
Together with the first through seventh interim distributions from Assets in Place and the first
through fifth interim distributions from Additional Property, the current distributions from Assets
in Place and Additional Property will result in holders of allowed RCM Securities Customers
Claims receiving approximately 44.57~~91.80~~% of allowed claims and holders of allowed RCM
FX/Unsecured Claims receiving approximately ~~91.80~~44.57% of allowed claims.  Reserves will
be adjusted and maintained accordingly.  Amounts to be distributed are allocated among holders
of allowed RCM Securities Customers Claims and holders of allowed RCM FX/Unsecured
Claims as provided in the RCM Settlement Agreement.  These amounts have been determined by
the RCM Plan Administrator in his business judgment based on the above-provided analysis.

6

**EXHIBIT A**

## Calculations of Implied Deficiency Claims
## and Pro Rata Shares under
## RCM Settlement Agreement

| | |
|---|---:|
| Assets in Place at 12/15/06 [1] | $2,499,399,679 |
| Minus: Recoveries per Section 14(b)(A) and 14(b)(D) of the RCM Settlement Agreement and Secured Claims | 308,641,467 |
| Customer Property at 12/15/06 | $2,190,758,212 |
| | |
| Estimated Allowed Securities Customer Claims [2] | $2,837,000,000 |
| Plus: Administrative and Priority Claims Paid from Assets in Place Pursuant to Section 8(b) of the RCM Settlement Agreement | 90,000,719 |
| | |
| Gross Securities Customer Claims | 2,927,000,719 |
| | |
| Minus: Customer Property at 12/15/06 | 2,190,758,212 |
| | |
| Estimated Implied Securities Customer Deficiency Claims | $736,242,507 |
| | |
| Plus: Estimated Allowed FX/General Unsecured Claims [3] | 888,000,000 |
| | |
| Total Estimated Implied Securities Deficiency Claims and FX/General Unsecured Claims | $1,624,242,507 |
| | |
| Pro Rata Shares of Total Estimated Claims Pursuant to Section 8(a) of the RCM Settlement Agreement: [4] | |
| Securities Customers | 45.33% |
| | |
| FX/General Unsecured | 54.67% |

(1)   Determined 15 days before the initial distribution pursuant to Section 8(c) of the RCM Settlement Agreement.

(2)   Estimated based on most current information. To date $2,835,617,000 of Securities Customer Claims have been allowed; there are no reserves for disputed Securities Customer Claims, as all such claims have been resolved.

(3)   Estimated based on most current information. To date $637,620,000 of FX/General Unsecured Claims have been allowed; reserves for disputed FX/General Unsecured Claims aggregate $259.65 million.

(4)   Under the First and Second Interim Distributions of Additional Property, Securities Customers and FX/General Unsecured Claims received 44.93% and 55.07% of Additional Property, respectively. In accordance with Section 8(a) of the RCM Settlement Agreement, the Pro-Rata Shares were Trued-up in December, 2007 in connection with the Third Interim Distribution of Additional Property to reflect updated estimates of claims.

**EXHIBIT B**

**Calculations of Advance Amount
and Risk Return Amount**

**I. Calculation Of Amounts Advanced To FX/General Unsecured Claimants**

| | |
|---|---|
| Total FX/General Unsecured Distributions Pursuant Section 5(B) | $221,000,000 |
| Minus Agreed FX/General Unsecured Property, Including Interest Pursuant to Section 14(b)(A) | 100,992,219 |
| Total Advance Amount | $120,007,781 |

**II. Calculation Of Interest Earned On Disputed Claim Reserve To Credit Against Risk Return Amount [1]**

| | 1st Distribution | 2nd Distribution | 3rd Distribution | Additional Property Distribution |
|---|---|---|---|---|
| Distribution Date | 12/28/2006 | 3/29/2007 | 6/7/2007 | 6/25/2007 |
| Total Amount Held by RCM for Benefit of FX/General Unsecured Claims | $100,992,219 | $98,490,497 | $53,294,412 | $36,788,880 |
| Days | 13 | 91 | 70 | 18 |
| Interest Earned On Reserves at 4.74% | 170,497 | 1,163,915 | 484,468 | 85,995 |
| Advance Amount | 120,007,781 | | | |
| Total Distributed To FX/General Unsecured Claimants | (122,680,000) | (46,360,000) | (16,990,000) | |
| Total Amounts Held In Reserve | $98,490,497 | $53,294,412 | $36,788,880 | $36,874,875 |

**III. Calculation Of Total Advance Amount Plus Risk Return Amount**

| | | |
|---|---|---|
| Advance Amount | $120,007,781 | |
| Initial Distribution Date | 12/28/2006 | |
| Estimated Distribution Of Additional Property | 6/25/2007 | |
| Days For Interest Calculation | 179 | |
| Risk Return Amount On Advance Amount At 12%, Pursuant To 6(c)(I) | 7,062,376 | $7,062,376 |
| | | (1,904,875) |
| Advance Amount Plus Risk Return Amount | 127,070,157 | $5,157,501 |
| Total Interest Earned On Disputed Claim Reserve To Credit Against Risk Return Amount | $(1,904,875) | |
| Advance Amount Plus Risk Return Amount, Net Of Interest Credit On Disputed Claim Reserve | $125,165,282 | |

A/72571872.3

(1)    Under Section 5(b) of the RCM Settlement Agreement a fixed sum of $221 million was allocated to holders of RCM FX/Unsecured Claims from Assets in Place. That sum included the Advance Amount. Pursuant to Sections 10(b) and 10(c) of the RCM Settlement Agreement, the RCM Trustee (and subsequently the RCM Plan Administrator) established appropriate reserves for disputed claims, including disputed claims of holders of RCM FX/Unsecured Claims otherwise entitled to share in the $221 million sum.

Funds in the disputed RCM FX/Unsecured Claims reserve earn interest for the benefit of holders of allowed RCM Securities Customer Claims as derived from Assets in Place. Interest also accrues for the benefit of holders of allowed Securities Customer Claims on the Advance Amount in the form of the Risk Return Amount. However, Section 6(c) of the RCM Settlement Agreement did not specifically describe whether the Risk Return Amount also accrues on the funds in the disputed RCM FX/Unsecured Claims reserve attributable to the Advance Amount.

The RCM Plan Administrator has determined that interest accrues on the funds in the disputed RCM FX/Unsecured Claims reserve attributable to the Advance Amount, but the RCM Plan Administrator has also determined to credit against the Risk Return Amount the interest earned on funds in the disputed RCM FX/Unsecured Claims reserve. The RCM Plan Administrator has done so to avoid the unfair result of the interest earned on the funds in the reserve being for the benefit of holders of allowed RCM Securities Customer Claims while the holders of allowed RCM Securities Customer Claims also receive the full Risk Return Amount. The credit reduces the Risk Return Amount to holders of allowed RCM Securities Customer Claims, in effect giving the benefit of the interest earned on the funds in the reserve to the holders of allowed RCM FX/Unsecured Claims.

A/72571872.3

**EXHIBIT C**

**Calculation of Pro Rata Distribution
of $587.07 Million of Additional Property
Under Section 6(b) of the Agreement[1]**

**Calculation Of Initial Pro Rata Distribution Of Additional Property:**

| | Total | Securities Customer Allocation | FX/General Unsecured Allocation |
|---|---|---|---|
| Initial Pro Rata Allocation Section 6(b) | $150,000,000 | | |
| Administrative Claims in Excess Of $60 Million Section 6(b) | (30,000,719) | $30,000,719 | |
| Applicable Proceeds for Initial Allocation | $119,999,281 | $119,999,281 | $119,999,281 |
| Pro Rata Shares Pursuant to Section 8(a) | | 45.33% | 54.67% |
| Distribution of Initial Amount, Pursuant to Section 6(b) | $119,999,281 | $54,395,674 | $65,603,607 |

**Application of Remaining Proceeds To Advance Repayment:**

| | | | |
|---|---|---|---|
| Additional Property for Allocation | $587,070,000 | | |
| Minus: Distribution of Initial Amount | (150,000,000) | | |
| Remaining Additional Property, Subject to Advance Repayment | $437,070,000 | | |
| Pro Rata Shares Pursuant to Section 8(a) | | 45.33% | 54.67% |
| Gross Allocation of Remaining Additional Property [2] | $437,070,000 | $198,123,831 | $238,946,169 |
| Risk Return Amount, net of Interest Earned on Disputed Claim Reserve Through 6/25/2007 | | | 5,157,501 |
| FX/General Unsecured Allocation Applied To Interest Repayment | | 5,157,501 | (5,157,501) |
| Advance Amount (Principal) | | | 120,007,781 |
| FX/General Unsecured Allocation Applied To Advance Amount Repayment | | 120,007,781 | (120,007,781) |
| Remaining Additional Property Distributed, After Advance Amount Repayment | $437,070,000 | $323,289,113 | $113,780,887 |
| **Total Of Additional Property Received From Contributing Debtors** | $587,070,000 | $407,685,506 | $179,384,494 |

(1)    Under the RCM Settlement Agreement, the RCM Plan Administrator made the First and Second Interim Distribution of Additional Property, totaling approximately $456.07 million in accordance with the RCM Administrator's June 2007 estimate of Allowed Securities Customer and FX/General Unsecured Claims. In accordance with the RCM Settlement, the RCM Administrator updated these Estimates in December 2007 in connection with the Third Interim Distribution of Additional Property and Trued-up the amounts payable to Allowed Securities Customer and FX/General Unsecured Claims based on the Revised Calculation less amounts paid previously. This Exhibit shows how the $587.07 million of Additional Property will be allocated as required under the RCM Settlement Agreement between holders of allowed RCM Securities Customer Claims and holders of allowed RCM FX/Unsecured Claims using the same estimates as the Third Interim Distribution of Additional Property. The RCM Plan Administrator will perform further True-ups as claims are resolved.

(2)    After the initial allocation of the first $150 million of Additional Property, the entire Risk Return Amount and Advance Amount were paid out of the next $137,678,465 that would otherwise have been distributed to the holders of allowed RCM FX/Unsecured Claims. This occurred in the First Distribution of Additional Property.

**Annex 1**

.

o

In re: Refco Capital Markets, LTD.
Case No. 05-60018

**E3**

**Claims Subject to Preference Recovery Actions**

(For Purposes of 6th Interim Distribution of Assets in Place and 5th Interim Distribution of Additional Property– REVISED June 11, 2008)

| Name | Claim Number | Filed Claim Total or Amount Previously Agreed and Allowed | Type of Claim | Treatment | Previous Exhibit, If Modified |
|------|------|------|------|------|------|
| **IN ACCORDANCE WITH TREATMENT PREVIOUSLY ORDERED** | | | | | |
| BAYERISCHE HYPO-UND VEREINSBANK AG | 10782 | $534,570.49 | FX | Distribution withheld pending resolution of preference recovery action | |
| COSMOREX LTD | 10138 | $105,850,964.00 | FX | Distribution withheld pending resolution of preference recovery action | |
| CREATIVE FINANCE LIMITED | 10136 | $4,235,972.00 | FX | Distribution withheld pending resolution of preference recovery action | |
| CREATIVE FINANCE LIMITED | 10137 | $65,445,343.00 | FX | Distribution withheld pending resolution of preference recovery action | |
| NIKKO FUTURES FUND | 10015 | $1,355,107.69 | FX | Distribution withheld pending resolution of preference recovery action | |
| STILLTON INTERNATIONAL HOLDINGS LIMITED | 9124 | $54,000,000.00 | FX | Distribution withheld pending resolution of preference recovery action | |
| **GRAND TOTAL:** | | **$231,421,957.18** | | | |

# EXHIBIT 7

**The New York Times**



August 9, 2007

# Bankruptcy Trustee Sues Big Investor in Refco

### By FLOYD NORRIS

Correction Appended

The trustee for Refco, a commodities brokerage firm that collapsed in fraud a few months after it went public in 2005, has sued Thomas H. Lee, the private equity firm that controlled Refco, saying the firm should have known about the fraud before it sold stock.

The suit, filed yesterday in Federal District Court in Manhattan, seeks hundreds of millions of dollars in damages. The firm has argued that it was also a victim of a fraud that federal prosecutors say was engineered by Refco's former chief executive, Phillip R. Bennett.

Refco investors lost more than $1 billion when the firm faltered.

"The story of T.H.L.'s misconduct," the complaint stated, referring to both Mr. Lee, the founder of the equity firm, and the companies he controlled, "is one of greed and a failure of integrity."

"T.H.L. defendants have hidden from public view their extensive knowledge of the serious problems at Refco" before the public offering, the complaint said.

A spokesman for the Lee companies called the suit "misdirected and entirely without merit."

Refco collapsed in late 2005, only months after it went public, and shareholders were wiped out.

According to the indictments in the case and to investigations conducted by Refco, Mr. Bennett had been hiding hundreds of millions of dollars in losses at Refco for many years, showing instead that the company was owed the money by outsiders. Mr. Bennett and two other former Refco executives are scheduled to go on trial on March 17. The Lee company and funds that it managed took control of Refco in a leveraged buyout in 2004. The suit does not maintain that Lee executives knew of the fraud, but does argue that they knew of numerous problems at Refco and had evidence that Mr. Bennett had lied to them, well before the public offering.

It states that after an informant told Mr. Lee that Refco had transferred losses to a foreign subsidiary in the 1990s to hide the losses, the accounting firm KPMG, which was advising Thomas H. Lee, suggested an audit that would have uncovered the fraud.

But Mr. Lee instead accepted Mr. Bennett's assurances that the transfers had been done for tax reasons and were not relevant to the firm's current condition.

Through dividends and proceeds from the offering, the Lee defendants recovered $162.5 million and obtained another $113 million from management contracts, the suit states.

**EXHIBIT 7**

Case 1:08-cv-00361-JJF    Document 21-3    Filed 07/15/2008    Page 28 of 64

In an interview, Marc S. Kirschner, the trustee of the Refco Liquidation Trust, said he expected to file additional suits, but would not name defendants.

"There were a number of red flags that the Lee folks ignored," he said. "They learned of significant problems at Refco, which they basically ignored in the rush to go public."

The suit was filed two weeks after the Lee operations filed their own suit, against the law firm that represented Refco before the buyout, Mayer, Brown, Rowe & Maw.

That suit said that lawyers from Mayer, Brown were involved in the transactions that hid the fraud and should have disclosed them.

Yesterday, the Lee spokesman said the private equity firm intended to sue Grant Thornton, Refco's former auditors, "and are actively evaluating potential claims against other responsible parties."

The suit filed yesterday paints a picture of Thomas H. Lee as a firm that had learned that Refco was a mess, with its accounting in disarray and significant evidence that it had illegally used customer funds.

"Rather than fix the problems at Refco, the T.H.L. defendants made a conscious choice to bury those problems," the suit stated, adding that they "operated Refco with a singular goal of getting a payday for themselves as quickly as possible."

The suit also claimed that the Lee companies were in a hurry because they were raising a new private equity fund and believed that a quick profit at Refco would help to "create a favorable track record for marketing purposes."

Correction: August 11, 2007

An article and headline in Business Day on Thursday about a suit involving the collapse of the commodities firm Refco, and the High & Low Finance column on Friday about the same subject, referred incorrectly to both the defendants and the plaintiff in the suit. As the article described, the suit was filed by the trustee of the Refco Liquidation Trust, which represents creditors of Refco. He is not the Refco bankruptcy trustee, as the headline said, nor is he the trustee of the company, as the first paragraph said.

The article and the column should have pointed out that the Thomas H. Lee Partners and partnerships run by that firm, which are defendants in the suit, are no longer controlled by Thomas H. Lee, who severed his ties with the firm in 2006. Mr. Lee is named as a defendant because of his role as a director of Refco, and the suit names several other former directors who were not identified in the article.

The article and column also misstated certain allegations in the lawsuit. The suit stated that representatives of the Lee companies, not Mr. Lee himself, had failed to thoroughly investigate allegations of irregularities before the Lee companies took control of Refco, and had failed to disclose their knowledge of problems at the company before it went public in 2005.

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT 8

No. **140234**

British Virgin Islands
The International Business Companies Act
(Cap. 291)

# MEMORANDUM OF ASSOCIATION
## AND
## ARTICLES OF ASSOCIATION
## OF

**STILTON INTERNATIONAL HOLDINGS LIMITED**

Incorporated the **19th** day of    **January**    , 19  **95**



B.V.I. COMPANY FORMATIONS LTD.
P.O. Box 146
Road Town
Tortola
British Virgin Islands



CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
**SIHAAA0296**

**EXHIBIT 8**

## MEMORANDUM OF ASSOCIATION

### OF

### STILTON INTERNATIONAL HOLDINGS LIMITED

### INDEX

| CLAUSE | | PAGES |
|---|---|---|
| 1 | Name | 1 |
| 2 | Registered Office | 1 |
| 3 | Registered Agent | 1 |
| 4 | General Objects and Powers | 1 |
| 5 | Exclusions | 1-2 |
| 6 | Share Capital | 2-3 |
| 7 | Amendments | 3 |
| 8 | Definitions | 3 |



CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0297

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

MEMORANDUM OF ASSOCIATION

OF

STILTON INTERNATIONAL HOLDINGS LIMITED

1.    **NAME**

The name of the company is   Stilton International Holdings Limited.

2.    **REGISTERED OFFICE**

The Registered Office of the Company will be the offices of Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands or such other place within the British Virgin Islands as the Company from time to time may determine by a resolution of directors.

3.    **REGISTERED AGENT**

The Registered Agent of the Company will be Trident Trust Company (B.V.I.) Limited or such other qualified person in the British Virgin Islands as the Company from time to time may determine by a resolution of directors.

4.    **GENERAL OBJECTS AND POWERS**

The object of the Company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands which are necessary or conducive to the conduct, promotion or attainment of the object of the Company.

5.    **EXCLUSIONS**

5.1    The Company has no power to:

5.1.1    carry on business with persons resident in the British Virgin Islands;

5.1.2    own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph 5.2.5 of sub clause 5.2,

1

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0298

5.1.3   carry on banking or trust business unless it is licensed under the Banks and Trust Companies Act, 1990;

5.1.4   carry on business as an insurance or reinsurance company, insurance agent or insurance broker unless it is licensed under an enactment authorising it to carry on that business;

5.1.5   carry on business of company management, unless it is licensed under the Company Management Act, 1990; or

5.1.6   carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

5.2   For the purposes of paragraph 5.1.1 of sub clause 5.1, the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if,

5.2.1   it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands,

5.2.2   it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands,

5.2.3   it prepares or maintains books and records within the British Virgin Islands,

5.2.4   it holds, within the British Virgin Islands, meetings of its directors or members,

5.2.5   it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained,

5.2.6   it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act, or

5.2.7   shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act.

6.   **SHARE CAPITAL**

6.1   CURRENCY

Shares in the Company shall be issued in the currency of The United States of America.

2

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0299

6.2    AUTHORISED CAPITAL

The authorised capital of the Company is US$50,000.00 divided into 50,000 shares of one dollar (US$1.00) par value each.

6.3    CLASSES OF SHARES

The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

6.4    RIGHTS, QUALIFICATIONS OF SHARES

The directors shall by resolution have the power to issue any class or series of shares that the company is authorised to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions.

6.5    REGISTERED OR BEARER SHARES

6.5.1    The directors are authorised at their discretion to determine by resolution whether shares are to be issued as registered shares or as shares to bearer or both.

6.5.2    Shares issued as registered shares may be exchanged for shares issued to bearer. Shares issued to bearer may be exchanged for registered shares.

6.5.3    Notice to the holders of shares issued to bearer shall be sent by prepaid registered post addressed to the adressee to which the original bearer shares were despatched and notice to such address shall constitute proper service upon the bearer of such shares.

6.6    TRANSFER OF SHARES

Registered shares in the Company may be transferred subject to the prior or subsequent approval of the Company as evidenced by a resolution of directors or by a resolution of members.

7.    AMENDMENTS

The Company may amend its Memorandum of Association and Articles of Association in any way permitted by the International Business Companies Act by a resolution of members or a resolution of directors.

8.    DEFINITIONS

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.

3

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0300

We, the undersigned, of the address stated below, for the purpose of incorporating an Internationa Business Company under the laws of the British Virgin Islands hereby subscribe our name to thi Memorandum of Association the 19th day of January, 1995 in the presence of the undersigned witness

NAME AND ADDRESS
OF WITNESS

SUBSCRIBER

Janet Peters,
c/o P.O. Box 146,
Road Town, Tortola,
British Virgin Islands.

B. R. Good

Trident Trust Company (B.V.I.) Limited,
P.O. Box 146,
Wickhams Cay 1,
Road Town, Tortola,
British Virgin Islands.



4

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0301

# ARTICLES OF ASSOCIATION

## OF

## STILTON INTERNATIONAL HOLDINGS LIMITED

| CLAUSE | INDEX | PAGES |
|---|---|---|
| 1 | Interpretation | 1-3 |
| 2 | Registered Shares | 3 |
| 3 | Bearer Shares | 3-6 |
| 4 | Shares, Authorised Capital and Capital | 6-8 |
| 5 | Transfer of Shares | 8 |
| 6 | Transmission of Shares | 8 |
| 7 | Reduction or Increase in Authorised Capital or Capital | 8-9 |
| 8 | Mortgages and Charges of Registered Shares | 10 |
| 9 | Forfeiture | 10-11 |
| 10 | Meetings and Consents of Members | 11-14 |
| 11 | Directors | 14-15 |
| 12 | Powers of Directors | 15-16 |
| 13 | Proceedings of Directors | 16-17 |
| 14 | Officers | 17-18 |
| 15 | Conflicts of Interest | 18 |
| 16 | Indemnification | 18-19 |
| 17 | Seal | 19 |
| 18 | Dividends | 19-20 |
| 19 | Accounts | 20 |
| 20 | Audit | 20-21 |
| 21 | Notices | 21-22 |
| 22 | Pension and Superannuation Funds | 22 |
| 23 | Arbitration | 22 |
| 24 | Voluntary Winding Up and Dissolution | 22 |
| 25 | Continuation | 23 |

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0302

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

ARTICLES OF ASSOCIATION OF

STILTON INTERNATIONAL HOLDINGS LIMITED

1.                    **INTERPRETATION**

In these Articles, if not inconsistent with the context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof.

| | Expression: | Meaning: |
|---|---|---|
| 1.1 | capital | The sum of the aggregate par value of all outstanding shares with par value of the Company and shares with par value held by the Company as treasury shares plus |
| | | 1.1.1 the aggregate of the amounts designated as capital of all outstanding shares without par value of the Company and shares without par value held by the Company as treasury shares, and |
| | | 1.1.2 the amounts as are from time to time transferred from surplus to capital by a resolution of directors. |
| 1.2 | member | A person who holds shares in the Company. |
| 1.3 | person | An individual, a corporation, a trust, the estate of a deceased individual, a partnership or an unincorporated association of persons. |
| 1.4 | resolution of directors | 1.4.1 A resolution approved at a duly constituted meeting of directors or of a committee of directors of the Company, by affirmative vote of a simple majority of the directors present at the meeting who voted and did not abstain; or |
| | | 1.4.2 a resolution consented to in writing by all the directors or all the members of the committee, as the case may be; |
| | | 1.4.3 where a director is given more than one vote in the circumstances, he shall in the circumstances be counted for the purposes of establishing a majority by the number of votes casts. |

1

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0303

| 1.5 | resolution of members | 1.5.1 | A resolution approved at a duly constituted meeting of th members of the company by the affirmative vote of |
|---|---|---|---|

| | | 1.5.1.1 | a simple majority, or such larger majorit as may be specified in the Articles, of th votes of the shares that were present a the meeting and entitled to vote thereo and were voted and did not abstain, or |
|---|---|---|---|
| | | 1.5.1.2 | a simple majority, or such larger majorit as may be specified in the Articles, of th votes of each class or series of share which were present at the meeting an entitled to vote thereon as a class or serie and were voted and not abstained and o a simple majority, or such larger majorit as may be specified in the Articles, of th votes of the remaining shares entitled t vote thereon that were present at th meeting and were voted and not abstained or |

1.5.2  a resolution consented to in writing by

| | | 1.5.2.1 | a majority, or such larger majority as ma be specified in the Articles, of the vote of shares entitled to vote thereon, or |
|---|---|---|---|
| | | 1.5.2.2 | a majority, or such larger majority as ma be specified in the Articles, of the vote of each class or series of shares entitle to vote thereon and of a majority, or suc larger majority as may be specified in th Articles, of the votes of the remainin shares entitled to vote thereon. |

| 1.6 | securities | Shares and debt obligations of every kind, and options, warrants an rights to acquire shares, or debt obligations. |
|---|---|---|
| 1.7 | surplus | The excess, if any, at the time of the determination of the tot assets of the Company over the aggregate of its total liabilities, as show in its books of accounts, plus the Company's capital. |
| 1.8 | the Act | The International Business Companies Act (Cap. 291), including an modification, extension, re-enactment or renewal thereof and an regulations made thereunder. |
| | the Memorandum | The Memorandum of Association of the Company as originall framed or as from time to time amended. |

2

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0304

| 1.10 | the Seal | Any seal which has been adopted as the Seal of the Company. |
|------|----------|-------------|
| 1.11 | these Articles | These Articles of Association as originally framed or as from time to time amended. |
| 1.12 | treasury shares | Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled. |

1.13    "Written" or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or re-presented or reproduced by any mode of representing or re-producing words in a visible form, including telex, telegram, facsimile, cable or other form of writing produced by electronic communication.

1.14    Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles.

1.15    Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others.

1.16    A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction.

1.17    A reference to money in these Articles is, unless otherwise stated, a reference to the currency in which shares in the Company shall be issued according to the provisions of the Memorandum.

## 2.                    REGISTERED SHARES

2.1    The Company shall issue to every member holding registered shares in the Company a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him and the signature of the director or officer and the Seal may be a facsimile.

2.2    Any member receiving a share certificate for registered shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of the wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a share certificate for registered shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors.

2.3    If several persons are registered as joint holders of any shares, any one of such persons may be given receipt for any dividend payable in respect of such shares.

## 3.                       BEARER SHARES

3.1    Subject to a request for the issue of bearer shares and to the payment of the appropriate consideration for the shares to be issued, the Company may, to the extent authorized by the Memorandum, issue bearer shares to, and at the expense of, such person as shall be

3

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
**SIHAAA0305**

specified in the request. The Company may also upon receiving a request in writing accompanied by the share certificate for the shares in question, exchange registered shares for bearer shares or may exchange bearer shares for registered shares. Such request served on the Company by the holder of bearer shares shall specify the name and address of the person to be registered and unless the request is delivered in person by the bearer shall be authenticated as hereinafter provided. Such request served on the Company by the holder of bearer shares shall also be accompanied by any coupons or talons which at the date of such delivery have not become due for payment of dividends or any other distribution by the Company to the holders of such shares. Following such exchange the share certificate relating to the exchanged shares shall be delivered as directed by the member requesting the exchange.

3.2   Bearer share certificates shall be under the Seal and shall carry an identifying number and state that the bearer is entitled to the shares therein specified, and may provide by coupons, talons, or otherwise for the payment of dividends or other monies on the shares included therein.

3.3   Subject to the provisions of the Act and of these Articles the bearer of a bearer share certificate shall be deemed to be a member of the Company and shall be entitled to the same rights and privileges as he would have had if his name had been included in the share register of the Company.

3.4   Subject to any specific provisions in these Articles, in order to exercise his rights as a member of the Company, the bearer of a bearer share certificate shall produce the bearer share certificate as evidence of his membership of the Company. Without prejudice to the generality of the foregoing, the following rights may be exercised in the following manner:

3.4.1   for the purpose of exercising his voting rights at a meeting, the bearer of a bearer share certificate shall produce such certificate to the chairman of the meeting;

3.4.2   for the purpose of exercising his vote on a resolution in writing, the bearer of a bearer share certificate shall cause his signature to any such resolution to be authenticated as hereinafter set forth;

3.4.3   for the purpose of requisitioning a meeting of members, the bearer of a bearer share certificate shall address his requisition to the directors and his signature thereon shall be duly authenticated as hereinafter provided; and

3.4.4   for the purpose of receiving dividends, the bearer of the bearer share certificate shall present at such places as may be designated by the directors any coupons or talons issued for such purpose, or shall present the bearer share certificate to any paying agent authorised to pay dividends.

3.5   The signature of the bearer of a bearer share certificate shall be deemed to be duly authenticated if the bearer of the bearer share certificate shall produce such certificate to a notary public or a bank manager or a director or officer of the Company (herein referred to as an "authorised person") and if the authorised person shall endorse the document bearing such signature with a statement identifying the bearer share certificate produced to him by number and date and specifying the number of shares and the class of shares (if appropriate) comprised therein;

4

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0306



3.5.2   confirming that the signature of the bearer of the bearer share certificate was subscribed in his presence and that if the bearer is representing a body corporate he has so acknowledged and has produced satisfactory evidence thereof; and

3.5.3   specifying the capacity in which he is qualified as an authorised person and, if a notary public, affixing his seal thereto or, if a bank manager, attaching an identifying stamp of the bank of which he is a manager.

3.6   Notwithstanding any other provisions of these Articles, at any time, the bearer of a bearer share certificate may deliver the certificate for such shares into the custody of the Company at its registered office, whereupon the Company shall issue a receipt therefor under the Seal signed by a director or officer identifying by name and address the person delivering such certificate and specifying the date and number of bearer share certificates so deposited and the number of shares comprised therein. Any such receipt may be used by the person named therein for the purpose of exercising the rights vested in the shares represented by the bearer share certificate so deposited including the right to appoint a proxy. Any bearer share certificate so deposited shall be returned to the person named in the receipt or his personal representative if such person be dead and thereupon the receipt issued therefor shall be of no further effect whatsoever and shall be returned to the company for cancellation or, if it has been lost or mislaid, such indemnity as may be required by resolution of directors shall be given to the Company.

3.7   The bearer of a bearer share certificate shall for all purposes be deemed to be the owner of the shares comprised in such certificate and in no circumstances shall the Company or the Chairman of any meeting of members or the Company's registrars or any director or officer of the Company or any authorised person be obliged to inquire into the circumstances whereby a bearer share certificate came into the hands of the bearer thereof, or to question the validity or authenticity of any action taken by the bearer of a bearer share certificate whose signature has been authenticated as provided herein.

3.8   If the bearer of a bearer share certificate shall be a corporation, then all the rights exercisable by virtue of such shareholding may be exercised by an individual duly authorised to represent the corporation but unless such individual shall acknowledge that he is representing a corporation and shall produce upon request satisfactory evidence that he is duly authorised to represent the corporation, the individual shall for all purposes hereof be regarded as the holder of the shares in any bearer share certificate held by him.

3.9   The directors may provide for payment of dividends to the holders of bearer shares by coupons or talons and in such event the coupons or talons shall be in such form and payable at such time and in such place or places as the directors shall resolve. The Company shall be entitled to recognise the absolute right of the bearer of any coupon or talon issued as aforesaid to payment of the dividend to which it relates and delivery of the coupon or talon to the Company or its agents shall constitute in all respects a good discharge of the Company in respect of such dividend.

3.10   If any bearer share certificate, coupon or talon be worn out or defaced, the directors may, upon the surrender hereof for cancellation, issue a new one in its stead, and if any bearer share certificate, coupon or talon be lost or destroyed, the directors may upon the loss or destruction being established to their satisfaction, and upon such indemnity being given to the Company as it shall by resolution of directors determine, issue a new bearer share certificate in its stead, and in either case on payment of such sum as the Company may from time to time by resolution of directors require. In case of loss or destruction the person to whom such new bearer share certificate, coupon or talon is issued shall also bear and pay to the Company all expenses

5

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0307

incidental to the investigation by the Company of the evidence of such loss or destruction and to such indemnity.

4.                              **SHARES, AUTHORISED CAPITAL AND CAPITAL**

4.1     Subject to the provisions of these Articles and any resolution of members the unissued shares of the Company shall be at the disposal of the directors who may, without limiting or affecting any rights previously conferred on the holders of any existing shares or class or series of shares, offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions as the Company may by resolution of directors determine.

4.2     No share in the Company may be issued until the consideration in respect thereof is fully paid, and when issued the share is for all purposes fully paid and non-assessable save that a share issued for a promissory note or other written obligation for payment of a debt may be issued subject to forfeiture in the manner prescribed in these Articles.

4.3     Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property or any combination of the aforegoing as shall be determined by a resolution of directors.

4.4     Shares in the Company may be issued for such amount of consideration as the directors may from time to time by resolution of directors determine, except that in the case of shares with par value, the amount shall not be less than the par value, and in the absence of fraud the decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved. The consideration in respect of the shares constitutes capital to the extent of the par value and the excess constitutes surplus.

4.5     A share issued by the Company upon conversion of, or in exchange for, another share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security.

4.6     Treasury shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with these Articles) as the Company may by resolution of directors determine.

4.7     The Company may issue fractions of a share and a fractional share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole share of the same class or series of shares.

4.8     Upon the issue by the Company of a share without par value, if an amount is stated in the Memorandum to be authorized capital represented by such shares then each share shall be issued for no less than the appropriate proportion of such amount which shall constitute capital, otherwise the consideration in respect of the share constitutes capital to the extent designated by the directors and the excess constitutes surplus, except that the directors must designate as capital an amount of the consideration that is at least equal to the amount that the share is entitled to as appreciation, if any, in the assets of the Company upon liquidation of the Company.

6

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0308

4.9    The Company may, subject to any limitations imposed by the Act, purchase, redeem or otherwise acquire and hold its own shares but only out of surplus or in exchange for newly issued shares of equal value.

4.10    Subject to provisions to the contrary in

    **4.10.1**      the Memorandum or these Articles;

    **4.10.2**      the designations, powers, preferences, rights, qualifications, limitations and restrictions with which the shares were issued; or

    **4.10.3**      the subscription agreement for the issue of the shares,

the Company may not purchase, redeem or otherwise acquire its own shares without the consent of the members whose shares are to be purchased, redeemed or otherwise acquired.

4.11    No purchase, redemption or other acquisition of shares shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

4.12    A determination by the directors under the preceding Regulation is not required where shares are purchased, redeemed or otherwise acquired

    4.12.1  pursuant to a right of a member to have his shares redeemed or to have his shares exchanged for money or other property of the Company;

    4.12.2  by virtue of a transfer of capital pursuant to Regulation 7.3;

    4.12.3  by virtue of the provisions of Section 83 of the Act; or

    4.12.4  pursuant to an order of the Court.

4.13    The Company may purchase, redeem or otherwise acquire its shares at a price lower than the fair value if permitted by, and then only in accordance with, the terms or

    4.13.1  the Memorandum or these Articles; or

    4.13.2  a written agreement for the subscription for the shares to be purchased, redeemed or otherwise acquired.

4.14    Shares that the Company purchases, redeems or otherwise acquires pursuant to the preceding Regulations may be cancelled or held as treasury shares. Upon the cancellation of a share, the amount included as capital of the Company with respect to that share shall be deducted from the capital of the Company.

4.15    Where shares in the Company are held by the Company as treasury shares or are held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other company, such

7

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0309

shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the capital of the Company.

### 5.        TRANSFER OF SHARES

5.1     Subject to any limitations in the Memorandum, registered shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they consider appropriate.

5.2     The Company shall not be required to treat a transferee of a registered share in the Company as a member until the transferee's name has been entered in the share register.

5.3     Subject to any limitations in the Memorandum, the Company must, on the application of the transferor or transferee of a registered share in the Company, enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months.

### 6.        TRANSMISSION OF SHARES

6.1     The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognised by the Company as having any title to his share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following two regulations.

6.2     Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors.  An application by any such person to be registered as a member shall be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

6.3     Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

6.4     What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

### 7.        REDUCTION OR INCREASE IN AUTHORISED CAPITAL OR CAPITAL

The Company may by a resolution of members or a resolution of directors amend the Memorandum to increase or reduce its authorised capital and in connection therewith the

8

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0310

Company may in respect of any unissued shares increase or reduce the number of such shares, increase or reduce the par value of any shares or effect any combination of the foregoing.

7.2    The Company may amend the Memorandum to

    7.2.1    divide the shares, including issued shares, of a class or series into a larger number of shares of the same class or series; or

    7.2.2    combine the shares, including issued shares, of a class or series into a smaller number of shares of the same class or series;

provided however, that where shares are divided or combined under this Regulation, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares.

7.3    The capital of the Company may by a resolution of directors be increased by transferring an amount of the surplus of the Company to capital.

7.4    Subject to the provisions of Regulations 7.5 and 7.6 the capital of the Company may by resolution of directors be reduced by transferring an amount of the capital of the Company to surplus.

7.5    No reduction of capital shall be effected that reduces the capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

7.6    No reduction of capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realisable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

7.7    Where the Company reduces its capital the Company may

    7.7.1    return to its members any amount received by the Company upon the issue of any of its shares;

    7.7.2    purchase, redeem or otherwise acquire its shares out of capital; or

    7.7.3    cancel any capital that is lost or not represented by assets having a realisable value.

7.8    The Company may by a resolution of directors include in the computation of surplus for any purpose the unrealized appreciation of the assets of the Company, and, in the absence of fraud, the decision of the directors as to the value of the assets is conclusive, unless a question of law is involved.

9

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0311

**8.**                    **MORTGAGES AND CHARGES OF REGISTERED SHARES**

8.1    Members may mortgage or charge their registered shares in the Company and upon satisfactory evidence thereof the Company shall give effect to the terms of any valid mortgage or charge except insofar as it may conflict with any requirements herein contained for consent to the transfer of shares.

8.2    In the case of the mortgage or charge of registered shares there may be entered in the share register of the Company at the request of the registered holder of such shares

    8.2.1    a statement that the shares are mortgaged or charged;

    8.2.2    the name of the mortgagee or chargee; and

    8.2.3    the date on which the aforesaid particulars are entered in the share register.

8.3    Where particulars of a mortgage or charge are registered, such particulars shall be cancelled

                     the named mortgagee or chargee or anyone authorized to

    8.3.2    upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

8.4    Whilst particulars of a mortgage or charge are registered, no transfer of any share comprised therein shall be effected without the written consent of the named mortgagee or chargee or anyone authorized to act on his behalf.

8.5    The provisions of this Regulation 8 shall be without prejudice to the rights of the holder of bearer shares to mortgage such shares in the manner provided in the Act.

**9.**                    **FORFEITURE**

9.1    When shares issued for a promissory note or other written obligation for payment of a debt have been issued subject to forfeiture, the following provisions shall apply.

9.2    Written notice specifying a date for payment to be made and the shares in respect of which payment is to be made shall be served on the member who defaults in making payment pursuant to a promissory note or other written obligations to pay a debt.

9.3    The written notice specifying a date for payment shall

    9.3.1    name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which payment required by the notice is to be made; and

    9.3.2    contain a statement that in the event of non-payment at or before the time named in the notice the shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

10

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0312

9.4    Where a written notice has been issued and the requirements have not been complied with within the prescribed time, the directors may at any time before tender of payment forfeit and cancel the shares to which the notice relates.

9.5    The Company is under no obligation to refund any moneys to the member whose shares have been forfeited and cancelled pursuant to these provisions. Upon forfeiture and cancellation of the shares the member is discharged from any further obligation to the Company with respect to the shares forfeited and cancelled.

10.                    MEETINGS AND CONSENTS OF MEMBERS

10.1   The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the directors consider necessary or desirable.

10.2   Upon the written request of members holding 10 percent or more of the outstanding voting shares in the Company the directors shall convene a meeting of members.

10.3   The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting. The directors may fix the date notice is given of a meeting of members as the record date for determining those shares that are entitled to vote at a meeting.

10.4   A meeting of members held in contravention of the requirement in Regulation 10.3 is valid,

       10.4.1    if members holding not less than 90 percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or 90 percent of the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with not less than a 90 percent majority of the remaining votes, have agreed to shorter notice of the meeting, or

       10.4.2    if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

10.5   The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

10.6   A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

10.7   The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

10.8   An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

11

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0313

(Name of Company)

I/We_____

being a member of the above Company with_____

shares  HEREBY APPOINT_____

of_____ or failing him _____

_____ of _____

to be my/our proxy to vote for me/us at the meeting of members to be held on the

_____ day _____ 19 ___ and, _____ at any

adjournment thereof.

(Any resolutions concerning to be inserted here)

Signed this day of _____, _____.

_____
Member

10.9     The following shall apply in respect of joint ownership of shares:

    10.9.1     if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member;

    10.9.2     if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and;

    10.9.3     if two or more of the joint owners are present in person or by proxy they must vote as one.

10.10     A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

10.11     A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares or class or series of shares entitled to vote on resolutions of members to be considered at the meeting. If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person, then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

10.12     If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it

12

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0314

shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

10.13   At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose someone of their number to be the chairman. If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

10.14   The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

10.15   At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof. If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken. If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

10.16   Any person other than an individual shall be regarded as one member and subject to Regulation 10.17 the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member.

10.17   Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise if it were an individual member of the Company.

10.18   The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

10.19   Directors of the Company may attend and speak at any meeting of members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

13

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0315

10.20  An action that may be taken by the members at a meeting may also be taken by a resolution of members consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication, without the need for any notice, but if any resolution of members is adopted otherwise than by the unanimous written consent of all members, a copy of such resolution shall forthwith be sent to all members not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more members.

11.                                    **DIRECTORS**

11.1   The first directors of the Company shall be elected by the subscribers to the Memorandum; and thereafter, the directors shall be elected

    11.1.1     by the members for such terms as the members determine, or

    11.1.2     by the directors for such terms as the directors may determine.

11.2   Until directors are appointed,the subscribers to the Memorandum of Association shall have the power to act as directors.

11.3   The minimum number of directors shall be one and the maximum number shall be twenty.

11.4   Each director shall hold office for the term, if any, fixed by resolution of members or directors, as the case may be. In the case of a director who is an individual the term of office of a director shall terminate on the director's death, resignation or removal. The bankruptcy of a corporate director shall terminate the term of office of such director.

11.5   A director may be removed from office, with or without cause, by a resolution of members or, with cause, by a resolution of directors.

11.6   A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

11.7   A vacancy in the Board of Directors may be filled by a resolution of members or by a resolution of a majority of the remaining directors.

11.8   With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

11.9   A director shall not require a share qualification, and may be an individual or a company.

11.10  The Company may determine by resolution of directors to keep a register of directors containing

    11.10.1     the names and addresses of the persons who are directors of the Company;

    11.10.2     the date on which each person whose name is entered in the register was appointed as a director of the Company; and



    11.       the date on which each person named as a director ceased to be a director of the Company.

14

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0316

11.11   If the directors determine to maintain a register of directors, a copy thereof shall be kept at the registered office of Company and the Company may determine by resolution of directors to register a copy of the register with the Registrar of Companies.

12.                              POWERS OF DIRECTORS

12.1    The business and affairs of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members of the Company, subject to any delegation of such powers as may authorised by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirement made by a resolution of members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

12.2    The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an officer or agent of the Company. The resolution of directors appointing an agent may authorize the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

12.3    Every officer or agent of the Company has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the matters requiring a resolution of directors under the Act.

12.4    Any director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written consents.

12.5    The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director may appoint directors to fill any vacancy that has arisen or summon a meeting of members.

12.6    The directors may by resolution of directors exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

12.7    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of directors.

12.8    The directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons whether appointed directly or indirectly by the directors to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Regulations) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of person

15

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0317

dealing with such attorney or attorneys as the directors may think fit and may also authorise any such attorney or attorneys to delegate all or any powers, authorities and discretions vested in them.

12.9    The Company may determine by resolution of directors to maintain at its registered office a register of mortgages, charges and other encumbrances in which there shall be entered the following particulars regarding each mortgage, charge and other encumbrance:

    12.9.1    the sum secured;

    12.9.2    the assets secured;

    12.9.3    the name and address of the mortgagee, chargee or other encumbrancer;

    12.9.4    the date of creation of the mortgage, charge or other encumbrance; and

    12.9.5    the date on which the particulars specified above in respect of the mortgage, charge or other encumbrance are entered in the register.

12.10    The Company may also by resolution of directors to register a copy of the register of mortgages, charges or other encumbrances with the Registrar of Companies.

13.    **PROCEEDINGS OF DIRECTORS**

13.1    The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

13.2    A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

13.3    A director shall be given not less than 3 days notice of meetings of directors, but meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend, waive notice of the meeting; and for this purpose, the presence of a director at the meetings shall be deemed to constitute waiver on his part. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

13.4    A director may by a written instrument appoint an alternate who need not be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director.

13.5    A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors, unless there are only two directors in which case the quorum shall be two.

13.6    If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record

16

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0318

in writing and sign a note or memorandum of all matters requiring a resolution of directors. Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

13.7 At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice Chairman of the Board of Directors shall preside. If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the directors present shall choose someone of their number to be chairman of the meeting.

13.8 An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution of directors or a committee of directors consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication by all directors or all members of the committee, as the case may be, without the need for any notice. The consent may be in the form of counterparts, each counterpart being signed by one or more directors.

13.9 The directors shall cause the following corporate records to be kept:

13.9.1 minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members;

13.9.2 copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members; and

13.9.3 such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company.

13.10 The books, records and minutes shall be kept at the registered office of the Company, its principal place of business or at such other place as the directors determine.

13.11 The directors may, by a resolution of directors, designate one or more committees, each consisting of one or more directors.

13.12 Each committee of directors has such powers and authorities of the directors, including the power and authority to affix the Seal, as are set forth in the resolution of directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles to appoint directors or fix their emoluments, or to appoint officers or agents of the Company.

13.13 The meetings and proceedings of each committee of directors consisting of 2 or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

14.                                          **OFFICERS**

14.1 The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, President and one or more

17



CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0319

Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable. Any number of offices may be held by the same person.

14.2 The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at meetings of directors and members, the Vice Chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

14.3 The emoluments of all officers shall be fixed by resolution of directors.

14.4 The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors. Any vacancy occurring in any office of the Company may be filled by resolution of directors.

15. CONFLICTS OF INTEREST

15.1 No agreement or transaction between the Company and one or more of its directors or any person in which any director has a financial interest or to whom any director is related, including as a director of that other person, is void or voidable for this reason only or by reason only that the director is present at the meeting of directors or at the meeting of the committee of directors that approves the agreement or transaction or that the vote or consent of the director is counted for that purpose if the material facts of the interest of each director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors.

15.2 A director who has an interest in any particular business to be considered at a meeting of directors or members may be counted for purposes of determining whether the meeting is duly constituted.

16. INDEMNIFICATION

16.1 Subject to the limitations hereinafter provided the Company may indemnify against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who

16.1.1 is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or



18

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0320

16.1.2 is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

16.2 The Company may only indemnify a person if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

16.3 The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful, is in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

16.4 The termination of any proceedings by any judgement, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

16.5 If a person to be indemnified has been successful in defence of any proceedings referred to in that Regulation the person is entitled to be indemnified against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

16.6 The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under Regulation 16.1.

17.                                    SEAL

The directors shall provide for the safe custody of the Seal. An imprint of the Seal shall be kept at the registered office of the company. The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorised from time to time by resolution of directors. The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

18.                                  DIVIDENDS

18.1 The Company may by a resolution of directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorising the dividends, a fair and proper value for the assets to be so distributed.

19

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0321

18.2    The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company.

18.3    The directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

18.4    No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

18.5    Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

18.6    No dividend shall bear interest as against the Company and no dividend shall be paid on shares described.

18.7    A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred to capital upon the issue of the share.

18.8    In the case of a dividend of authorised but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

18.9    In the case of a dividend of authorized but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distribution, except that the directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

18.10    A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller par value does not constitute a dividend of shares.

19.                              ACCOUNTS

The Company shall keep such accounts and records as the directors consider necessary or desirable in order to reflect the financial position of the Company.

20.                              AUDIT

The Company may by resolution of members call for the accounts to be examined by auditors in which event the remaining provisions of this Regulation 20 shall apply to the appointment and activities of the auditors.

20

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0322

20.2    The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members.

20.3    The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

20.4    The remuneration of the auditors of the Company

    20.4.1    in the case of auditors appointed by the directors, may be fixed by resolution of directors;

    20.4.2    subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine.

20.5    The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

    20.5.1    in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period;

    20.5.2    all the information and explanations required by the auditors have been obtained.

20.6    The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

20.7    Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

20.8    The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

21.                                NOTICES

21.1    Any notice, information or written statement to be given by the Company to members may be served in the case of members holding registered shares in any way by which it can reasonably be expected to reach each member or by mail addressed to each member at the address shown in the share register and in the case of members holding shares issued to bearer, in the manner provided in the Memorandum.

21.2    Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

21.3    Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order,

21

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0323

document, process, information or written statement was delivered to the registered office or the registered agent of the Company or that it was mailed in such time as to admit to its being delivered to the registered agent of the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

22.                    PENSION AND SUPERANNUATION FUNDS

The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to, any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. Subject always to the proposal being approved by resolution of members a director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension, allowance or emolument.



23.                              ARBITRATION

23.1    Whenever any difference arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act, touching anything done or executed, omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act or Act affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to two arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

23.2    If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for 10 days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

24.          VOLUNTARY WINDING UP AND DISSOLUTION

The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of directors.



22

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0324

**25.**              **CONTINUATION**

The Company may by resolution of members or by resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

We, the undersigned, of the address stated below, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to the Articles of Association this 19th day of January, 1995 in the presence of the undersigned witness.

**NAME AND ADDRESS**                    **SUBSCRIBER**
**OF WITNESS**

Janet Peters,                           Trident Trust Company (B.V.I.) Limited,
c/o P.O. Box 146,                       P.O. Box 146,
Road Town, Tortola,                     Wickham's Cay 1,
British Virgin Islands.                 Road Town, Tortola,
                                        British Virgin Islands.



23

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0325

# INTERNATIONAL BUSINESS COMPANY

## COMPANY REGISTER
### OF

_Silton International Holdings Limited_



## B.V.I. COMPANY FORMATIONS LTD

Trident Chambers
Wickhams Cay
P.O. Box 146
Road Town, Tortola
Tel. 809-494-2434
Fax 809-494-3754

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0326

## CONSENT ACTIONS OF THE SOLE DIRECTOR

## OF

## STILTON INTERNATIONAL HOLDINGS LIMITED

THE UNDERSIGNED, being the Sole Member of the Board of Directors of Stilton International Holdings Limited, ("the Company"), a Company organized as an International Business Company under the laws of the British Virgin Islands, hereby consents to the adoption of the following resolutions taken without a meeting, this instrument to have the same force and effect as if the actions herein referred to had been taken at a timely called and duly held meeting of the Board of Directors of the Company and directs that this written consent to such actions be filed with the minutes of the proceedings of the Board of Directors of the Company:-

**IT IS HEREBY**

RESOLVED THAT, the registered office of the Company will be the offices of Trident Trust Company (B.V.I.) Limited, P.O. Box 146, Road Town, Tortola, British Virgin Islands and

THAT, the registered agent of the Company will be Trident Trust Company (B.V.I.) Limited.

**AND FURTHER**

RESOLVED THAT, a company seal be adopted, an impression of which be affixed hereto.

**AND FURTHER**

RESOLVED THAT, the following shares be issued as detailed below and that such issuance be recorded in the Register of Members:-

Certificate No. 1      Bearer      5,000 shares

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0327

This Consent Action shall be effective as of the 8th day of March, 1995.

_Harald McPike_
Harald McPike
Sole Director

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
**SIHAAA0328**

## STILTON INTERNATIONAL HOLDINGS LIMITED

### (An International Business Company)

### Appointment of First Director/s

We, Trident Trust Company (B.V.I.) Limited, being the subscriber to the Memorandum and Articles of Association of the Company and having the power to appoint the first director/s of the Company hereby appoint the following as the first director/s of the Company:

**HARALD McPIKE**

In witness whereof a duly authorised representative of Trident Trust Company (B.V.I.) Limited has executed this Appointment this 8th day of March, 1995.

B. R. Good

Authorised Representative

Trident Trust Company (B.V.I.) Limited

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0329



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

CERTIFICATE OF INCORPORATION    (Sections 14 and 15)

No. 140234

The Registrar of Companies of the British Virgin Islands HEREBY CERTIFIES pursuant to the International Business Companies Act, Cap. 291 that all the requirements of the Act in respect of incorporation having been satisfied,

STILTON INTERNATIONAL HOLDINGS LIMITED

is incorporated in the British Virgin Islands as an International Business Company

this 19th day of January, 19 95

Given under my hand and seal at Road Town, Tortola in the Territory of the British Virgin Islands

GALVIN A. EVERSLEY, Esq.
REGISTRAR OF COMPANIES

CONFIDENTIAL PURSUANT TO ORDER
AAA NO. 50 148 T 00217-07
SIHAAA0330