## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STILTON INTERNATIONAL  )
HOLDINGS LIMITED,  )
   )
       Petitioner,  )
   )
       v.  )   C.A. No.  08-361-JJF
   )
CIS FINANCIAL SERVICES, INC. and  )   **PUBLIC VERSION**
CARGILL, INCORPORATED,  )
   )
       Respondents.  )

## AFFIDAVIT OF BRUCE G. PAULSEN IN RESPONSE TO CROSS-MOTION TO VACATE OR ALTERNATIVELY TO MODIFY ARBITRATION AWARD

### VOLUME 1 OF 2

OF COUNSEL:

Bruce G. Paulsen
Jeffrey M. Dine
Paula Odysseos
SEWARD & KISSEL LLP
1 Battery Park Plaza
New York, New York
Tel: (212) 574-1200

Kevin R. Shannon (#3137)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
P. O. Box 951
Wilmington, DE  19899
Tel: (302) 984-6000
kshannon@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Petitioner Stilton International Holdings Limited*

Dated: July 21, 2008
Public Version Dated: July 29, 2008
33162

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

STILTON INTERNATIONAL )
HOLDINGS LIMITED, )
 )
 Petitioner, )
 )
 v. ) C.A. No. 1:08-cv-00361-JJF
 )
CIS FINANCIAL SERVICES, INC. and ) **PUBLIC VERSION**
CARGILL, INCORPORATED, )
 )
 Respondents. )

### AFFIDAVIT OF BRUCE G. PAULSEN
### IN RESPONSE TO CROSS-MOTION TO VACATE
### OR ALTERNATIVELY TO MODIFY ARBITRATION AWARD

STATE OF NEW YORK )
 ) ss.:
COUNTY OF NEW YORK )

BRUCE G. PAULSEN, being duly sworn, deposes and says:

1. I am a member of the law firm of Seward & Kissel LLP, counsel for Petitioner Stilton International Holdings Limited ("Stilton") in the above-referenced matter. I have personal knowledge of all the facts contained herein and, if called to testify, could and would competently testify thereto.

2. Attached hereto as Exhibits are true and correct copies of the following documents:

| Exhibit | Description | Date |
|---------|-------------|------|
| 6 | Stilton's Statement of Claim (without exhibits) | 06/20/07 |
| 7 | Cargill's Answering Statement (without exhibits) | 07/19/07 |
| 8 | Stilton's Pre-Hearing Brief | 03/07/08 |
| 9 | Stilton's Post-Hearing Brief | 05/02/08 |
| 10 | Excerpts from Cargill's Pre-Hearing Brief | 03/07/08 |

| Exhibit | Description | Date |
|---|---|---|
| 11 | Excerpts from AAA Hearing Transcript | 03/17/08 & 03/18/08 |
| 12 | CISFS Foreign Exchange Account Agreement Addendum (Claimant's Hearing Ex. 5) | 03/09/00 |
| 13 | (Claimant's Hearing Ex. 8) | 08/20/04 |
| 14 | (Claimant's Hearing Ex. 55) | 05/31/05 |
| 15 | (Claimant's Hearing Ex. 59) | 06/00/05 |
| 16 | (Claimant's Hearing Ex. 124) | 09/01/05 |
| 17 | (Claimant's Hearing Ex. 137) | 10/19/05 |
| 18 | (Claimant's Hearing Ex. 140) | 12/07/05 |
| 19 | State of Delaware Certificate of Dissolution for CIS Financial Services (Claimant's Hearing Ex. 143) | 05/19/06 |
| 20 | US Bankruptcy Court Claim, Stilton (Claimant's Hearing Ex. 145) | 07/07/06 |
| 21 | Disclosure Statement With Respect to Joint Chapter 11 Plan of Refco Inc. and certain of its direct subsidiaries (excerpts only) (Claimant's Hearing Ex. 163) | 10/06/06 |
| 22 | Statement of RCM Client Account (Claimant's Hearing Ex. 164) | 11/18/05 |
| 23 | Objection of Marc S. Kirschner as plan administrator to Stilton's Proof of Claim (Claimant's Hearing Ex. 165) | 03/26/07 |
| 24 | RCM Plan Administrator's Notice of Third Distribution of Additional Property (Claimant's Hearing Ex. 166) | 12/19/07 |
| 25 | Notice of RCM Plan Administrator's Motion for Entry of an Order (Claimant's Hearing Ex. 167) | 05/18/07 |
| 26 | (Claimant's Hearing Ex. 169) | 08/01/05 |
| 27 | Cargill Worldwide (http://www.cargill.com/worldwide/index.htm) | last visited 07/18/08 |
| 28 | Cargill Management (http://www.cargill.com/about/organization/management.htm) | last visited 07/18/08 |
| 29 | UNCITRAL, Status 1958 – Convention on the Recognition and Enforcement of Foreign Arbitral Awards | last visited 07/18/08 |

3.    I declare under penalty of perjury that the foregoing is true and correct.

_____
Bruce G. Paulsen

Sworn to before me this 18 day of
July, 2008

_____
Notary Public

DARBY J GREEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02GR6139906
Qualified in Nassau County
My Commission Expires January 17, 2010

SK 25387 0004 902813

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on July 29, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on July 29, 2008, I have Electronically Mailed the document to the

following person(s):

Daniel B. Rath
Rebecca L. Butcher
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801
rath@lrclaw.com
butcher@lrclaw.com

Michael B. Fisco
Will Stute
Michael M. Krauss
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
MFisco@faegre.com
WStute@faegre.com
mkrauss@faegre.com

/s/ David E. Moore
Kevin R. Shannon (#3137)
David E. Moore (#3983)
1313 N. Market Street
Hercules Plaza, 6th Floor
P. O. Box 951
Wilmington, DE 19899
Tel: (302) 984-6000
kshannon@potteranderson.com
dmoore@potteranderson.com

872980/33162

# Exhibit 6

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the matter of the arbitration between<br><br>STILTON INTERNATIONAL HOLDINGS LIMITED,<br><br>                          Claimant,<br><br>          - against -<br><br>CIS FINANCIAL SERVICES, INC. and CARGILL,<br>INCORPORATED,<br><br>                      Respondents. | AAA Arbitration No. ___<br><br><br>**CLAIMANT'S STATEMENT<br>OF CLAIM** |

## STATEMENT OF CLAIM

       Claimant Stilton International Holdings Limited ("Stilton"), by its attorneys Seward &

Kissel LLP, respectfully submits this Statement of Claim against Respondents CIS Financial

Services, Inc. ("CISFS") and Cargill, Incorporated ("Cargill, Inc.") (CISFS and Cargill, Inc.,

collectively, "Cargill").

**Nature of Proceeding**

       1.     This is an action for (a) breach of contract; (b) breach of the covenant of good

faith and fair dealing; (c) constructive trust; (d) unjust enrichment; (e) fraud in the inducement

and (f) negligent misrepresentation.

       2.     Stilton engages in multinational currency trading.  On or about October 17, 1997,

Stilton entered into a foreign exchange trading account agreement ("Account Agreement") with

CIS Financial Services, Inc. ("CISFS") and opened trading account No. 5OO1P (the "Account").

Pursuant to the Agreement, CISFS acted as broker and custodian for its customer, Stilton,

enabling Stilton to trade in many different currencies.  A copy of the Account Agreement is

attached as Exhibit A.

3.      Upon information and belief, Stilton was one of CISFS' top ten customers in 2005, and, in 2005 (until the events described below), held from $20-80 million in assets in the Account at any given time.

4.      Cargill, Inc., one of the largest privately held corporations in the world, admittedly owned CISFS and controlled CISFS.  (*See* ¶ 23 below.)  As a result, Stilton believe that it faced only minimal institutional risk when it placed its assets in the care CISFS.

5.      Stilton's trading operations with CISFS ran smoothly until the summer of 2005, when Cargill, Inc. caused certain of its assets – including CISFS' foreign exchange trading business – to be sold to Refco Group Ltd., LLC, the parent company of Refco Capital Markets, Ltd. ("RCM") (collectively, "Refco").

6.      Cargill represented to Stilton that it was confident in the "strategy," "resources" and "leadership" of Refco based on the "much time" it spent "deliberating" on the decision to sell.  Exhibit G.

7.      Only weeks after Cargill, Inc. sold the foreign exchange trading business to Refco for $209 million in cash plus an "earn-out" payment, Refco's Chairman, President and CEO, Phillip Bennett ("Bennett"), was arrested for securities fraud and Refco itself filed for bankruptcy.

8.      According to media accounts regarding Bennett's tenure at Refco, Refco's "leadership" was corrupt and its "resources" fraudulently overstated.

9.      Cargill, Inc. and CISFS substantially benefited by breaching their contracts with, and duties to, Stilton, when they transferred the Account and its contents to Refco.

10.　　Cargill, Inc. is bound to arbitrate here and is responsible for damages to Stilton because Cargill, Inc. is estopped from denying it is subject to arbitrate here, or, alternatively, is bound to arbitrate because it is the alter ego of CISFS.

11.　　At the time of Refco's bankruptcy filing, the Account had a credit balance (after forced liquidation of positions) of $54 million. That amount is now an unsecured claim in the Refco bankruptcy. Stilton received a distribution of just under $10 million in connection with Refco's confirmed chapter 11 plan (the "Plan"). Any further distributions to Stilton as a creditor under the Plan are being held up because of a preference lawsuit for $20 million against Stilton. Accordingly, Stilton currently has a $54 million claim (on which it has received only $10 million) in the Refco bankruptcy proceeding and is currently facing the referenced $20 million preference action. Stilton would not be facing this situation had Cargill not transferred the Account to Refco for Cargill's own pecuniary benefit.

**The Parties**

12.　　Stilton is a corporation duly organized and existing under the laws of the British Virgin Islands.

13.　　Upon information and belief, at all times relevant, defendant CISFS was a financial services company organized under the laws of the State of Delaware with its principal place of business at Sears Tower, Suite 2300, 233 South Wacker Drive, Chicago, Illinois, and was a wholly owned and controlled subsidiary of Cargill, Inc.

14.　　Upon information and belief, Linda L. Cutler, an attorney for Cargill, Inc. and the President and Chief Executive Officer of CISFS, caused CISFS to be dissolved on or about May 19, 2006, after Refco filed in bankruptcy.

15.    Upon information and belief, Ms. Cutler was acting in her capacity as an agent of Cargill, Inc. and at Cargill Inc.'s direction when she dissolved CISFS.  A copy of the certificate of dissolution is attached as Exhibit B.

16.    Upon information and belief, defendant Cargill, Inc. is a multinational, privately held corporation organized under the laws of the State of Delaware, with its principal place of business in Minneapolis, Minnesota.

**Jurisdiction to Arbitrate**

17.    Section 17 of the Account Agreement provides that "[a]ny controversy arising out of or relating to transactions in this Account, this Agreement or the breach hereof or thereof shall be settled by arbitration pursuant to the commercial arbitration rules of the American Arbitration Association."

18.    As set forth in ¶¶ 74-81 below, Cargill, Inc. is bound to arbitrate here because it accepted the benefits of the Account Agreement and is therefore estopped from refusing to arbitrate and because Cargill, Inc. is the alter ego of CISFS.

19.    Section 20 of the Account Agreement provides that New York law governs all disputes arising pursuant to the Account Agreement.

**Stilton Commences Forex Trading Through CISFS**

20.    Stilton first opened its Account with CISFS on October 17, 1997, the date upon which the Account Agreement, attached as Exhibit A, was executed.

21.    In the Account Agreement, CISFS agreed to "act as broker" for Stilton.  Ex. A, Preamble.

22.    The Account Agreement indicated that Stilton was "aware of the risks inherent in the trading of Foreign Exchange and is financially able to bear such risks and withstand any

losses incurred." Ex. A § 1. Stilton did not accept any risks other than those directly resulting from its trading activities. In fact, the Account Agreement represents that CISFS was owned and controlled by one of the largest, privately held corporations in the world – Cargill, Inc.

23.     Indeed, the Account Agreement states: "CISFS is ultimately owned by Cargill, Incorporated and is under the common control of Cargill, Incorporated…." Ex. A§ 21.

24.     Upon information and belief, Cargill, Inc. is the second largest privately held corporation in the world.

25.     Upon information and belief, Cargill Inc.'s business activities include purchasing, processing and distributing grain and other agricultural commodities and the manufacture and sale of livestock feed and ingredients for processed foods and pharmaceuticals.

26.     Upon information and belief, Cargill, Inc. also undertakes substantial business in commodities trading, including foreign exchange.

27.     Stilton relied, and Cargill knew that Stilton relied, on the size, reputation, creditworthiness and backing of CISFS' owner and controlling party, Cargill, Inc., when it decided to enter into the Account Agreement and entrust millions of dollars to the care of CISFS. By, among other things, indicating Cargill, Inc.'s ownership of CISFS in the Account Agreement, Cargill, Inc. and CISFS acknowledged and expected that customers would rely on the value of that relationship.

28.     The Account Agreement constituted a personal services contract because (a) it was executory; (b) any rights arising out of the Agreement were coupled with liabilities, and (c) the Agreement involved a relationship of personal credit and confidence.

**Stilton's Ownership of the Account Assets**

29.    "[F]or purposes of [the Account] agreement, as well as all other purposes, CISFS" intended to treat Stilton "as the owner of all cash balances, unrealized gains and/or losses and interest due or credited on the Account." March 9, 2000 Amendment to Account Agreement, attached as Exhibit C.  Similarly, CISFS represented that it would "document the customer's ownership interest in the Account through an entry on its books." *Id.*

30.    In other words, CISFS held any Account funds in a custodial capacity for the benefit of Stilton and those funds constituted Stilton's property.

31.    Based on its understanding of Cargill, Inc.'s financial strength and its historical support for its subsidiaries, Stilton entered into the Account Agreement assuming only minimal institutional risk with respect to its broker's ability to safeguard Stilton's own  assets.

**Cargill's Sale of Assets to Refco**

32.    On or about June 21, 2005, Refco Group Ltd., LLC ("as 'Purchaser'") and Cargill, Incorporated (as "Parent") entered into a Purchase and Sale Agreement (the "P&S Agreement"). A copy of the P&S Agreement is attached as Exhibit D.

33.    Neither Stilton nor CISFS were parties to the P&S Agreement.

34.    Notably, under the P&S Agreement, Cargill, Inc. did not transfer the ownership of CISFS to Refco in the sale transaction.  Rather, Cargill, Inc. agreed to cause CISFS to transfer its assets to Refco.

35.    In the P&S Agreement, CISFS (along with other Cargill, Inc. entities) was defined as an "Asset Seller." Exhibit D, Preamble at 1.  Pursuant to the terms of the P&S Agreement, Cargill, Inc. was defined as the "Parent." *Id.*  Under the P&S Agreement (Ex. D § 3.1):

> Parent shall cause the Asset Sellers to assign, convey, transfer and
> deliver to Purchaser [Refco] … all of the Asset Sellers' title, right

and interest in and to all of the assets, properties and rights
(wherever located) that are used or held for use in, primarily related
to or necessary for the Business.

36.     Among other things, the "assets, properties and rights" being transferred included

a category defined as "Assumed Contracts" which, upon information and belief, incorporated the

Account Agreement.  Ex. D § 3.2(a).

37.     Upon information and belief, under the P&S Agreement and specifically with

respect to the Assumed Contracts, Refco did not assume any of the Asset Sellers' (*e.g.,* CISFS)

obligations or liabilities arising "on or prior to the Closing Date."  Ex. D § 3.4(a).

38.     Further, upon information and belief, Refco only assumed the obligations of the

Asset Sellers after the Closing Date to the extent the Assumed Contracts were "effectively

assigned to Purchaser at the Closing."  Ex. D § 3.4(a).

39.     Under the terms of the P&S Agreement, CISFS was not a third-party beneficiary

of this provision and therefore could not benefit from any purported assumption of obligations by

Refco in the P&S Agreement.  *See* Ex. D § 15.9.

40.     Upon information and belief, Cargill, Inc. received, at the time of the closing of

the P&S Agreement, $209 million cash in consideration for performing its duties thereunder.  *See*

Amendment Number One to Purchase and Sale Agreement, attached as Exhibit E ¶ 2.

41.     Upon information and belief, under the P&S Agreement, in addition to the $209

million cash Refco paid Cargill, Inc. on the Closing Date, Refco was obligated to tender an

additional amount of no less than $67 million and not more than $192 million on or shortly after

August 31, 2007.  This amount was defined in the P&S Agreement as the "Post Closing Payment

Amount," and the determination of the actual amount to be paid within that delineated range was

contingent on the value of the "Post Closing Enterprise Value."  Ex. D at 8.

42.    In other words, upon information and belief, Refco was obligated to compensate Cargill with "bonus" money based on Cargill, Inc.'s success level in **"causing"** its subsidiaries to transfer their business over to Refco.  The more assets transferred to Refco, the more money made by Cargill, Inc.

43.    Cargill was therefore motivated to ensure that the Account of one of its top customers – Stilton – was passed on to Refco.

44.    Cargill contractually promised Refco that it would "cause" its customers to transfer their accounts over to Refco before even attempting to obtain its customers' consent to do so.

45.    Under New York law, which governed the Account Agreement, rights arising out of a contract cannot be transferred if they are coupled with liabilities or if they involve a relationship of personal credit and confidence.

46.    The only way in which Cargill, Inc. and CISFS could have legally delegated their duties under the Account Agreement, much less discharged their obligations thereunder, would be to have obtained a valid novation of the Account Agreement.  No such novation was ever obtained.

**Cargill's Announcements and Misrepresentations Regarding the Sale**

47.    On or about June 23, 2005, Bennett sent a letter to affected Cargill clients, including Stilton, regarding the P&S Agreement.  A copy is attached as Exhibit F.

48.    Upon information and belief, CISFS and Cargill, Inc. authorized Bennett to send the letter to Cargill's clients and make the representations therein in furtherance of Cargill, Inc.'s duty to cause the accounts to be transferred.  For example, Bennett made the following representation in his letter: "Looking to the future, we believe the combination of our two

operations will ensure that we possess the resources to preserve the uniqueness of our status and proprietary technology for all of our customers." Ex. F.

49.     Bennett's letter also reflected his intent to provide Stilton, and other Cargill customers, with a "seamless transition" from Cargill to Refco.

50.     On or about July 4, 2005, Cargill, Inc. caused another of its subsidiaries involved in the sale, CIS Ltd., to send a letter to clients, including Stilton. The letter to Mr. Jim Cone, Chief Operating Officer and Managing Director of Trading at Stilton, described Cargill's "provisional agreement to sell the entire **global** business of Cargill Investor Services to Refco" (emphasis added). The July 4, 2005 letter is attached as Exhibit G.

51.     That same July 4, 2005 letter stated that "The Cargill Leadership Team, in consultation with the senior management of CIS, **spent much time deliberating on this decision** and have concluded that this is an exciting and unique opportunity, underpinned by good strategic synergies between the two companies" (emphasis added).

52.     Upon information and belief, the phrase "Cargill Leadership Team" means the executives of Cargill, Inc., which was contractually obligated to Refco to "cause" the transfer of CISFS' accounts.

53.     The July 4, 2005 letter also represented that the Cargill Leadership Team had "confidence in the **strategy, resources and leadership** of Refco" (emphasis added). The same letter further stated that Refco had "the scale and resources" for the business. To further convince its clients, the letter stated that Cargill itself would be a client of Refco for five years.

54.     Upon information and belief, Cargill failed to conduct adequate due diligence of Refco in support of those representations and instead, focused its efforts on moving clients over, which would yield greater economic benefit to Cargill.

9

55.    In fact, Refco made no representations concerning its financial resources or leadership in the P&S Agreement.

56.    On or about August 15, 2005, Stilton received a letter from CISFS notifying Stilton that CISFS had agreed to sell certain of its assets to Refco Group LLC, the parent company of RCM and that "Your [A]ccount [Agreement] documentation will be assigned to RCM on August 31, 2005 unless you notify CISFS not to effect such assignment and we actually receive such notice at the CISFS address listed below prior to 5 p.m. on August 26, 2005. New documentation will not be required to transfer your account to RCM. . . . **Please be assured that after the transfer to RCM the service provided to you will continue without interruption**" (emphasis added).

57.    It is apparent that Cargill, Inc. caused that letter to be sent to Stilton in an effort to comply with its contractual obligations under the P&S Agreement.

58.    Notwithstanding the negative notice provision of the August 15 letter, on or about August 30, 2005, Mike Cartier, CISFS' account representative for the Account, contacted Stilton and stated that CISFS required Stilton's consent to assign the Account in order for Stilton to continue to trade its outstanding foreign exchange contracts.

59.    This call is evidence that Cargill knew that it could not effect an assignment of the Account Agreement on negative notice.

60.    At Cargill's urging and out of concern that trading operations could be interrupted, on or about August 30, 2005, after the deadline had passed, Stilton faxed a copy of the August 15 letter back to CISFS, and wrote "We agree, Sincerely, Jim Cone." A copy of the fax is attached as Exhibit H.

61.    Notably, the August 15, 2005 letter did not contain, as required under New York law to effect a novation, an express disclaimer of CISFS' or Cargill's liability stemming from, or in connection with, the transfer of the Account.

62.    Stilton reasonably relied on Cargill's representation in the August 15, 2005 letter that the service would be provided without any interruption, as well as all other prior representations and warranties made by or attributable to Cargill, especially representations that Refco was a solid company. Stilton did not assume that it would be taking on any additional risk to the extent it agreed to the transfer of its Account and did not release Cargill from its obligations to Stilton. In addition, it would have been difficult and prohibitively expensive to Stilton to transfer its business to another foreign exchange broker in the time available to it.

**The Collapse of Refco**

63.    Only **five weeks** after Stilton's account was transferred to Refco, on October 10, 2005, Bennett was suspended by the Refco Board for hiding $430 million in unpaid Refco debts dating to 1998. On October 12, 2005, Bennett was arrested and charged with securities fraud.

64.    Refco filed for chapter 11 bankruptcy protection one week later, on October 17, 2005.

65.    Cargill's representations that it "spent much time deliberating" on the Refco transaction, and the intimation that it, through due diligence, confirmed its confidence in Refco's "leadership" (*e.g.,* Bennett) as well as the "resources" of Refco (*e.g.,* assets overstated by **half a billion dollars**) were proven to be false and unwarranted just **five weeks** after the August 31 Closing Date.

66.    Similarly, CISFS' representation that the services under the Agreement would be continued "without interruption" was quickly proven to be false.

11

67.    At the time Cargill made the untrue representations referred to in ¶¶ 65-66 above, it knew that those representations of material facts were untrue and/or made those representations recklessly.

68.    Further, those untrue representations were offered to deceive Stilton and induce Stilton to consent to the assignment of the Account Agreement.

**Cargill Is Liable for Stilton's Losses Because There Was Never A Valid Novation**

69.    A novation would be required in order for the purported assignment to validly discharge Cargill, Inc.'s and CISFS' obligations pursuant to the Account Agreement.

70.    There was no novation here.

71.    Under New York law, a valid novation requires: a previously valid obligation; agreement of all parties to a new contract; extinguishment of the old contract, and a valid new contract.

72.    The old contract was never fully extinguished, nor is there evidence that a valid new contract is in existence.  The August 30, 2005 facsimile from Stilton to Cargill contains no language even suggesting that obligations under the original contract were being extinguished, nor is there any reference to a release.

73.    Further, Stilton could not (and did not) agree to any "new contract" because any purported consent to assignment was based on false and/or misleading information provided to Stilton by Cargill.  Any purported "consent" to an assignment of the Account Agreement by Stilton would have been invalidated by those misrepresentations.

**Cargill, Inc. Is Liable to Stilton And Is Subject to the**
**Jurisdiction of the Arbitration Panel Based on Estoppel**

74.    In addition, or in the alternative, Cargill, Inc. is estopped from arguing that it is

not bound by the terms of the Account Agreement because it knowingly exploited the Account

Agreement.

75.    Upon information and belief, Cargill, Inc. accepted the benefits of the Account

Agreement when it (a) acted in a manner consistent with the belief that it could legally cause a

transfer of that Agreement and then (b) purported to assign that Agreement in exchange for direct

compensation from Refco.

76.    For these reasons, Cargill, Inc. is required to arbitrate here and, further, is liable to

Stilton for its damages.

**Cargill, Inc. is Liable to Stilton As Alter Ego of CISFS**

77.    Cargill, Inc. may also be compelled to arbitrate here and faces liability for CISFS'

actions based on an alter ego theory.  As indicated in the Account Agreement, Cargill, Inc. was

the "ultimate[] owner" of CISFS.

78.    Cargill admitted in the P&S Agreement, which was filed with the Securities and

Exchange Commission, that it completely controlled its subsidiary, CISFS, and would be

contractually bound to "cause" the assets of its subsidiaries, including CISFS, to be transferred to

Refco.

79.    Upon information and belief, during the relevant period in which the Cargill

entities and Refco were negotiating the P&S Agreement, Cargill, Inc. controlled all negotiations

respecting P&S Agreement.

80.    Furthermore, upon information and belief, Cargill, Inc. dissolved CISFS in order

to strip its subsidiary of assets in order to render it judgment-proof.

81.     Upon the dissolution of CISFS, upon information and belief, CISFS transferred its assets to Cargill, Inc., including any assets it may have received which were generated from, *inter alia*, the transfer of Stilton's account to Refco.  Cargill, Inc.'s receipt of compensation from Refco, in respect of client accounts at CISFS, is further evidence that Cargill, Inc. was in complete control of CISFS and is therefore bound to arbitrate here and faces liability here.

### First Claim for Relief
### (Breach of Contract)

82.     Stilton repeats and realleges the allegations set forth in paragraphs 1 through 81 above as if set forth in full herein.

83.     CISFS entered into a binding contract, the Account Agreement, with Stilton in connection with the Account.

84.     Because there was no novation of the Account Agreement, CISFS and Cargill, Inc. remain liable under it.  Cargill is therefore liable for the damage caused to Stilton by Refco's defalcation.

85.     Alternatively, Cargill's purported assignment of the Account Agreement to Refco was invalid because it materially changed Stilton's level of risk, as Cargill caused the transfer of its assets from the custody of Cargill, Inc., the second largest privately held corporation in the world, to the custody of Refco, a corporation on the brink of financial disaster.

86.     Cargill breached its contractual obligation to act as Stilton's broker when its delegee Refco went bankrupt.

87.     As a result of Cargill's breach, Stilton has been damaged in an amount to be determined at hearing, but not less than $44 million exclusive of interest.

14

**Second Claim for Relief**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

88.    Stilton repeats and realleges the allegations set forth in paragraphs 1 through 81 above as if set forth in full herein.

89.    Cargill breached the implied covenant of good faith and fair dealing under the Account Agreement.  Specifically, because of the nature of the executory Account Agreement, Cargill had a duty to ensure that its customers, *e.g.*, Stilton's, assets were being placed in the hands of an entity capable of sufficiently guarding those assets.  Cargill acted in bad faith when it (a) failed to conduct proper due diligence, and, as a result, placed Stilton's property in the hands of a company (Refco) plagued by fraud; (b) represented that Refco was a solid company and (c) represented there would be no "interruption" in the services provided to Stilton.

90.    As a result of Cargill's various breaches, Stilton has been damaged in an amount to be determined at hearing, but not less than $44 million exclusive of interest.

**Third Claim for Relief**
**(Constructive Trust)**

91.    Stilton repeats and realleges the allegations set forth in paragraphs 1 through 81 above as if set forth in full herein.

92.    Stilton relied on Cargill when it agreed to transfer its Account to Refco, and Stilton based its reliance on the special nature of the relationship between Cargill and Stilton.  Stilton relied on Cargill's representations that it had spent "substantial time" assessing the leadership, resources and strategy of Refco, in which it said it was "confident."  Stilton further relied on Cargill's promise to Stilton that there would be no "interruption" in the services provided to Stilton.  Those representations turned out to be false when, only a few weeks later, it

became evident that Refco's leadership was corrupt, its resources overstated, and Refco went bankrupt.

93.    Cargill benefited by the transfer of Stilton's Account when it received compensation from Refco based on such transfer.

94.    Upon information and belief, all money generated by the sale and transfer of CISFS' assets to Refco went directly to Cargill, Inc.

95.    Cargill, Inc. may not, in good conscience, retain the beneficial interest of those sale proceeds and a constructive trust should be imposed on those proceeds.

96.    As a result of Cargill's actions, Stilton has been damaged in an amount to be determined at hearing, but not less than $44 million, exclusive of interest.

**Fourth Claim for Relief**
**(Unjust Enrichment)**

97.    Stilton repeats and realleges the allegations set forth in paragraphs 1 through 81 above as if set forth in full herein.

98.    Cargill, Inc. and CISFS were unjustly enriched as a result of the sale of assets to Refco, which sale included compensation for the transfer of Stilton's Account which at the time of transfer contained more than $55 million dollars in assets.

99.    Cargill, Inc. and CISFS benefited at the expense of Stilton and, as a result, should be held liable for damages sustained by Stilton.

100.    As a result of Cargill's actions, Stilton has been damaged in an amount to be determined at hearing, but not less than $44 million, exclusive of interest.

### Fifth Claim for Relief
### (Fraud in the Inducement)

101.    Stilton repeats and realleges the allegations set forth in paragraphs 1 through 81 above as if set forth in full herein.

102.    The purported "assignment" by and between Cargill and Stilton was invalid *ab initio* because it was based on Cargill's fraudulent representations, which were untrue and known to be untrue and/or recklessly made, regarding the viability of Refco to act as a comparable delegate of Cargill's duties. Examples of those representations included Cargill's stated "confidence" in the leadership and resources of Refco based on the substantial time it spent deliberating the P&S Agreement.

103.    Cargill made untrue statements which it knew were untrue and/or made those statements recklessly. Cargill was motivated to push the transaction through to obtain hundreds of millions of dollars in return for its "causing" certain assets, including Stilton's Account, to be transferred to Refco.

104.    Cargill intended to deceive Stilton and induce Stilton into consenting to an assignment of the Account Agreement. That consent was invalid because it was based on fraudulent misrepresentations.

105.    As a result of Cargill's fraudulently inducing it to permit the transfer of its account, Stilton has suffered damages in an amount to be determined at hearing, but not less than $44 million, exclusive of interest.

### Sixth Claim for Relief
### (Negligent Misrepresentation)

106.    Stilton repeats and realleges the allegations set forth in paragraphs 1 through 81 above as if set forth in full herein.

17

107. Stilton opened a foreign exchange trading account with CISFS in October of 1997.

108. CISFS served Stilton in the capacity of a broker, as well as in the capacity of a custodian of the Account. The relationship between Cargill and Stilton was not an ordinary business relationship. Stilton relied on the integrity and financial stability of Cargill when it opted to place millions of dollars of assets in Cargill's care. For example, Stilton believed that Cargill, Inc. would fully support any of CISFS' obligations in connection with the Account.

109. Based on the longstanding relationship between the parties, and based on the special nature of trust required in the context of this relationship, Stilton was entitled to, and did expect that Cargill would act in the best interests of its customers when it decided to sell assets to Refco and to rely on its representations. Events quickly proved that Cargill did not act in its customers' best interests, but rather, was motivated by financial gain at its customers' expense.

110. Cargill represented to Stilton that it had spent much time deliberating about the decision and that it was confident in Refco's resources, leadership and strategy. Stilton reasonably and detrimentally relied on those representations, which turned out to be untrue.

111. Upon information and belief, the compensation received by Cargill in connection with the sale of assets was contingent on the value of the accounts Cargill sent over to Refco. Thus, Cargill was motivated to "encourage" its customers to transfer their accounts. Cargill did so by making certain representations to Stilton, which were false and made negligently, at the very least.

112. Stilton also reasonably and detrimentally relied on Cargill's representation that "after the transfer to RCM the service provided to you will continue without interruption." That statement was false.

113.    Upon information and belief, Cargill failed to undertake adequate efforts to ensure its representations to Stilton were true and correct.  Stilton had the right to rely on Cargill's explicit representations that Refco was a solid company and that it would receive the same type of service, without interruption, once it consented to a transfer of its Account to Refco.  Stilton was entitled to, and did, rely on Cargill's expressed confidence in RCM's ability to act in the capacity as a custodian and broker of its Account.

114.    As a result of Cargill's negligent misrepresentations, Stilton has been damaged in an amount to be determined at hearing, but not less than $44 million, exclusive of interest.

**WHEREFORE**, Stilton demands judgment as follows:

(a) awarding Stilton compensatory damages or restitution against Cargill in an amount to be determined at hearing, but not less than $44 million, together with interest;

(b) awarding costs and disbursements; and

(c) awarding Stilton such other and further relief as the Panel deems just and proper.

New York, New York
June 20, 2007

SEWARD & KISSEL LLP

By: _____
Bruce G. Paulsen
Jeffrey M. Dine
Paula Odysseos

One Battery Park Plaza
New York, New York  10004
(212) 574-1200

Attorneys For Claimant Stilton International
        Holdings Ltd.

SK 25387 0004 781619 v6

# Exhibit 7

AMERICAN ARBITRATION ASSOCIATION

In the matter of the arbitration between

STILTON INTERNATIONAL HOLDINGS
LIMITED,

AAA Arbitration No. 50 148 T 00217 07

Claimant,

- against -

CIS FINANCIAL SERVICES, INC. and
CARGILL, INCORPORATED,

Respondents.

## ANSWERING STATEMENT OF CIS FINANCIAL SERVICES, INC. AND CARGILL, INCORPORATED TO CLAIMANT'S STATEMENT OF CLAIM

The Respondents, CIS Financial Services, Inc. and Cargill, Incorporated (together, "Respondents"), submit this Answering Statement ("Answer") to the Statement of Claim ("Statement") made by Stilton International Holdings Limited ("Stilton").

**ANSWER**

1.      Through May 19, 2006, CIS Financial Services, Inc. ("CISFS") offered over-the-counter foreign exchange brokerage services primarily to customers of its affiliates, Cargill Investor Services, Inc. and Cargill Investor Services Limited.  Prior to its dissolution on May 19, 2006, CISFS was a wholly-owned subsidiary of CIS Holdings, Inc., which, prior to its dissolution on May 19, 2006, was a wholly-owned subsidiary of Cargill, Incorporated ("Cargill").  Cargill, itself, is an international provider of food, agricultural, and risk management products and services.

2.      In October 1997, CISFS and Stilton entered into a Foreign Exchange Account Agreement ("Account Agreement"), under which CISFS acted as Stilton's broker for certain

over-the-counter foreign exchange transactions. As acknowledged by Stilton in its Statement, under the Account Agreement, Stilton assumed the risks inherent in the trading of foreign exchange and further represented to CISFS that it was financially able to bear such risks and withstand any losses incurred by it.

3.    The parties' relationship under the Account Agreement continued through August 31, 2005, at which time CISFS effectively assigned the Account Agreement to Refco Capital Markets, Ltd. ("RCM"), a member of Refco Group Ltd., LLC ("Refco Group"), with Stilton's consent (as described more fully below). Refco Group was, at that time, a leading provider of execution and clearing services for exchange-traded derivatives and one of the world's largest independent derivative brokers.

4.    The Account Agreement is not, as Stilton argues, a personal services contract requiring the personal knowledge, skill, judgment or taste of CISFS. On and after the assignment of the Account Agreement until October 18, 2005, RCM provided the brokerage and custodian services to Stilton as set forth in the Account Agreement. In fact, RCM was able to immediately step into CISFS's shoes and perform the brokerage and custodian services to Stilton under the original terms of the Account Agreement. Notably, this transfer required no new account documentation because the brokerage and custodian services previously provided by CISFS were also provided by RCM. In fact, many of the employees of CISFS became employees of Refco Group or one of its affiliated entities.

5.    Two months prior to the assignment, on June 22, 2005, Refco Group announced that it had entered into a definitive agreement to purchase the global brokerage operations of Cargill Investor Services, Inc. ("CIS") and affiliated companies. CIS was a wholly-owned, but separately managed, subsidiary of Cargill. CISFS was part of the CIS group of companies and

operated under the management of CIS.  That same day, CIS contacted its clients, including Stilton, by telephone to discuss the sale and the consequent opportunity for clients to move their accounts to Refco Group.

6.     Before the parties closed on the sale, Phillip Bennett, Chief Executive Officer and Chairman of the Board of Directors of Refco Inc., sent a letter to the clients of CISFS, including Stilton, dated June 23, 2005, to discuss the sale and Refco Group's brokerage capabilities.[1] Thereafter, on July 4, 2005, CIS sent a follow-up letter to its clients, including Stilton, to provide further detail regarding the Purchase and Sale Agreement.[2]  At no time during this process did Stilton object to the assignment of its account, nor did it express concerns to CIS regarding Refco Group's brokerage capabilities.  *In fact, during its initial telephone call with Stilton on June 22, 2005, CIS learned that Stilton was currently working with and already had a pre-existing relationship with Refco.*

7.     On August 15, 2005, CIS sent a letter to Stilton to effect the transfer of Stilton's trading account to RCM.[3]  The letter provided that Stilton's Account Agreement with CISFS and the related account would be assigned to RCM on August 31, 2005, the closing date, unless Stilton notified CISFS not to effect such assignment.  Stilton did *not* object to the assignment by CISFS and, in fact, on August 30, 2005, Jim Cone, Stilton's Chief Operating Officer, signed and returned the letter to CISFS, agreeing to the assignment.

---

[1] A copy of the letter from Mr. Bennett is attached as Exhibit F to the Statement filed by Stilton.

[2] A copy of the letter from CIS is attached as Exhibit G to the Statement filed by Stilton.

[3] A copy of the second letter from CIS is attached as Exhibit H to the Statement filed by Stilton.

8.    Despite Stilton's assertion to the contrary, the parties intended the assignment of Stilton's account on August 31, 2005 to constitute a novation of the Account Agreement.[4] Stilton was informed, through various letters and telephone calls, that Refco Group was acquiring all of CIS's brokerage operations.  As indicated in the letter dated July 4, 2005, following the closing of the sale, CIS would no longer provide brokerage services, as demonstrated by the transfer of brokerage services of its own parent corporation, Cargill, to Refco Group.[5]  As a sophisticated party,[6] Stilton understood, based upon the information provided prior to and in the letter dated August 15, 2005,[7] that CISFS could not continue to be a party under the Account Agreement because it no longer provided brokerage services. Accordingly, the parties intended to replace CISFS with RCM as a party to the Account Agreement, extinguishing CISFS's rights and obligations, and thereby creating a new agreement under which Stilton and RCM conducted business, at least until the Refco bankruptcy cases (as discussed below).

9.    Stilton consented to the substitution of RCM for CISFS on August 30, 2005, and CISFS's rights and obligations to Stilton under the Account Agreement were assigned to RCM.[8]

---

[4] Even if the account transfer initially constituted an assignment and delegation of CISFS's rights and obligations, Stilton's subsequent conduct converted the transfer into a novation.

[5] A copy of the July 4, 2005 letter from James Davison of CIS to Jim Cone of Stilton is attached as Exhibit G to the Statement filed by Stilton.

[6] By its own admission, Stilton is a sophisticated investor and held between $20 and $80 million in its foreign exchange account at any given time.  (Stilton Statement of Claim ¶ 3.)  Based upon the amount of foreign exchange transactions, Stilton undoubtedly conducted its own due diligence of Refco Group, either in connection with the account transfer or its own pre-existing and continuing relationship with Refco Group.

[7] A copy of the August 15, 2005 letter from CISFS to Stilton is attached as Exhibit H to the Statement filed by Stilton.

[8] CISFS and Refco Group also consented to the transfer to Refco Group of CISFS's rights and obligations under the Account Agreement under the terms of the Purchase and Sale Agreement, which is attached as Exhibits D and E to the Statement filed by Stilton.

4

Stilton later acknowledged, in various pleadings filed in the Refco bankruptcy cases, that: "RCM is the successor to CIS Financial Services Inc. ("CISFS") under that certain Foreign Exchange Account Agreement dated October 17, 1997 between CISFS and Stilton," under which RCM acted as broker and custodian for Stilton, as customer. (*See* Exhibit E (Memorandum of Law of Stilton) at p. 2.)  Based on Stilton's conduct, including these prior representations to the Bankruptcy Court, any claim by Stilton that a novation did not occur is disingenuous.

10.    To effect the sale, Refco Group and Cargill entered into a Purchase and Sale Agreement on June 21, 2005, which was subsequently amended by Amendment Number One to Purchase and Sale Agreement dated as of August 31, 2005 (as amended, the "Purchase and Sale Agreement").[9]  Under the terms of the Purchase and Sale Agreement, Cargill caused certain of its subsidiaries (defined in the Purchase and Sale Agreement as the "Sellers") to sell certain of their assets and shares of capital stock to Refco Group.  The sale closed on August 31, 2005 ("Closing Date").

11.    In consideration for the sale, Refco Group paid Cargill $208,600,000 in cash at closing and further assumed certain liabilities, including the obligations of CISFS arising under the Account Agreement after the Closing Date.  Refco Group was further obligated to pay Cargill a post-closing payment amount of not less than $67,000,000 and no more than $192,000,000, based on the performance of the acquired operations within the two-year period after closing (this was not, as Stilton suggests, "bonus" money).  Due to Refco Group's bankruptcy filing, the post-closing payment amount has not and will never be paid in full. Obviously, given the two-year post-closing performance period, Cargill did not anticipate that Refco Group and its affiliates would cease operations shortly after the sale closed.

---

[9] A copy of the Purchase and Sale Agreement is attached as Exhibits D and E to the Statement filed by Stilton.

12.     In fact, in conjunction with the Purchase and Sale Agreement, the parties executed and delivered certain other related agreements regarding the sale of the assets and shares. Among the related agreements was an Exclusivity Agreement dated as of August 31, 2005 ("Exclusivity Agreement"), under which Cargill agreed to use Refco Group, and cause numerous of its affiliated entities to use Refco Group, exclusively, for clearing services previously provided to Cargill's business units by CIS for a period of 5 years after the Closing Date. A copy of the Exclusivity Agreement is attached as Exhibit A.

13.     Cargill clearly expected to conduct business with Refco Group and its affiliates until at least August 31, 2010.[10]

14.     Less than two months after the sale between Refco Group and Cargill closed, on October 17, 2005 ("Petition Date"), Refco Group and approximately 25 of its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). Although not obligated to do so, from and after the Closing Date through the Petition Date, Stilton continued to do business with Refco Group under the Account Agreement.

15.     The Debtors commenced their bankruptcy cases, in large part, as a result of certain fraudulent actions taken by Phillip Bennett, Refco Inc.'s Chief Executive Officer. Through an internal review, Refco Inc. discovered a receivable owed to it by an entity controlled by Mr. Bennett in the amount of approximately $430 million. This revelation was brought to the attention of the company's Chief Financial Officer and then to the company's audit committee, which immediately hired professionals to commence an investigation. On October 10, 2005,

---

[10] Also in conjunction with the sale, Cargill and its affiliated entities agreed to provide certain services to Refco Group to assist in the transition of their businesses to Refco Group. Accordingly, at closing, Cargill executed and delivered to Refco Group a Transition Services Agreement dated as of August 31, 2005 ("Transition Services Agreement"). A copy of the Transition Services Agreement is attached as Exhibit B.

Refco Inc. informed its customers that its previously issued financial statements could no longer be relied upon.  At the request of the Board of Directors, Mr. Bennett took a leave of absence. And on Tuesday, October 11, 2005, Mr. Bennett was arrested.

16.  According to the Debtors, the disclosure of the financial statement irregularities together with the news of Mr. Bennett's arrest precipitated a crisis at Refco Inc. that evolved at an incredibly rapid pace.  Customers at all of the company's businesses sought to withdraw cash, securities and other property on deposit with the company in a manner that rapidly turned into a "run on the bank," resulting in a liquidity crisis.  Given the actions taken by Mr. Bennett, no one, including the Respondents, could have predicted the Debtors' bankruptcy cases or the effect on their creditors.  In fact, until the October 10th announcement was made, none of Refco's customers, including Cargill, knew, or could have known, about the impending crisis at Refco. Refco's bankruptcy cases took Cargill, Stilton, and many other major financial institutions by surprise.

17.  The Debtors quickly sold a substantial portion of their businesses to Man Financial Inc. ("Man Financial"), including the regulated, exchange-traded brokerage operations purchased from Cargill.  On November 14, 2005, the Bankruptcy Court approved the sale ("Asset Sale").  Shortly after the Asset Sale closed, Refco Group informed Cargill of its intention to assume and assign the parties' Exclusivity Agreement to Man Financial but not assume (and thereby satisfy obligations under) the Purchase and Sale Agreement, including payment of the post-closing payment amount.  Refco Group also took the position that no cure amounts were due to Cargill as a condition to assigning the Exclusivity Agreement.

18.  Cargill contested the validity of Refco Group's assignment of the Exclusivity Agreement.  By order dated February 14, 2006, the Bankruptcy Court upheld the assignment.

Cargill appealed that order to the United States District Court for the Southern District of New York, which affirmed the order. Cargill then appealed to the United States Court of Appeals for the Second Circuit.

19.     The parties settled their dispute, including the numerous claims filed by Cargill and its related entities in the Debtors' bankruptcy cases, pursuant to a Settlement Agreement dated as of April 11, 2007 ("Settlement Agreement"). A copy of the Settlement Agreement is attached as Exhibit C.

20.     Under the terms of the Settlement Agreement, the Debtors agreed to allow the pre-petition claims of Cargill and its affiliates in the aggregate amount of $150,574,247.42. These claims arise under and in connection with the Purchase and Sale Agreement, the Exclusivity Agreement and Transition Services Agreement for, among other things, foreign exchange transactions, payments under customer guarantees, transition services and Refco Group's post-closing payment obligation.

21.     The Debtors also agreed to pay Cargill on its administrative expense claim totaling $1,301,584.21, for, among other things, postpetition transition services rendered for the benefit of Refco Group under the Transition Services Agreement and amounts paid by certain Cargill entities to third-party vendors.

22.     Like Stilton, Cargill will only receive a pro rata distribution on its allowed pre-petition claims in accordance with the Debtors' Chapter 11 plan. The Debtors filed their Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries on or about October 20, 2006, as modified by the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries dated December 4, 2006 (as subsequently amended or modified, the "Plan"). The Plan became effective on December 26, 2006, at which time the

8

Debtors began implementing its terms, including making pro rata distributions to the Debtors' creditors.

23.    The Debtors' disclosure statement, under which they explain, in detail, the terms of their Plan, estimates the percentage distribution they anticipate making on each of the various categories of claims filed against them in the bankruptcy cases. Based on the Debtors' estimates, Cargill and its affiliates stand to *lose* approximately $108,608,905 as a result of the Refco bankruptcy cases.

24.    Given the anticipated losses Cargill will suffer, it is clear that Cargill has not substantially benefited (and will not substantially benefit), as Stilton suggests, from the sale of its global brokerage operations to Refco Group. In fact, Cargill will never be fully paid for the business it sold to Refco Group.

25.    Stilton also has filed a pre-petition claim in the Debtors' bankruptcy cases, totaling $54,000,000. Stilton filed its claim on July 12, 2006. A copy of the claim is attached as Exhibit D. In its claim, Stilton confirms and acknowledges the transfer of its account from CISFS to Refco Group. Stilton states, "[o]n August 31, 2005, upon the sale of CISFS's business to RCM, RCM began to act as broker and custodian to Stilton." (*See* Exhibit D at ¶ 4.) Stilton's claim against the Debtors arises under the Account Agreement. (*Id.* at ¶ 2.)

26.    In pleadings filed with the Bankruptcy Court, Stilton has made the following additional representations:

(a)    "RCM is the successor to CIS Financial Services Inc. ("CISFS") under that certain Foreign Exchange Account Agreement dated October 17, 1997 between CISFS and Stilton." (*See* Exhibit E (Memorandum of Law of Stilton) at p. 2);

(b)    "In the August 15 Letter, CISFS proposed to transfer the Account to RCM and provided that the account documentation would be assigned to RCM on August 31, 2005. Effective August 31, 2005, the Account has transferred to RCMI, which began to act as broker and custodian to Stilton." (*See* Exhibit F (Complaint of Stilton) at ¶¶ 19-20); and

(c)    "Stilton International Holdings has always enjoyed an excellent relationship with Cargill Investor Services Limited and subsequently with Refco Capital Markets (RCM). In particular we have always enjoyed a professional and courteous relationship with the personnel at each organization. We are both alarmed and concerned with the recent events regarding the future of RCM." (*See* Exhibit G (Letter to RCM from Stilton dated October 19, 2005, Exhibit E to Declaration of John R. Ashmead filed on behalf of Stilton.)

27.    As evidenced by Stilton's representations to the Bankruptcy Court, Stilton knew and understood that its account and the Account Agreement had been transferred from CISFS to RCM. What is more, Stilton continued to transact business with the Refco entities through the Petition Date and believed, like many of Refco's customers, that it had an "excellent relationship" with these entities until Bennett's fraudulent activities were discovered and the ensuing run on the bank forced the Debtors out of business. To suggest, based on these undisputed facts, that Cargill somehow set out to "deceive" and "induce" Stilton by making reckless, false and untrue representations is simply unfounded.

## GENERAL DENIAL

Accordingly, Respondents deny each and every allegation of the Statement, except that they do admit that CISFS and Stilton entered into an agreement to arbitrate the dispute between the parties, and further deny that Stilton is entitled to any recovery or relief sought or alleged by reason of any act, omission, or conduct on the part of Respondents.

## AFFIRMATIVE DEFENSES

28.    The Statement fails to state a claim against Respondents upon which relief can be granted.

29.    Any losses suffered by Stilton are barred by the doctrines of waiver, estoppel, consent, assumption of risk, and laches.

30.     Any injury or damage that Stilton may have sustained was proximately caused by the acts, omission, or fault of persons over whom Respondents exercised no control and for which acts, omissions, or fault Respondents cannot be held liable.

31.     Any injury or damage that Stilton may have sustained was voluntarily assumed by Stilton.

32.     Any injury or damage that Stilton may have sustained was proximately caused by the failure of Stilton to mitigate its damages.

33.     Respondents acted at all times in compliance with the Account Agreement, and further acted reasonably and in good faith at all material times based on all relevant facts and circumstances known by them at the time it so acted.

34.     Respondents owed no duty to Stilton after the Closing Date.

35.     Stilton has brought this action against Respondents without substantial justification, and Respondents are entitled to reasonable attorneys fees and costs.

36.     Respondents reserve the right to assert additional defenses to Stilton's claims as investigation and discovery may warrant.

## CONCLUSION

Respondents request that the arbitration panel:

(a)     Find that Respondents did not breach the Account Agreement or their contractual, fiduciary, or other legal obligations to Stilton;

(b)     Dismiss all of Stilton's claims against Respondents;

(c)     Award Respondents their costs, attorneys fees, and expenses incurred in connection with the arbitration, including fees or costs of the AAA and the arbitrators; and

(d)     Such other, further and different relief as the arbitration panel deems just and proper.

11

Dated:  July 19, 2007

FAEGRE & BENSON LLP

Michael B. Fisco
Abby E. Wilkinson
Theresa H. Dykoschak
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
E-mail:  mfisco@faegre.com
         awilkinson@faegre.com
         tdykoschak@faegre.com

*Attorneys for Respondents CIS Financial
Services, Inc. and Cargill, Incorporated*

## PROOF OF SERVICE

The undersigned hereby certifies that on this 19th day of July, 2007, a true and correct copy of the foregoing Answering Statement of CIS Financial Services, Inc. and Cargill, Incorporated to Claimant's Statement of Claim was served upon the following attorney of record for Claimant via First Class Mail, postage pre-paid, and via electronic mail:

Bruce G. Paulsen
Seward & Kissel LP
One Battery Park Plaza
New York, NY  10004
Telephone:  212.574.1533
Facsimile:  212.480.8421
E-mail:  Paulsen@sewkis.com

Brenda L. Walz

fb.us.2177642.02

12

# Exhibit 8

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 10

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# Exhibit 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 12

## Foreign Exchange Account Agreement Addendum

*Stilton*
_____
Customer Name

5001P
_____
Account Number

**Agreement
To
Pay
Interest**

**CIS Financial Services, Inc.**
233 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606

## DEFINITIONS

**"Cash Balance"**

The outstanding cash balance in each currency as reported in the Ending Account Balance section of the customers Cash Foreign Exchange Statement for each day during the prior month.

**"U.S. Treasury Bill Rate"**

The median point between the bid and ask price of the current __90__ day Treasury Bill discount rate for each day during the prior month as published in the Midwest edition of the Wall Street Journal.

## ADDENDUM TO FOREIGN EXCHANGE ACCOUNT AGREEMENT / NON-U.S.

### Purpose

The purpose of this agreement is to ensure compliance with certain U.S. tax rules relating to the payment of interest by CISFS to Non-U.S. clients. The agreement also specifies the terms of interest paid to the account(s).

### Interest Calculation

CISFS agrees to pay the customer account(s) (the "Account"), identified below, interest on the cash balance in the Account as follows:

For U.S. Dollar credit balances, payments will be made monthly and will be equal to the summation of the Cash Balance, multiplied by ___100%___ of the ___90___ day rate for U.S. Treasury Bills publicly issued during the month divided by 360, for each calendar day in the month. The balance used will be the daily ending account balance in the Account; and

### Ownership

For purposes of this agreement, as well as all other purposes, CISFS will treat the undersigned customer as the owner of all cash balances, unrealized gains and/or losses and interest due or credited on the Account. CISFS will document the customer's ownership interest in the Account through an entry on its books.

### Transfer of Account

If at any time the customer wishes to transfer ownership of all or part of the Account, including any due or credited interest, the transfer will be effective only if CISFS receives:

(a)     a written request signed and notarized by the customer and by the party to whom the customer wishes to transfer the Account (the "Transferee"); and

(b)     an accurately completed and signed I.R.S. Form W-8 from the Transferee; and

(c)     all necessary CISFS new Foreign Exchange Account Agreements for the Transferee.

No transfer shall be effective until CISFS records the Transferee's name as the owner of the Account on its books. Further, in no event can the Account be transferred to anyone who would not be eligible to open a new account with CISFS directly.

### Acknowledgement

Acknowledged this _9_ day of _March_, 19 _2000_

Account Name: _____ Stilton _____

Account Number(s): _____ 5001P _____

By: _____
(Signature of Authorized Person)

Title: _Harald McPike   President Stilton International_
(Title of Authorized Person)

# Exhibit 13

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 14

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 15

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# Exhibit 16

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# Exhibit 17

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY